IAiTHERH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

RAMON HERNADEZ,
*on behalf of himself,*
*FLSA Collective Plaintiffs*
*and the Class, et al.,*

             Plaintiffs,

        v.                  17 CV 9541 (RJS)

BETWEEN THE BREAD 55th INC.,
et al.,

             Defendants.

------------------------------x

                     New York, N.Y.
                     October 18, 2018
                     12:00 p.m.

Before:

            HON. RICHARD J. SULLIVAN,

                     District Judge

            APPEARANCES

LEE LITIGATION GROUP
    Attorneys for Plaintiffs
BY:  WILLIAM BROWN

SMITH, GAMBRELL & RUSSELL
    Attorneys for Defendants
BY:  TODD DOBRY
    YASH DAVE


ALSO PRESENT:  STEVEN MALDONADO, Spanish interpreter

IAiTHERH

1          (Case called)

2          THE COURT:  All right.  Good afternoon.  Let me take

3     appearances.  For the plaintiffs?

4          MR. BROWN:  William Brown for the plaintiff, and I

5     also have with me in the gallery --

6          THE COURT:  Tell me who is at the table with you

7     first.

8          MR. BROWN:  This is Jane Wang, also have Radames Duran

9     who is going to be assisting me.

10          THE COURT:  Okay.  Ms. Wang, is that right?

11          MS. WANG:  Yes.

12          THE COURT:  And?

13          MR. BROWN:  Radames Duran.

14          THE COURT:  And who is here with you in the back?

15          MR. BROWN:  We have five plaintiffs, Jorge Menendez,

16     Carlos Gonzalez, Constantino Hernandez --

17          THE COURT:  Hernandez?

18          MR. BROWN:  Hernandez.

19          Jose Reyes.

20          THE COURT:  The baseball player?

21          MR. BROWN:  No.

22          THE COURT:  Not the baseball player.

23          MR. BROWN:  Not the same guy.  And Mauro Teutle.

24          THE COURT:  What's the last name.

25          MR. BROWN:  Teutle, T-E-U-T-L-E.

1          THE COURT: Okay. Good afternoon. And everyone

2     speaks English or no?

3          MR. BROWN: No, we have an interpreter.

4          THE COURT: Okay. From the defendants?

5          MR. DOBRY: Good afternoon, your Honor, Todd Dobry and

6     Yash Dave on behalf of the defendants.

7          THE COURT: Okay. And with you at counsel table?

8          MR. DOBRY: We have Ms. Eisen, your Honor, she's a

9     defendant, and then this is a witness for this afternoon, Gina

10    Puppo.

11         THE COURT: All right. Thanks.

12         So we're here for a hearing because I guess there are

13    disputed issues of fact with respect to what exactly has gone

14    on since this suit was filed, and particularly with respect to

15    meetings related to arbitration agreements that would

16    effectively take this case out of federal court and move it to

17    an arbitrator's panel arguably, and would affect the ability of

18    other plaintiffs to join this litigation if there were an

19    arbitration agreement that was enforceable.

20         So we have had some submissions on this, there's been

21    some back and forth on this. I hoped it was resolvable, but

22    seems like it isn't or hasn't been. So I scheduled this

23    hearing at which I proposed to hear from the witnesses that

24    were at the meetings to hear exactly what went on, and then I

25    guess I'll be the fact finder to assess credibility with

IAiTHERH

1    respect to whether or not there's been an improper attempt to

2    interfere with this litigation.  That's really the issue.

3            So I'm not married to any particular order.  It does

4    seem to me that it might be most efficient to hear from the

5    defense witness first and then hear from the plaintiffs, but we

6    don't have to do it that way.  Do you have a view?

7            MR. BROWN:  I would prefer to have the plaintiffs

8    testify first.

9            THE COURT:  Why?

10           MR. BROWN:  Well, one, there's five of them and they

11   have taken off from work, and if they could leave earlier,

12   they're able to leave here, I think it's the better.  And also

13   I think it makes more sense to hear their side version of the

14   facts and compare with it the defendant's version.

15           THE COURT:  The defense version changed a couple of

16   times, that's why it seems to me it would be more efficient to

17   do it that way, because that's sort of -- I guess I would like

18   to hear whether there's one or now a third version that is

19   being pushed by the defendants.  So that was my thinking.  Do

20   you have a view?

21           MR. DOBRY:  Yes, your Honor.  First I would say that

22   defendant's position hasn't changed.

23           THE COURT:  Well, okay.

24           MR. DOBRY:  But I'm not opposed to plaintiffs going

25   first, since it is their burden of proof here, I just invoke

IAiTHERH

1    the rule, your Honor.

2              THE COURT:  The rule?

3              MR. DOBRY:  Yes, the sequester the witnesses.

4              THE COURT:  All right.  Some of them are parties,

5    right, they're all parties?

6              MR. DOBRY:  No, your Honor, none of the witnesses

7    today are parties.

8              MR. BROWN:  That's not entirely true, they're opt-ins.

9              THE COURT:  Jose Reyes is a party, right?

10             MR. DOBRY:  They're not named plaintiffs, your Honor.

11             THE COURT:  Well, they're listed on the docket sheet

12   as plaintiffs.  So I mean if this were a trial I wouldn't have

13   them excused, they would be sitting throughout the trial.

14             MR. DOBRY:  That's fine for opt-in plaintiffs, your

15   Honor.

16             THE COURT:  Okay.  So how many are opt-in plaintiffs?

17             MR. BROWN:  Well, Jose Reyes is named and the rest are

18   opt-ins, everyone is opt-ins to this action.

19             THE COURT:  Teutle is not named.  A different Mauro

20   Teutle is named, right?

21             MR. BROWN:  Yes.

22             MR. DOBRY:  Jorge Menendez is not a party, your Honor.

23             THE COURT:  That sounds right.  And Mr. Gonzalez does

24   not appear to be a party.  Mr. Hernandez, that's Ramon

25   Hernandez or a different Hernandez?  Constantino Hernandez,

IAiTHERH

1  which Hernandez did you say?

2        MR. DOBRY:  Jorge Menendez is not a party.

3        THE COURT:  He's not, but there's a Hernandez, I

4  didn't catch the first name.

5        MR. DOBRY:  Present today I believe it is Constantino

6  Hernandez.

7        THE COURT:  So he's on the docket sheet as a

8  plaintiff.  So look, I don't feel that strongly about it.  If

9  you feel -- is there some reason why we should be sequestering

10 parties from the testimony of other parties?

11       MR. BROWN:  I see absolutely no reason for it,

12 especially since they were pretty much at the same place at the

13 same time.

14       MR. DOBRY:  Your Honor, I add that -- point out for

15 sequestering that they did provide five virtually identical

16 declarations in anticipation of today.

17       THE COURT:  That is true.  I'm a fact finder, I guess

18 I have the leeway to do this.  Let's just take all the

19 witnesses one at a time.

20       So your witness is also going to step outside?

21       MR. DOBRY:  Yes, your Honor.

22       THE COURT:  Who will we call first?

23       MR. BROWN:  We'll do Jose Reyes.

24       THE COURT:  If you could ask the other witnesses to go

25 out into the hall, we'll begin with Mr. Reyes.

IAiTHERH                    Reyes - Direct

1            I'll have the interpreter state his name.

2            THE INTERPRETER:  Steven Maldonado, M-A-L-D-O-N-A-D-O.

3            (Interpreter sworn)

4            THE COURT:  And if I could ask the witness to raise

5   his hand.

6    JOSE REYES,

7        called as a witness by the Plaintiffs,

8        having been duly sworn, testified as follows:

9   DIRECT EXAMINATION

10  BY MR. BROWN:

11           THE COURT:  If you state your name and spell your name

12  for the record.

13           THE WITNESS:  Jose Reyes, J-O-S-E  R-E-Y-E-S.

14           THE COURT:  And Mr. Reyes, just keep your voice up

15  nice and loud.  Only answer the questions put to you and this

16  will go much more efficiently.  Okay?

17           THE WITNESS:  Okay.

18           THE COURT:  You may proceed.

19           MR. BROWN:  Thank you.

20  BY MR. BROWN:

21  Q.  When did you first start working for Between the Bread?

22  A.  October 2017.

23  Q.  And what was your position when you were hired?

24  A.  Delivery guy.

25  Q.  And has your position ever changed?

1    A.  Yes, about six months ago they made me assistant to

2    catering.

3              THE COURT:  Assistant to catering?

4              THE WITNESS:  Yes.

5    Q.  Did your actual job duties change at all when your title

6    changed?

7    A.  A little.

8    Q.  And how?

9    A.  We had to do things like help the person who was packaging

10   and doing things like bringing things to offices, which at

11   first I did not have to do.

12   Q.  Are you still employed by Between the Bread?

13   A.  No.

14   Q.  When did you stop working there?

15   A.  August 25th.

16   Q.  I'm going to show you a document --

17             MR. BROWN:  May I approach?

18             THE COURT:  Yes.  What exhibit is this?

19             MR. BROWN:  Plaintiff's Exhibit 1, and I think we

20   agreed to admissibility.

21             THE COURT:  So we stipulated to this or no?

22             MR. DOBRY:  Exhibit 1, yes.

23             THE COURT:  That's received.

24             (Plaintiff's Exhibit 1 received in evidence)

25   Q.  Please review what is marked as Exhibit 1.

IAiTHERH                          Reyes – Direct

1   A.  Yes.

2   Q.  And before today, have you ever seen this document?

3   A.  Yes.

4   Q.  When was the first time that you saw this document?

5   A.  July 13, 2018.

6   Q.  And before July 13, 2018, had you seen this document before

7   that date?

8   A.  No.

9   Q.  Do you recall who gave you that document?

10  A.  Yes.

11  Q.  And who gave you that document?

12  A.  Gina.

13  Q.  And was Gina previously in this courtroom?

14          THE COURT:  Who is Gina?

15  A.  Yes.

16          THE COURT:  Who is Gina?

17          THE WITNESS:  Gina.  The way I understood, she was the

18  person in charge of the documents in the office.

19          THE COURT:  Did she work in the same place you worked?

20          THE WITNESS:  Not the same place, no, but in the same

21  company, yes.

22          THE COURT:  How many times have you seen her in your

23  life?

24          THE WITNESS:  Like three times.

25          THE COURT:  When was the last time?

1           THE WITNESS:  When she gave me the document.

2           THE COURT:  Before today?

3           THE WITNESS:  Yeah.

4           THE COURT:  When did she give you the document?

5           THE WITNESS:  July 13.

6           THE COURT:  Go ahead.

7   BY MR. BROWN:

8   Q.  What did you understand Gina's job to be?

9   A.  Simply the paperwork of the company, paperwork, yeah.

10  Q.  And on July 13, do you recall approximately what time you

11  received the document?

12  A.  It was like in the morning, like at 10, between 10 and 11

13  in the morning.

14  Q.  And when you received the document, did she give the

15  document to you one by one or were you part of a group?

16  A.  Like part of a group.

17  Q.  And how many people were in the group?

18  A.  Seven or eight people.

19  Q.  And who were these other seven or eight people?

20  A.  It was other co-workers that also did deliveries.

21  Q.  So it was people who had the same position as you?

22  A.  Yes.

23  Q.  Did Gina say anything to you as she was distributing the

24  document?

25  A.  Yes, she tried to explain to us and told us that we had to

IAiTHERH                          Reyes - Direct

1    sign it.

2    Q.  Did she just give you this document or did she give you

3    other documents as well?

4    A.  Just this one.

5    Q.  Did she attempt to describe what this document was?

6    A.  Yes, but I did not understand her.

7    Q.  So at the time --

8          THE COURT:  Why did you not understand her?  She was

9    speaking in English?

10          THE WITNESS:  No, because we were all in a group so I

11    couldn't really hear her well.  I couldn't hear her well and I

12    didn't understand.

13          THE COURT:  What language was she speaking?

14          THE WITNESS:  English.

15          THE COURT:  Do you speak English enough to understand

16    what she was saying?

17          THE WITNESS:  Yes.

18          THE COURT:  All right.  Go ahead.

19    BY MR. BROWN:

20    Q.  At the time that you received the agreement, did you

21    understand what it was?

22    A.  Yes.

23    Q.  What was your understanding?

24    A.  That if I signed the paper I would not be able to start a

25    lawsuit with the company if I had a problem with them.

IAiTHERH                          Reyes - Direct

1    Q.  And do you know if -- did you hear that Gina was

2    distributing this agreement prior to July 13 to any other

3    employees?

4              MR. DOBRY:  Objection, hearsay.

5              THE COURT:  Sustained.  I don't care whether he heard

6    that from someone else.  Next question.

7    Q.  Do you know how many other employees received the agreement

8    on July 13?

9              MR. DOBRY:  Objection, speculation.

10             THE COURT:  Well, do you know how many -- let me make

11   sure I understand the question.  Do you know how many other

12   employees received the agreement on July 13?

13             Well, how many other employees were in the room with

14   you when you got the agreement?

15             THE WITNESS:  Seven.

16             THE COURT:  Go ahead.

17   BY MR. BROWN:

18   Q.  And you said previously that you were required to sign this

19   agreement?

20   A.  Yes, it was like an obligation.

21   Q.  Did you attempt to have her explain the document at all?

22   A.  No.

23   Q.  Did she take any questions about the document?

24   A.  No.

25   Q.  After the agreement was distributed, did you discuss this

1    with your co-workers?

2    A.   Yes.

3    Q.   And what did you discuss with your co-workers?

4    A.   That we weren't going to sign it.  We were all in agreement

5    not to sign it.

6    Q.   And why did you make this agreement not to sign it?

7    A.   Because we were part of this lawsuit.

8    Q.   So the people you discussed it with were all part of the

9    lawsuit?

10             MR. DOBRY:  Objection, speculation.

11             THE COURT:  Well, overruled.  Do you know whether the

12   people you spoke -- let me rephrase.

13             You said you spoke to some other people, right?

14             THE WITNESS:  Yes.

15             THE COURT:  Were the people you spoke to all

16   associated with this lawsuit?

17             THE WITNESS:  Yes.

18             THE COURT:  What do you mean by "associated with?"

19             THE WITNESS:  That we knew that we all had this

20   lawsuit and the person I spoke with, we knew that we had signed

21   into this lawsuit.

22             THE COURT:  Well, you had opted into the lawsuit as

23   plaintiffs.

24             THE WITNESS:  No.

25             THE COURT:  So I'm not sure what you mean.

1            THE WITNESS:  In other words, what do you refer by

2     that?

3            THE COURT:  You said we had signed into this lawsuit,

4     how did you sign into the lawsuit?

5            THE WITNESS:  Oh, I got the paper and I brought it to

6     the attorney's office.

7            THE COURT:  So this was the paper that allowed you to

8     opt into the case as a plaintiff, is that right?

9            THE WITNESS:  Yes.

10           THE COURT:  Go ahead, next question.

11    BY MR. BROWN:

12    Q.  So you said earlier that you believe that you could be

13    terminated, so if you believed that you could be terminated,

14    why didn't you sign the agreement then?

15    A.  Because we all came to the agreement not to sign and we did

16    not think that they were going to fire all of us.

17           THE COURT:  When was this?  Do you remember the date?

18           THE WITNESS:  It was like around the date that they

19    gave us the document, two days later, three days later.

20           THE COURT:  Do you remember the day?

21           THE WITNESS:  No.

22           THE COURT:  Do you remember the month?

23           THE WITNESS:  July.

24           THE COURT:  Go ahead.

25    Q.  Do you know anyone who signed the agreement?

1           MR. DOBRY:  Objection, speculative.

2           THE COURT:  Overruled.

3     A.  Yes.

4     Q.  And who do you know that signed the agreement?

5     A.  Christian.

6     Q.  And who is Christian?

7     A.  He was a deliveryman as well, co-worker.

8           THE COURT:  How do you know he signed it?

9           THE WITNESS:  He signed it because he told me he did.

10    Q.  And did you ask him why he signed the agreement?

11    A.  Yes, because he said he did not want to lose the job or be

12    let go.

13          MR. DOBRY:  Objection.

14          THE COURT:  It does seem to be hearsay.  Is there some

15    non-hearsay reason?

16          MR. BROWN:  I believe it's a non-hearsay statement.

17    He's not saying it for the fact of the matter asserted, this

18    just proves that.

19          THE COURT:  What's it prove?  Tell me what it proves

20    without it being a hearsay reason.  I'm dying to hear this.

21          MR. BROWN:  His statement is his impression of the

22    statement from this individual.

23          THE COURT:  And why do I need his -- why is his

24    impression of another person's statement relevant to this

25    hearing?

1          MR. BROWN:  His impression was that Christian signed

2     it because he was being forced to sign, so his impression --

3          THE COURT:  Why do I care whether I thinks Christian

4     was forced to sign?

5          MR. BROWN:  That's what we're trying to --

6          THE COURT:  But you are clearly offering this for

7     hearsay purpose, right?  You're offering this for the truth.

8     You are.  You're asking me to infer the reason for Christian's

9     actions based on what he told this defendant by accepting that

10    statement as true, right?

11         MR. BROWN:  It's not for the truth of the statement,

12    it's the fact that it was said at all.

13         THE COURT:  Why does the fact that it was said have

14    any bearing on this hearing?

15         MR. BROWN:  The fact that this person was clearly felt

16    intimidated.

17         THE COURT:  And that is clear because of what he said

18    to the witness, right?

19         MR. BROWN:  That's correct.

20         THE COURT:  So if I accept the truth of what he said

21    to the witness, then he was clearly intimidated.

22         MR. BROWN:  For example, if there was a witness to a

23    car accident and they heard someone scream, the scream is not

24    hearsay because it's the reaction.

25         THE COURT:  The scream is not hearsay because it's not

1   words, but if there were words it would be an excited

2   utterance, it might be a present sense impression, it might be

3   a lot of things, but I don't think that you're offering this as

4   that.  It seems to me you're offering this for the truth.

5           If you want to call Christian, let's call Christian,

6   but he can't testify for Christian.  This is not a trial so the

7   rules of evidence don't strictly apply, but I don't think it's

8   reliable, and for those reasons I think the hearsay rule should

9   apply here.  So let's move on.

10          MR. BROWN:  Okay.

11  Q.  Do you know any other employees that signed the agreement?

12  A.  No.

13          MR. BROWN:  I have no further questions for this

14  witness.

15          THE COURT:  Cross-examination.

16  CROSS-EXAMINATION

17  BY MR. DOBRY:

18  Q.  Good afternoon, Mr. Reyes.

19          When you were hired by BTB Events and Celebrations,

20  can you say again what your job position was, your position

21  was?

22  A.  To make deliveries.

23  Q.  And you testified that about six months ago your position

24  changed, is that correct?

25  A.  Yes.

1    Q.  And how do you know that your position changed?

2    A.  Because they told us we were no longer called deliverymen

3    and they made us sign a paper that indicated we were assistant

4    caterers.

5            THE COURT:  Who is "they?"

6            THE WITNESS:  The employees in the office.

7            THE COURT:  Who?  They all said it in chorus like a

8    singing group?  Who said this to you?

9            THE WITNESS:  I did not sign that paper that day

10   because it was a day off for me, but everyone else told me what

11   had happened.

12           THE COURT:  That's not my question, my question is

13   who -- you said they told us we were no longer called

14   deliverymen.  Who?  Who told you that?

15           THE WITNESS:  They didn't specify, they just said that

16   on paper.

17           THE COURT:  Well, who is "they?"

18           THE WITNESS:  The managers.

19           THE COURT:  And so the managers told you to read the

20   paper?

21           THE WITNESS:  No, I read the paper through another

22   employee who had brought it to his attorney.

23           THE COURT:  When you said they told us that we were no

24   longer called deliverymen, nobody actually told you that, is

25   that correct?

IAiTHERH                    Reyes - Cross

1              THE WITNESS:  No.

2              THE COURT:  So you heard that from a co-worker, is

3     that where you heard it?

4              THE WITNESS:  Yes.

5              THE COURT:  Now was there some document that said the

6     same thing?

7              THE WITNESS:  Yes.

8              THE COURT:  Where is that document?

9              THE WITNESS:  That document was given to those who

10    signed it and then gave it in, but I never got -- I never

11    signed that document.

12             THE COURT:  Did you ever receive that document?

13             THE WITNESS:  No.

14             THE COURT:  Did you ever look at it?

15             THE WITNESS:  Yes, personally, yes.

16             THE COURT:  And how did you come to look at it?

17             THE WITNESS:  By the co-worker that took it.

18             THE COURT:  Okay.  Go ahead.  Next question.

19    BY MR. DOBRY:

20    Q.  What is the name of the co-worker that showed you this

21    document?

22    A.  I don't remember the name.

23    Q.  Do you know if it is one of the other plaintiffs in this

24    case that showed that you document?

25    A.  I think so.

IAiTHERH                              Reyes – Cross

1    Q.  Was it Ramon Hernandez that showed you the document?

2    A.  No.

3    Q.  Was it Constantino Hernandez that showed you the document?

4    A.  No.

5           THE COURT:  Do you know the name of the person who

6    showed you the document?

7           THE WITNESS:  No, no, I don't remember the name.

8    Q.  So you don't know if it's Mauro Teutle that showed you the

9    document?

10   A.  It could be, but I don't remember the name very well.

11          THE COURT:  Well, do you remember the person's face?

12          THE WITNESS:  Yes.

13          THE COURT:  So you have a distinct recollection of who

14   this person was, you just don't know that person's name?

15          THE WITNESS:  Correct.

16          THE COURT:  When was the last time you saw this

17   person?

18          THE WITNESS:  It has been two months and a half to

19   three months.

20          THE COURT:  Go ahead.

21   BY MR. DOBRY:

22   Q.  So that person who showed you this document wasn't in this

23   courtroom earlier today?

24   A.  Yes.

25          THE COURT:  Well --

```
 1   Q.  Yes, they were in this courtroom earlier today or yes, they
 2   were not in this courtroom earlier today?
 3   A.  Yes.  They were here.
 4           THE COURT:  They were here.  It was a person who was
 5   here in this courtroom just a few minutes ago?
 6           THE WITNESS:  Yes, but I don't remember his name.
 7           THE COURT:  Go ahead.
 8   Q.  Earlier you testified that it was not Constantino Hernandez
 9   who showed you the document, correct?
10   A.  No, correct.
11   Q.  And earlier you received that it wasn't Carlos Gonzalez
12   that showed you the document, is that correct?
13   A.  Correct.
14   Q.  And earlier today you testified that it wasn't Mauro Teutle
15   that showed you the document, is that correct?
16   A.  It would be the only other person of which I don't remember
17   their name that was here.
18   Q.  So it was not Jorge Menendez that showed you that document?
19   A.  No.
20   Q.  Do you recall what specifically was written on that
21   document?
22   A.  The only thing it said was that we had to help the person
23   packaging, that's all I remember.
24   Q.  So you don't remember if it specifically said that your
25   position had changed by title?
```

IAiTHERH                              Reyes – Cross

1    A.  Well, the title change was obvious because I was a delivery

2    person and now I was assistant caterer.

3          THE COURT:  That's the point, the document said that

4    your title had changed?

5          THE WITNESS:  Yes.

6    Q.  Was that document signed by anyone?

7    A.  That I know personally having seen it, I don't know, but I

8    do know that people did sign it.

9    Q.  And by sign it, I'm referring to from the company,

10   authorizing the document.  Did someone from the company, a

11   management person, perhaps, sign that document?

12   A.  No, that I don't know.

13   Q.  Who told you that your job title before six months ago was

14   delivery person?

15   A.  The person who hired me explained to me what my job was

16   when she hired me, and she said that I would be doing

17   deliveries.

18   Q.  So you don't know if your official title with the company

19   was delivery person?

20   A.  She's the one who said that what I was going to be doing,

21   and deliveries is all I did while I worked there.

22   Q.  But no one told you that your official title as an employee

23   of BTB Events and Celebrations is, quote, "delivery person?"

24   A.  Maria.

25   Q.  Is it possible that your official title could have been

1  catering assistant but people referred to it as delivery?

2  A.  I doubt it, I don't think so.

3  Q.  Prior to six months ago, did you ever go into a client's

4  business location?

5  A.  Of a client, in what sense?  I don't understand the

6  question.

7  Q.  When you were bringing food to a client's location, to a

8  purchaser's location, did you ever go into their business or

9  their store, their office?

10  A.  Yes.

11  Q.  Did you ever set up the food or place the food out on

12  perhaps a table or a buffet?

13  A.  Yes, that was my job.

14  Q.  So that job activity wasn't created or added six months

15  ago?

16  A.  Okay.

17  Q.  So when earlier you testified --

18          THE COURT:  No, that's a question.  Is that correct?

19          THE WITNESS:  In what sense is it a question?

20          THE COURT:  He's asking you is that correct.

21          THE WITNESS:  Yes.

22  Q.  So when you testified earlier that this document that

23  was -- apparently you saw from another employee said that you

24  were now supposed to go into a person's place of business, that

25  simply is not true, correct?

1   A.  I didn't understand the way he was explaining what it was,

2   what I did understand was that my job was doing deliveries and

3   that was the job that I was doing.

4   Q.  So your job functions didn't change six months ago?

5   A.  As far as setting up, bringing food inside the businesses,

6   no, but as in bringing business, yes.

7           THE COURT:  What do you mean bringing business?

8           THE WITNESS:  Not in bringing business, but in the

9   place where the business was happening where we were at, there

10  we had to do other jobs that we were not supposed to do.

11  Q.  What other jobs were you not supposed to do?

12  A.  Like, for example, cutting lemons or having to do certain

13  things for deliveries that when I started I don't have to do,

14  it was never explained to me.

15  Q.  What makes you think you weren't supposed to do those

16  things?

17  A.  Because when Maria hired me she only explained that my job

18  was to bring the food from the store to client, and that was

19  all.

20  Q.  Is it possible that this document that someone showed you

21  was a training document?

22  A.  No.

23  Q.  And how is that not possible?

24          THE COURT:  I'm not sure how anyone could explain how

25  something is not possible.  Let's move on.

IAiTHERH                      Reyes - Cross

1   Q.  Is it correct you testified earlier you last saw Ms. Puppo

2   on July 13, 2018?

3   A.  Yes.

4          THE COURT:  Do you know her as Puppo?

5          THE WITNESS:  It's Gina, no?  No.

6          THE COURT:  I think it's not correct that he testified

7   that -- he didn't say that.  So characterize his testimony

8   correctly and then you can ask him to affirm or qualify.

9          MR. DOBRY:  Yes, your Honor.

10  Q.  Earlier did you testify that the last time you saw Gina was

11  July 13, 2018?

12  A.  Yes.

13  Q.  And is it correct that earlier you testified that Gina

14  spoke to you and a group of other co-workers?

15  A.  Yes.

16  Q.  How many co-workers were with you when Gina was speaking to

17  you?

18  A.  Seven.

19  Q.  Is it possible that there were more than seven people?

20  A.  At the moment that she was talking to us it was just seven,

21  eight counting me.

22  Q.  Who are those seven people?

23  A.  Co-workers, delivery guys.

24          THE COURT:  Do you know their names?

25          THE WITNESS:  Yes.

1    Q.  What are the seven people's names?

2    A.  From who I remember that were present, there was

3    Constantino, Susana, Christian, Ali, Kenneth, and the others I

4    don't remember their names too well, there were two more men.

5    Q.  What did Gina say when she first started speaking to you on

6    July 13?

7    A.  She just said that she was going to give us a document and

8    that she needed us to sign it.

9    Q.  And do you recall what that document was?

10   A.  Yes, I read it.  It's the one that was handed to me just

11   now.

12            THE COURT:  Plaintiff's Exhibit 1, he testified to

13   that.

14            MR. BROWN:  Can I clarify, your Honor, if Plaintiff's

15   Exhibit 1 is one or two pages?

16            THE COURT:  You can ask him.  Mine is only one.

17   What's in your binder?

18            THE WITNESS:  It's two.

19            THE COURT:  So is there a reason why the witness has

20   one document and I have a different one?

21            MR. BROWN:  I think that might have been an error in

22   the binder.  We have no objection to the two pages in, but I

23   was only asking questions about the first page during my

24   direct.

25            THE COURT:  But going forward let's make it clear if

1    you are only using one page of the document and you wanted the

2    whole document in, we have to clarify the whole document is in.

3    It's a two-page document and you showed him which of the two

4    pages?

5             MR. BROWN:  Just the first page.

6             THE COURT:  Go ahead.

7    BY MR. DOBRY:

8    Q.  Have you seen the second page of Plaintiff's Exhibit 1

9    before today?

10   A.  Yes.

11   Q.  When did you see that document?

12   A.  The same day.

13   Q.  So Gina showed you more than just the first page of

14   Plaintiff's Exhibit 1 on July 13?

15            MR. BROWN:  Your Honor, you don't have a copy of --

16   A.  Yes.

17   Q.  So earlier when you testified --

18            THE COURT:  Go ahead, don't worry about it.

19   Q.  Earlier when you testified that she only provided you with

20   that first page, that isn't correct, correct?

21   A.  He only asked me about one page, not how many pages there

22   were.

23   Q.  So just to clarify, is it correct that Gina showed you more

24   than one document, being -- she showed you more than just the

25   first page?

IAiTHERH                         Reyes - Cross

1  A.  She gave me the two sheets.

2  Q.  Can you please describe what the second page of Plaintiff's

3  Exhibit 1 is.

4  A.  From what I understood when I read it, it was like the

5  rules of the job.  That was all, rules of the job.

6  Q.  So because she gave you a document that you describe as

7  being the rules of your job, is it possible that she discussed

8  employment policies with you at that meeting?

9  A.  No, she only spoke about the first page.  When she wanted

10  to -- or spoke, I was no longer in the store, I was doing a

11  delivery.

12  Q.  So you were not present for the entire discussion of Gina?

13  A.  Just about the first page, and I read it on my own also.

14  Q.  So you were able to take the first page with you outside of

15  the discussion?

16  A.  Yes, because there was a co-worker who also had to do some

17  deliveries.  He asked her if he could take the paper, and she

18  said yes, but bring it back to me tomorrow signed.

19  Q.  Who was that individual who told you that?

20  A.  Not that they told me, I was there when they said it.

21            THE COURT:  Who said it?

22            THE WITNESS:  That was the other co-worker, his name

23  is Orlando.

24  Q.  What day of the week is July 13, 2018?

25  A.  If I remember correctly, it was a Thursday or Friday.

1          MR. DOBRY:  Your Honor, I request the Court take

2     judicial notice that July 13, 2018 was a Friday.

3          THE COURT:  I can look it up, but I haven't yet.  But

4     all right.  Do you have any further questions?

5          MR. DOBRY:  Yes, I do, your Honor.

6     Q.  Assuming July 13, 2018 is a Friday, that would make the

7     following day a Saturday, correct?

8     A.  Correct.

9     Q.  Were you supposed to work for Between the Bread on July 14,

10    that Saturday?

11    A.  No.

12    Q.  Do you generally work Saturdays for Between the Bread

13    events and celebrations?

14    A.  No.

15    Q.  So why would Gina say to hand back the documents the

16    following day if no one was going to be working?

17    A.  Because maybe she did not know it was Saturday.  And for

18    the following day, maybe she was referring to Monday.

19    Q.  But you were not required to sign either the first page or

20    the second page of Plaintiff's Exhibit 1 on July 13, is that

21    correct?

22    A.  Yes.  It was like an obligation.  She told me it was an

23    obligation.

24          THE COURT:  And she told you what would happen if you

25    didn't sign it?

IAiTHERH                         Reyes - Cross

1              THE WITNESS:  She told us --

2              THE INTERPRETER:  Sorry, your Honor.

3              THE COURT:  Did she tell you what would happen if you

4    didn't sign it?

5              THE WITNESS:  She did not specify what would happen if

6    I didn't sign it, but I thought that if I didn't sign it they

7    would fire me.

8              THE COURT:  That was based on something she said or

9    something she did or something else?

10             THE WITNESS:  Yes, by her attitude, the way she spoke

11   about it, the way she made us see things, and from what I read

12   is how I understood that that was the case.

13   Q.  So you understood what was written on that first page of

14   Plaintiff's Exhibit 1.

15   A.  Yes, because I read it.

16   Q.  I'm going to show you -- I just handed the witness what is

17   listed as Defendant's Exhibit 4, the declaration of Jose Reyes.

18             THE COURT:  Defendant Exhibit 4, go ahead.

19   Q.  Mr. Reyes, have you seen that document before?

20   A.  Yes.

21   Q.  In paragraph two of your declaration does it say that --

22   did you say or declare that Gina distributed the document to us

23   one by one?

24   A.  Yes, we were in a group and she gave it one by one to each

25   person in the group.

IAiTHERH                          Reyes - Cross

1   Q.  But she didn't speak to you about that document one by one?

2   A.  No.

3   Q.  And earlier today is it correct that you testified you

4   understood what that document was during the discussion with

5   Gina?

6   A.  No, I did not say that.

7   Q.  You did not testify earlier that you were able to

8   understand the contents of the arbitration agreement that is

9   the first page of Plaintiff's Exhibit 1?

10  A.  Yes, but not that she explained it, I understood it myself

11  after I read it.

12  Q.  So you understood what that document was on July 13, 2018,

13  correct?

14  A.  From what I read, it was referring to it if I had any

15  problem with the company that I could not sue or we could get

16  to some agreement and that was all.

17  Q.  Earlier today I believe you testified that you felt it was

18  required to -- you were required to sign that document because

19  of the word obligation, is that correct?

20  A.  Yes.

21  Q.  Did Gina specifically tell you or the group that you had to

22  sign all the documents that she distributed?

23  A.  Yes, obviously she told us that we had to sign it and

24  submit it.

25  Q.  But you didn't have to sign it during that meeting with

IAiTHERH                        Reyes – Cross

1    Gina, is that correct?

2    A.  I had to sign it, but I didn't sign it, and I will repeat

3    it, because I had to go out.

4    Q.  And did you ever sign that agreement?

5    A.  No, because we came to an agreement, the people who were

6    suing, that we were not going to sign it until we showed it to

7    the attorney.

8            MR. DOBRY:  Your Honor, I would like to move

9    Defendant's Exhibit 4 into evidence.

10           THE COURT:  It's already a court document, right?

11           MR. DOBRY:  Correct.

12           THE COURT:  I don't need it in evidence.  Go ahead.

13   BY MR. DOBRY:

14   Q.  When did you first learn about this lawsuit, Mr. Reyes?

15   A.  When I got the paper at my house.

16           THE COURT:  When was that, what month, what year?

17           THE WITNESS:  That was June or July.

18           THE COURT:  Before you were presented with the

19   document that is Exhibit 1, correct?

20           THE WITNESS:  Yes, correct.

21           MR. DOBRY:  Your Honor, I'm presenting what is listed

22   as Defense Exhibit 9 to the witness.

23   Q.  Please take a moment and review.

24           THE COURT:  Do you recognize it?

25           THE WITNESS:  Yes.

 1              THE COURT:  What is it?

 2              THE WITNESS:  This is what came to my house, and that

 3    if I wanted to be part of the lawsuit I had to sign it and give

 4    him the papers.

 5              THE COURT:  Next question.

 6    BY MR. DOBRY:

 7    Q.  I'm handing the witness what is listed as Exhibit 10.

 8              Have you seen that document before, Mr. Reyes?

 9    A.  Yes, it was the one I signed.

10    Q.  And what is the date that you signed this document?

11    A.  June 26 of 2018.  June 26.

12    Q.  Why did you sign this document on June 26, 2018?

13    A.  Because that's when I brought it -- when I went to the

14    attorneys.

15    Q.  Did you receive the notice of this lawsuit before you went

16    to attorneys and signed this document in the mail?

17    A.  The notification of this lawsuit or this paper?

18    Q.  The notification of the lawsuit.

19    A.  Is that a paper or what?

20    Q.  It is the document that I provided you, it is Defendant's

21    Exhibit 9.

22    A.  That's what came to my house.  It was the first document

23    that made me aware of this lawsuit.

24    Q.  So by -- is it correct by June 26, 2018, you had decided

25    that you desired to opt into this lawsuit?

IAiTHERH                          Reyes - Cross

1   A.   Yes, correct.

2   Q.   Where did you sign this document?

3   A.   At the attorney's office.

4   Q.   Did you contact -- do you know when this document was

5   submitted to the Court that you signed?

6   A.   No.

7   Q.   But either way, it's correct that you decided you were

8   going to join this lawsuit before July 13, 2018?

9   A.   Yes, of course.

10  Q.   Were you prevented from joining this lawsuit because of the

11  discussion with Gina on July 13, 2018?

12  A.   Prevented me -- basically what prevented me was the paper.

13  Q.   Have you been prevented from being involved in this

14  lawsuit?

15  A.   No.

16  Q.   Do you know if -- did your attorneys tell you that the

17  consent form was filed?

18          MR. BROWN:  Objection.

19          THE COURT:  Were you aware -- I don't care about this.

20          All right.  So you joined this lawsuit before you were

21  given the paper that is Exhibit 1, right?

22          THE WITNESS:  Correct.

23          THE COURT:  And you said that you were told or you

24  understood that you would be fired if you didn't sign that

25  agreement that Gina gave you, correct?

IAiTHERH                          Reyes - Cross

1           THE WITNESS:  Of course.

2           THE COURT:  Of course.  Who told you that?  Gina or

3   someone else?

4           THE WITNESS:  That was through how I understood the

5   manner that she was talking to me.

6           THE COURT:  So was it the words or the manner?

7           THE WITNESS:  Both.

8           THE COURT:  So what were the words that she used that

9   led you to conclude that you would be fired if you didn't sign

10  the agreement that is Plaintiff's Exhibit 1?

11          THE WITNESS:  Because she was utilizing a rude manner

12  of talking to us.

13          THE COURT:  Listen to the question.  What were the

14  words?  You said it was her words and the manner, I asked you

15  what were the words and you described the manner.  So tell me

16  the words.

17          THE WITNESS:  Obligation, obligatory.

18          THE COURT:  She said it was your obligation to sign

19  this document?

20          THE WITNESS:  Yes.

21          THE COURT:  She had it was obligatory.

22          THE WITNESS:  Yes.

23          THE COURT:  Did she tell you what would happen if you

24  didn't?

25          THE WITNESS:  I had already gone.  She did not specify

IAiTHERH                         Reyes - Cross

1   to me, no.

2              THE COURT:  All right.  Next question.  Anything else?

3   BY MR. DOBRY:

4   Q.  Were you fired when you did not sign that agreement?

5   A.  No, because she never talked to me again.

6              THE COURT:  Well, did you sign the document?

7              THE WITNESS:  No, because we came to the agreement

8   that we were not going to sign it.

9              THE COURT:  Were you fired as a result of that?

10             THE WITNESS:  No, but there were other things that

11  happened, like retaliation.

12             THE COURT:  Just answer my questions.  It works a lot

13  easier if you answer the questions.  You were not fired as a

14  result of not signing the document, right?

15             THE WITNESS:  That's correct.

16             THE COURT:  When did you stop working for the company?

17             THE WITNESS:  August 25th.

18             THE COURT:  Were you fired or did you leave on your

19  own accord?

20             THE WITNESS:  I left.

21             THE COURT:  All right.  Next question.

22             MR. DOBRY:  No further questions, your Honor.

23             THE COURT:  Anything else?

24             MR. BROWN:  I just have two questions.

25             (Continued on next page)

IAiTHERH                          Reyes - Redirect

1    REDIRECT EXAMINATION

2    BY MR. BROWN:

3    Q.  You testified earlier that Christian had signed the

4    arbitration agreement.

5    A.   Correct.

6    Q.  And Christian was at that July 13 meeting with you as well,

7    he was one of the eight people?

8              MR. DOBRY:  Objection, mischaracterization of

9    testimony.

10             THE COURT:  Seven versus eight?

11             MR. DOBRY:  Yes.

12             MR. BROWN:  He said seven people, with him included

13   eight.

14             THE COURT:  I don't think he said that, actually, but

15   in any event, I don't care what number of people were there,

16   really.  Christian was one of the people that was at the

17   meeting that you were at on July 13, 2018, correct?

18             THE WITNESS:  Yes, correct.

19             THE COURT:  Okay.

20             MR. BROWN:  Your Honor, I would like to respectfully

21   request a reconsideration on the previous position of the Court

22   regarding hearsay statements.  I understand that the Court

23   ruled they are hearsay, but because this is a hearing I think

24   it would be valuable to at least hear the testimony and the

25   Court could give it whatever weight it decides.

IAiTHERH

```
1          THE COURT:  I'm not likely to give it very much

2     weight.  It's his inference to what Christian meant or what he

3     was thinking.  So why don't you make an attorney's proffer to

4     what he will say, what is he going to say?

5          MR. BROWN:  From my discussions with the client, he

6     would say Christian discussed with him that the reason he

7     signed the agreement is because he would be fearful that he

8     would be terminated and he previously wanted to join the

9     action.

10         THE COURT:  You could have subpoenaed Christian to be

11    here, right?

12         MR. BROWN:  This was recently discovered information.

13         THE COURT:  Overruled.  Anything else?

14         MR. BROWN:  That's all.

15         THE COURT:  Okay.  You can step down.  Thank you.

16         Witness.

17         MR. BROWN:  Next witness is Constantino.

18         THE COURT:  Let's go quickly, because if we'll take an

19    hour and 15 minutes with each witness, we're not going to

20    finish this today.  So I'm hoping we can move through these

21    more efficiently.

22         MR. DOBRY:  Your Honor, the witness on the bench is

23    speaking with the remaining witnesses with plaintiffs' counsel.

24    I prefer that to stop.

25         THE COURT:  Mr. Brown, did you hear what Mr. Dobry
```

1   said?  The witness who was just on the stand is now discussing

2   his testimony with other witnesses or potential witnesses,

3   so --

4            MR. BROWN:  Do you want me to separate them?

5            THE COURT:  Nobody asked me to direct them or

6   sequester anyone outside the courtroom.  You could cross them

7   all on this, I suppose.

8    CONSTANTINO HERNANDEZ,

9        called as a witness by the Plaintiffs,

10       having been duly sworn, testified as follows:

11  DIRECT EXAMINATION

12  BY MR. BROWN:

13           THE COURT:  Could you state your name and spell your

14  name for the record.

15           THE WITNESS:  Constantino Hernandez,

16  C-O-N-S-T-A-N-T-I-N-O  H-E-R-N-A-N-D-E-Z.

17           THE COURT:  Okay.  Go ahead.

18  BY MR. BROWN:

19  Q.  When did you first start working for Between the Bread?

20  A.  I started in October of 2014.

21  Q.  And what was your position there?

22  A.  Yes, delivery guy.

23  Q.  And did your position ever change throughout your

24  employment?

25  A.  No.

IAiTHERH                           Hernandez - Direct

1   Q.  Are you still employed by Between the Bread?

2   A.  Yes.

3   Q.  In front of you is Plaintiff's Exhibit 1, the first page.

4   Can you please review that document.  Just the first page.

5   A.  Yes.

6   Q.  Have you ever seen this document before today?

7   A.  Yes, I saw it when it was given to us by Ms. Gina to sign.

8   Q.  And when was that?

9   A.  It was July 13, and on July 17 she gave it to me again.

10  Q.  And before July 13 had you seen that document before?

11  A.  No.

12  Q.  So July 13 was the first time that you had seen this

13  document?

14  A.  Yes.

15  Q.  And you mentioned that the document was given to you by

16  someone named Gina?

17  A.  Yes, Gina who works at here, Between the Bread.

18  Q.  And do you know what Gina's position is at Between the

19  Bread?

20  A.  I don't know exactly what her position is, but I know that

21  she works there because we have always had to bring like papers

22  to her at the office.

23  Q.  Do you know what she did at Between the Bread, what type of

24  things she would do?

25  A.  Well, no, I know that she would just receive documents and

IAiTHERH                        Hernandez - Direct

1   sometimes she will go to the stores, interview people, just

2   that.

3   Q.  So would you say she's in charge of like the documentation,

4   the employment documentation?

5   A.  Yes.

6   Q.  Do you know approximately what time of day she gave the

7   document out to you?

8   A.  Approximately around 10, 11 of the morning.

9   Q.  And when you received the document, were you by yourself or

10  were you with a group of people?

11          MR. DOBRY:  Objection, your Honor, leading.

12  A.  No, there were a group people.

13          THE COURT:  Overruled.  A group of people.  Okay, how

14  big a group?

15          THE WITNESS:  Around seven to eight people.

16  Q.  And do you know who -- can you --

17          THE COURT:  How many of those people did you know?

18          THE WITNESS:  I knew all of them.

19          THE COURT:  Can you tell me the names of the people

20  you remember being there?

21          THE WITNESS:  There was Jose Reyes, there was -- I

22  don't remember the names too well.  Christian -- Christian, I

23  don't remember his last name.  Carlos.

24          THE COURT:  Do you remember his last name?

25          THE WITNESS:  I believe it's Hernandez, but honestly I

 1  don't remember.

 2              THE COURT:  Who else?

 3              THE WITNESS:  There was Rubin.

 4              THE COURT:  Do you know his last name?

 5              THE WITNESS:  No, I just remember the name.

 6              THE COURT:  Anyone else?

 7              THE WITNESS:  Gemaro.

 8              THE COURT:  Do you know his last name?

 9              THE WITNESS:  No.

10              THE COURT:  The name was Gemaro?

11              THE WITNESS:  Gemaro.

12              THE COURT:  How do you spell it?

13              THE WITNESS:  G-E-M-A-R-O.

14              THE COURT:  Anyone else?

15              THE WITNESS:  I don't remember the names too well.

16              THE COURT:  If there is anyone else, let me know.  If

17  you don't remember anyone else, that's enough.

18              THE WITNESS:  There was Mauro.

19              THE COURT:  Was it all men or were there any women?

20              THE WITNESS:  Yes, and also Susana was there.

21              THE COURT:  That was the only woman besides Gina?

22              THE WITNESS:  Yes.

23              THE COURT:  Go ahead, next question.

24  BY MR. DOBRY:

25  Q.  Did all these individuals have the same job position as

1    you?

2    A.  Yes.

3    Q.  And did Gina say anything before handing the agreement to

4    you?

5    A.  Yes, she told us that she was going to give us these

6    documents and we had to sign them.

7    Q.  And then after that, did she give the document to you?

8    A.  Yes.

9    Q.  Did she say anything after she gave the document to you?

10   A.  That that was -- nothing would hurt or anything bad towards

11   us, and that we had to sign it.

12           THE COURT:  She said you had to sign it?

13           THE WITNESS:  Yes.

14   Q.  And did she tell you this in English or Spanish?

15   A.  In Spanish.

16   Q.  And she said it to you in Spanish?

17   A.  Yes.

18           THE COURT:  Do you remember the words, exact words she

19   used?

20           THE WITNESS:  Not exactly.

21           THE COURT:  Did she indicate in words what would

22   happen if you didn't sign it?

23           THE WITNESS:  No, no, she didn't say.

24           THE COURT:  It you have an understanding as to what

25   would happen if you didn't sign it?

1          THE WITNESS:  I did not know anything because

2    everything was in English.

3          THE COURT:  What do you mean everything was in

4    English?

5          THE WITNESS:  Yes, the document she gave us was in

6    English.

7          THE COURT:  But she spoke to you in Spanish, you said,

8    right?

9          THE WITNESS:  Yes, to tell us that we had to sign it,

10   but she did not read to us any of it like in Spanish.

11         THE COURT:  But I'm asking, was there anything that

12   she told you or anything that you observed that led you to

13   understand what would happen if you didn't sign it?

14         THE WITNESS:  I don't know, but she told us like in a

15   way that it was like oblatory for us to sign it.

16         THE COURT:  And what way was that?  Describe it.

17         THE WITNESS:  Because someone said if they didn't have

18   it in Spanish she then said I will bring it to you in Spanish

19   tomorrow, but she never did, but she said tomorrow, the next

20   day we had to give it in signed, if not, you give it to me like

21   that without the signature, but you give me your name.

22         THE COURT:  And from that you understood what?

23         THE WITNESS:  At the moment I did not understand, but

24   afterwards with people, with Kenneth, which was another person

25   who was there, he read it, he knows English well, and he said

IAiTHERH                          Hernandez - Direct

```
 1   it was not good for us.
 2             THE COURT:  But I'm asking what she said that led you
 3   to conclude that you would -- well, I'm asking what your
 4   understanding was.  I'm asking you to tell me what you
 5   understood the consequences would be if you didn't sign it.
 6             THE WITNESS:  That they could fire us or something
 7   similar.
 8             THE COURT:  That was your understanding.
 9             THE WITNESS:  Yes.
10             THE COURT:  Or something similar.  What would be
11   similar to firing?
12             THE WITNESS:  Sometimes they give us days off, just
13   that.
14             THE COURT:  Next question.
15   BY MR. BROWN:
16   Q.  Did anyone ask any questions after receiving the document
17   in the group?
18   A.  Yes, there were some questions, but Gina individually, I no
19   longer heard anything.
20   Q.  Do you recall any of the questions that were asked?
21   A.  No, I don't remember.
22   Q.  Then you said that you also received the document again on
23   July 17 --
24             THE COURT:  Wait, between July 13 and July 17, did you
25   sign the document?
```

1            THE WITNESS:  No.

2            THE COURT:  Did you have any conversation with Gina

3    about that between July 13 and July 17?

4            THE WITNESS:  No.

5            THE COURT:  All right.  Go ahead.

6    Q.  You said you received the document again July 17, 2018, is

7    that correct?

8    A.  Yes.

9    Q.  And can you tell me the circumstances around the second

10   time she gave you the agreement?

11   A.  Ms. Gina asked me again if I had it, if I already signed

12   it.

13           THE COURT:  Wait.  Who else was present for this

14   July 17 meeting?

15           THE WITNESS:  Just me.

16           THE COURT:  Where was this?

17           THE WITNESS:  Right there at the job.

18           THE COURT:  You were working at the time?

19           THE WITNESS:  Yes.

20           THE COURT:  So what were you doing?

21           THE WITNESS:  At that moment?

22           THE COURT:  Yeah.

23           THE WITNESS:  Waiting for my delivery.

24           THE COURT:  And so how did you come to encounter her?

25           THE WITNESS:  She arrived at the store, she got there.

1          THE COURT:  And then what happened?

2          THE WITNESS:  She asked me if I had it, if I had

3    already signed it, and I told her that no, and then I told her

4    no, and she gave it to me again.

5          THE COURT:  Okay.  Did she say anything else?

6          THE WITNESS:  No.

7          THE COURT:  Did she say anything about what would

8    happen if you didn't sign it?

9          THE WITNESS:  No, she didn't tell us.

10          THE COURT:  Okay.  Did she seem angry?

11          THE WITNESS:  Yes.

12          THE COURT:  In what way did she express or reflect

13    that she was angry?

14          THE WITNESS:  She was very curt with her conversation,

15    she's like:  You don't have it, here it is.

16          THE COURT:  Had you dealt with her much before?

17          THE WITNESS:  No.

18          THE COURT:  How many times had you seen her before?

19          THE WITNESS:  I see her -- we see her often.

20          THE COURT:  This conversation on July 17, was it in

21    English or Spanish?

22          THE WITNESS:  Spanish.

23          THE COURT:  And how is her Spanish?

24          THE WITNESS:  It's good.

25          THE COURT:  Is she a native speaker, can you tell?

IAiTHERH                          Hernandez – Direct

1              THE WITNESS:  Could be.

2              THE COURT:  Do you know where she learned Spanish?

3              THE WITNESS:  No.

4              THE COURT:  Do you know whether she's born in this

5    country or a different country?

6              THE WITNESS:  No, I don't.

7              THE COURT:  Could you tell from her accent what

8    country she was from or what country -- well, could you tell

9    from her accent what type of Spanish she spoke?

10             THE WITNESS:  No.

11             THE COURT:  She didn't speak like a Spaniard, right?

12             THE WITNESS:  No.

13             THE COURT:  And did she sound like she was from

14   Argentina?

15             THE WITNESS:  I don't think so.

16             THE COURT:  Did she sound like she was Dominican?

17             THE WITNESS:  It could be when I think about it now,

18   but I never really thought about it.  It could be that maybe

19   someone from Puerto Rico.

20             THE COURT:  Go ahead.

21   BY MR. BROWN:

22   Q.  Did you see her giving the agreement to anyone else on

23   July 17?

24   A.  July 17, no.  July 13, yes.

25             THE COURT:  We already talked about July 13, right?

1          THE WITNESS:  Yes.

2          THE COURT:  But nobody else on July 17.

3          THE WITNESS:  I did not see.

4          THE COURT:  Okay, next question.

5   BY MR. BROWN:

6   Q.  Did you discuss the document in front of you with any of

7   your co-workers after you received it on July 13?

8   A.  Yes.

9   Q.  And when did you first discuss the document with your

10  co-workers?

11  A.  Immediately after she left, people who knew English, they

12  commented on what this document was.  So then we thought that

13  that was not good for us, the ones that are part of this

14  lawsuit.

15         THE COURT:  But I only want you to testify to what you

16  thought or what you knew.  Next question.

17  Q.  Who was present at the first conversation?

18  A.  There was Christian, Kenneth, Christian.

19         THE COURT:  Let me put it this way, you had this

20  meeting on July 13 that Gina was there and the other people you

21  mentioned before, right?

22         THE WITNESS:  Yes.

23         THE COURT:  She handed you and others this paper,

24  right?

25         THE WITNESS:  Yes.

IAiTHERH                         Hernandez – Direct

1              THE COURT:  And then she left?

2              THE WITNESS:  Yes.

3              THE COURT:  And then you discussed that paper with

4    other people, is that right?

5              THE WITNESS:  Yes.

6              THE COURT:  And was it the entire group that had been

7    there when Gina was there or was it a smaller group?

8              THE WITNESS:  We were the same ones.

9              THE COURT:  Next question.

10   BY MR. BROWN:

11   Q.  And was there any discussion as to whether the people you

12   were talking with would sign the agreement?

13             MR. DOBRY:  Objection, your Honor, to the extent it

14   calls for hearsay.

15             THE COURT:  Well, "was there discussion" doesn't call

16   for hearsay, that calls for a statement of fact.  You can

17   answer.

18   A.  Yes, we all agreed that we were not going to sign it

19   because we had fear that we might be fired.

20             THE COURT:  Just testify about your own thoughts and

21   concerns.  The question was simply was there a discussion,

22   that's yes or no.  Was there a discussion as to whether you

23   would sign?

24             THE WITNESS:  Yes.

25             THE COURT:  Next question.

IAiTHERH                    Hernandez - Direct

1   BY MR. BROWN:

2   Q.  So you said earlier that you were concerned that you were

3   going to be terminated, and then you said you also did not sign

4   the agreement.  Why didn't you sign the agreement if you were

5   concerned that you would be terminated?

6   A.  Why did I sign it?

7            THE COURT:  Why did you not sign it.

8            THE WITNESS:  I did not sign it because I did not know

9   exactly what it was.

10            THE COURT:  Next question.

11   Q.  Do you know anyone who did sign it?

12   A.  Yes.

13   Q.  And any catering assistants or delivery people?

14   A.  Yes, there was Christian.

15   Q.  Do you know anyone else?

16   A.  I only saw Christian sign it, but I also found out that

17   Paul signed it.

18   Q.  And were those both people who were present at the July 13

19   meeting?

20   A.  Only Christian.

21   Q.  Do you know when Paul received the agreement?

22   A.  No, I don't know.

23            MR. BROWN:  I have no further questions.

24            THE COURT:  Cross-examination.

25            (Continued on next page)

1    CROSS-EXAMINATION

2    BY MR. DAVE:

3    Q.  Mr. Hernandez, when did you first learn about this lawsuit?

4    A.  When the mail came to my house.

5    Q.  I would like you to refer to what is on the table there,

6    it's Exhibit Number 9.  Do you recognize this document, sir?

7    A.  Yes, it's the one that came to my house.

8    Q.  And is this -- when you received this at home, that is the

9    first time you learned about this lawsuit, is that correct?

10   A.  Yes.

11   Q.  And you received this well before the July 13 meeting, is

12   that correct?

13   A.  I don't remember exactly the date I received it.

14          THE COURT:  Was it before or after the July 13

15   meeting?

16          THE WITNESS:  Yes, it was before, I think.

17   Q.  And looking at Exhibit 9, sir, the last page, the last two

18   pages, is a form for you to complete, is that correct?

19   A.  Exhibit 9, is that correct?

20   Q.  This is correct.

21          Was that a yes, sir?

22   A.  Yes.

23   Q.  I would like to show you what is marked as Defendant's

24   Exhibit 12.  Do you recognize this document, sir?

25   A.  Yes.

IAiTHERH                    Hernandez - Cross

1    Q.  Is that your signature on the line signature?

2    A.  Yes.

3    Q.  Is this the form that you completed and mailed back to your

4    attorneys?

5    A.  Yes.

6    Q.  And you dated this June 22nd, 2018, is that correct?

7    A.  Yes.

8    Q.  Did you understand what this document meant when you signed

9    it?

10   A.  Yes.

11   Q.  What was your understanding?

12   A.  My son explained that this was a lawsuit that Ramon

13   Hernandez made against the company where I work.

14   Q.  Did you understand that by signing it you would become part

15   of the lawsuit?

16   A.  Yes.

17   Q.  So you understood when you signed that document that you

18   were then part of this lawsuit.

19   A.  Yes.

20   Q.  And so you signed it on June 22nd, so that means you

21   received Exhibit 9 that you reviewed earlier prior to

22   June 22nd, is that correct?

23        You signed Exhibit 12 on June 22nd.  Would it be fair

24   to say that you received Exhibit 9 on or before June 22nd?

25   A.  Which one is 9?  Was that the first one you showed me?

IAiTHERH                        Hernandez - Cross

1   Q.  Yes.  On the bottom of each exhibit it says -- Exhibit 9.

2   A.  Okay.  So then can you repeat the question again?

3          THE COURT:  Did you sign number 12 the same day or

4   earlier as Exhibit 9?

5          You received it after you received that, you received

6   9 first and signed 12 later, right?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay, next question.

9   BY MR. DAVE:

10  Q.  Sir, I would like you to review what is marked Defendant's

11  Exhibit 7.  Do you recognize this document, sir?

12         THE COURT:  Turn to the second page.

13         THE WITNESS:  I think so, I don't remember too well.

14         THE COURT:  Is that your signature on the second page?

15         THE WITNESS:  Yes.

16  Q.  Sir, do you read English?

17  A.  Very little.

18  Q.  This is your declaration, correct, sir?

19         THE COURT:  Do you recognize this to be your

20  declaration in this case?

21         THE WITNESS:  I don't remember this document too well.

22         THE COURT:  Well, is that your signature on the second

23  page?

24         THE WITNESS:  Yes, yes.

25         THE COURT:  Did somebody translate this into Spanish

1    for you?

2              THE WITNESS:  It's that I don't remember who gave me

3    this.

4    BY MR. DAVE:

5    Q.  You didn't prepare this document, is that correct?

6    A.  No.

7    Q.  But you did sign it, you agreed to that?

8    A.  I don't remember signing this.

9              THE COURT:  Is that your signature, yes or no?

10             THE WITNESS:  That is my name but my signature is not

11   here.

12             THE COURT:  That's not your signature.

13             THE WITNESS:  No, it's just my name there.

14             THE COURT:  Okay.  We have a problem here, right?

15             MR. DAVE:  Yes, your Honor, we have a problem.

16             MR. DOBRY:  Filed with the Court representing a

17   declaration of Constantino Hernandez.

18             THE COURT:  I understand that.  I want you to sign

19   your name here.

20             So you have got -- which is your signature?  Put an X

21   next to your signature.

22             Then you wrote your name in letters underneath,

23   printed it, you printed your name underneath, correct?

24             THE WITNESS:  Yes.

25             THE COURT:  I will mark this as Court Exhibit 1 and

1    allow the lawyers to take a look at this.

2         Somebody better have an explanation for me how I have

3    a court exhibit that has been docketed that has presumed under

4    penalty of perjury what purports to be a signature line that

5    isn't a signature line from a witness who says that he doesn't

6    recall seeing this document.

7         MR. DAVE:  Your Honor, I add Exhibit 12 has been

8    admitted, the witness testified that was his signature on 12

9    and denied it was his signature on Exhibit 7, and that the

10   signature on Exhibit 12 resembles the signature on Court

11   Exhibit 1.

12        THE COURT:  I think that's a fair characterization.

13   Would you take a crack at that one?

14        MR. BROWN:  I'm kind of confused myself.  I went over

15   this.  I didn't personally, because I don't speak Spanish,

16   speak with him about this part of it, but I don't see any

17   reason why he wouldn't recognize it.

18        THE COURT:  Wait a minute.  You're saying that this

19   document, which is now Exhibit 7, was signed by this witness?

20        MR. BROWN:  Yes.

21        THE COURT:  That's what you're saying?  Even though --

22        MR. BROWN:  I have no reason to believe otherwise.

23        THE COURT:  Well, take a look at the signature.  That

24   might be one reason to believe otherwise, the testimony of the

25   witness might be another reason to believe otherwise because he

IAiTHERH                    Hernandez - Cross

1    doesn't remember signing this.

2           Do you remember signing this document, Exhibit 7?

3           THE WITNESS:  No.

4           THE COURT:  Do you remember reading this document

5    prior to today?

6           THE WITNESS:  No, I'm reading it right now.

7           THE COURT:  This strikes me as problematic.

8           So anything else for this witness?

9           MR. DAVE:  Yes, your Honor.  I do have a few more

10   questions with this witness.  Whether we can reserve this issue

11   for later --

12          THE COURT:  Well, it's potentially going to be a

13   sanctions issue or grievance committee issue, contempt issue,

14   might be a lot of issues.

15          MR. DAVE:  Thank you.

16   BY MR. DAVE:

17   Q.  Now Mr. Hernandez, you testified that you received

18   Exhibit 1 on July 13 for the first time, is that correct?

19   A.  Yes.

20   Q.  And I would like you to refer to Exhibit 1.  It's a

21   two-page document, is that correct, sir?

22   A.  Yes.

23   Q.  I would like to refer to page 2.  Do you recognize page 2?

24   A.  Yes.

25   Q.  What is this document, sir?

1    A.  I cannot understand it too well.

2                 THE COURT:  Have you seen it before?

3                 THE WITNESS:  Page 2?

4                 THE COURT:  Yeah.

5                 THE WITNESS:  Yes.  Yes.

6                 THE COURT:  When did you first see it?

7                 THE WITNESS:  Ms. Gina gave it to us together.

8                 THE COURT:  On July 13?

9                 THE WITNESS:  Yes.

10                THE COURT:  Did you sign this one?

11                THE WITNESS:  No.

12   Q.  How did you come to encounter Ms. Gina on July 13?

13   A.  She arrived at the store, we were there waiting for our

14   delivery, and she arrived from the office over here to the

15   store with the documents she wanted us to sign.

16   Q.  Where in the store were you waiting for your deliveries?

17   A.  We're always at the entrance hallway, all of us, waiting.

18   Q.  And was there a prescheduled meeting with Gina prior to her

19   showing up?

20   A.  No.

21   Q.  And when you and the others met with Gina, she went over

22   these documents with you, is that correct?

23   A.  She gave us the documents.

24   Q.  Well --

25                THE COURT:  Did she discuss them with you?

1              THE WITNESS:  With me, no, she spoke with all of us.

2    Q.  Well, when she spoke with all of you, did she explain the

3    documents, what they were?

4    A.  She told us just that they were documents that we had to

5    sign and there was nothing that would jeopardize us, that just

6    to sign it.

7    Q.  How long was this conversation with Gina?

8    A.  With everyone it was brief.

9    Q.  Less than five minutes?

10   A.  Yes.

11   Q.  Were you there for the entire time that Gina spoke?

12   A.  Yes.

13   Q.  What did you do after speaking with Gina?

14   A.  I just went up to the side, because other people were

15   asking her questions, so I just went away from there.

16   Q.  And did you just stay outside or did you leave for a

17   delivery after that?

18   A.  No, I stayed for some more time in there.

19   Q.  How long did you stay before you left the building?

20   A.  I don't remember exactly, but she left before.

21   Q.  She left before you left?

22   A.  Yes.

23   Q.  Do you know why Gina was there that day?

24   A.  No.

25   Q.  And on July 17, when you met Gina again, that was not a

IAiTHERH                        Hernandez - Cross

1   scheduled meeting, is that correct?

2   A.  No.

3          THE COURT:  On the 17th of July did Gina distribute

4   the arbitration agreement to anyone else besides you?

5          THE WITNESS:  I did not see her give it to any other

6   person, I was the only one there and she gave it to me.

7   Q.  And you didn't ask Gina any questions about the documents

8   either on July 13 or July 17, is that correct?

9   A.  No.

10  Q.  And Gina never said that if you didn't sign you would be

11  fired, is that correct?

12  A.  No, she didn't say.

13  Q.  And Gina is not your supervisor, is that correct?

14  A.  No, she's not.

15  Q.  And she does not prepare your work schedule, is that

16  correct?

17  A.  That I'm aware of, no.

18  Q.  And you testified Christian, and you don't know his last

19  name, was present on July 13, is that correct?

20  A.  Yes.

21  Q.  Was he a new employee, was he hired that day?

22  A.  He was just there for a short time.  It had been a few

23  weeks.

24  Q.  Had you seen him prior to July 13?

25  A.  Yes, he worked there with us.

IAiTHERH                          Hernandez - Cross

1    Q.  Do you know whether Christian ever received Exhibit 9 in

2    the mail?

3    A.  I don't know.

4    Q.  You testified that you did not sign the page 1 of

5    Exhibit 1, is that correct?

6    A.  No, I did not sign it.

7    Q.  Were you concerned that you might be fired if you didn't

8    sign?

9    A.  Yes.

10   Q.  And so then why didn't you sign it if you were concerned

11   that you might be fired?

12   A.  Well, the group that's part of the lawsuit, we all agreed,

13   because for me I thought it would be harder for them to fire

14   everyone together.

15   Q.  So you felt that if others didn't sign that they wouldn't

16   fire you, is that correct?

17   A.  No.

18          Can you repeat the question?  I did not understand.

19   Q.  Sure.  I want to make sure you understand.

20          The reason you didn't sign it is because there were

21   others who were willing not to sign the document?

22   A.  Yes.

23   Q.  And at that point you understood that you very likely will

24   not be fired?

25   A.  Not exactly, but I thought it was something better.

IAiTHERH                         Teutle - Direct

1  Q.  And you're still employed by the company today, correct?

2  A.  Yes.

3  Q.  Do you know anyone, any one person who did not sign and was

4  fired by the company?

5  A.  No.

6          MR. DAVE:  No further questions, your Honor.

7          THE COURT:  Any redirect?

8          MR. BROWN:  No, your Honor.

9          THE COURT:  You can step down.  Thank you.

10          Next witness.

11          MR. BROWN:  Mauro Teutle.

12          (Pause)

13          THE COURT:  Where is the witness and the lawyer?

14          MR. DAVE:  It appears the witness is nervous.

15          THE COURT:  What is going on?  I can't be taking a

16  five-minute break every time we change witnesses.

17          MR. BROWN:  Sorry, your Honor, I was having a

18  discussion with Mr. --

19          THE COURT:  Not on my time.  Where is the witness?

20   MAURO TEUTLE,

21      called as a witness by the Plaintiffs,

22      having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MR. BROWN:

25          THE COURT:  State your name and spell it for the

1    record.

2              THE WITNESS:  Mauro Teutle, M-A-U-R-O  T-E-U-T-L-E.

3              THE COURT:  Let's go.

4    BY MR. BROWN:

5    Q.  When did you first start working for Between the Bread?

6    A.  Three years.

7    Q.  And what was your position there?

8    A.  Delivery boy.

9    Q.  And did your position ever change?

10   A.  No, I still have the same position, delivery boy.

11             THE COURT:  You still work for Between the Bread?

12             THE WITNESS:  What was that?

13             THE COURT:  Do you still work for Between the Bread?

14             THE WITNESS:  Yes.

15   Q.  In front of you is a document that was marked as

16   Plaintiff's Exhibit 1, the first page of that exhibit.

17             Have you ever seen this document before today?

18   A.  No, I saw it approximately three months ago.

19   Q.  Do you know the approximate date that you first saw this

20   document?

21   A.  July 13.

22   Q.  And do you recall who gave you this document on July 13?

23   A.  Yes, a lady who I understood to be part of human resources.

24   Q.  And do you know that person's name?

25   A.  I don't know her name.

1    Q.  Had you seen her working around Between the Bread before?

2    A.  No, I saw her for the first time three months before.

3              THE COURT:  Three months before July 13?

4              THE WITNESS:  Yes, more or less she would come to buy.

5              THE COURT:  She would come to buy what?

6              THE WITNESS:  She would come to the office.  I'm

7    trying to say to the restaurant, to Between the Bread.

8              THE COURT:  Go ahead.

9    Q.  And what would she do when you saw her?

10   A.  She would arrive and go into the office.

11   Q.  Do you know what kind of job she had, what her position

12   was?

13   A.  Simply the information that she worked as part of human

14   resources.

15   Q.  And was she in charge of the documents at the company, the

16   employment documents?

17   A.  Honestly, I don't know, but when she finally demonstrated

18   this to us, I think yes.

19   Q.  And you said she gave you the document on July 13, 2018, is

20   that correct?

21             THE COURT:  Is that correct?

22   A.  Can you repeat it, please?

23   Q.  You said Gina gave you the document.

24             THE COURT:  He didn't say Gina.

25   Q.  You said that the human resources person, I apologize, gave

1   you the document on July 13, 2018, correct?

2   A.  Yes.

3   Q.  And when she gave you -- do you know what time of day it

4   was when she gave you the document?

5   A.  Approximately it was afternoon, midday, sorry.

6   Q.  And when you received it, were you alone or were you with a

7   group of people?

8   A.  There was like four to five delivery boys, five.

9   Q.  Do you recall who they were?

10  A.  Yes, there was Constantino, this other guy called Chris

11  that I remember also being -- Orlando.  The other ones I don't

12  remember too well.

13          THE COURT:  Was it all men or were there any women?

14          THE WITNESS:  Yes, there were men.

15          THE COURT:  Were there any women?

16          THE WITNESS:  There is one woman working there.

17          THE COURT:  I'm asking on July 13, when the lady came

18  and gave you the paper, were there any women there with you and

19  the other delivery people?

20          THE WITNESS:  No, no, no, no.  I don't remember, but

21  no.

22  Q.  And did she say anything prior to giving you this document?

23  A.  She read the document.

24          THE COURT:  She read it out loud?

25          THE WITNESS:  She was talking to one of the other

1    co-workers, and I was just listening, that this was going to

2    help us and all that, but just up to that.

3              THE COURT:  Next question.

4    Q.  And did she say anything to you after you received the

5    document?

6    A.  Well, that I had to sign it.

7              THE COURT:  What did she say?

8              THE WITNESS:  For us to sign it.

9              THE COURT:  Do you remember the words she used?

10             THE WITNESS:  I just remember that, that this was

11   going to benefit us, and then I left to a delivery, and that's

12   all I remember.

13             THE COURT:  Well, did she speak to you in English or

14   Spanish?

15             THE WITNESS:  Sometimes she spoke in Spanish, but

16   other times she spoke in English.

17             THE COURT:  When she told you you had to sign it, was

18   that in English or in Spanish?

19             THE WITNESS:  In Spanish.

20             THE COURT:  Did she say you had to sign it right

21   there?

22             THE WITNESS:  She said yes, and if not, to bring it

23   back.  I asked her if she could give me the opportunity so I

24   could look at it.

25             THE COURT:  You asked her that?

IAiTHERH                         Teutle - Direct

1              THE WITNESS:  And she insisted on a few occasions,

2       like or three times, for me to sign it, but no.

3              THE COURT:  No, we're just talking about July 13.  So

4       how many times did she tell you to sign it on July 13?

5              THE WITNESS:  Well, just one time.

6              THE COURT:  Okay.  And she told you that in Spanish?

7              THE WITNESS:  Yes.

8              THE COURT:  Did any of the people you saw there sign

9       it right there?

10             THE WITNESS:  I did not see anyone sign.

11             THE COURT:  And you said you had to leave early to do

12      a delivery, is that right?

13             THE WITNESS:  No, what happened was is they called me

14      and I had to go out and do a delivery.

15             THE COURT:  So you were called to do a delivery before

16      the meeting ended, is that correct?

17             THE WITNESS:  Yes, I was called.

18             THE COURT:  All right.  Did you bring the paper with

19      you?

20             THE WITNESS:  The paper, yes, yes, she gave it to me.

21             THE COURT:  Go ahead.

22      BY MR. BROWN:

23      Q.  And when you received the document after this human

24      resources person had spoken to you, did you believe that you

25      could be terminated if you did not sign?

1   A.   Frankly, yes, I felt that I would be let go.

2             THE COURT:  Why did you think that.

3             THE WITNESS:  Because it's an intimidation that you

4   feel at the moment.

5             THE COURT:  Did she say you would be fired?

6             THE WITNESS:  She did not say that, but we had to sign

7   it.

8             THE COURT:  And did she do or say anything else that

9   led you to believe that you would be fired if you didn't sign?

10             THE WITNESS:  Well, on the second occasion when I saw

11   her, I saw her from a distance --

12             THE COURT:  When was the second occasion?

13             THE WITNESS:  The next day.

14             THE COURT:  The next day.  Where were you when you saw

15   her?

16             THE WITNESS:  I was in the hallway.

17             THE COURT:  Who else was present?

18             THE WITNESS:  I believe it was the same co-workers.  I

19   mean there was Orlando and maybe three or four others.

20             THE COURT:  And you're sure it was the next day?

21             THE WITNESS:  Yes.

22             THE COURT:  And do you recall what time of day it was?

23             THE WITNESS:  I think it was approximately also like

24   one in the afternoon.

25             THE COURT:  Do you recall what day of the week it was?

1              THE WITNESS:  In all sincerity, I did not take that

2       into account.

3              THE COURT:  So what happened when you encountered her

4       the next day?

5              THE WITNESS:  I saw then at that moment that she

6       wanted us to sign, and I felt like a kind of intimidation,

7       didn't feel anything bad, but then I felt like I had to leave

8       there.

9              THE COURT:  You said you saw that she wanted you to

10      sign.  What did you see that led you to conclude that?

11             THE WITNESS:  Well, that I felt that by force she

12      wanted us to sign that document.

13             THE COURT:  You felt that by force.  What does that

14      mean?

15             THE WITNESS:  Well, at least at the moment I felt

16      fear.

17             THE COURT:  I am not asking you what you felt, I'm

18      asking you what you heard and what you saw.  So what did she

19      say?

20             THE WITNESS:  For us to sign.

21             THE COURT:  What did she say, as best you can

22      remember?

23             THE WITNESS:  Well, at the moment she was:  Sign it,

24      because this document is needs to be signed by all of you.

25             THE COURT:  You just encountered her and she said:

1   Sign it, this document needs to be signed by all of you?

2            THE WITNESS:  Yes, or rather that we had to sign it.

3            THE COURT:  And so you just walked upon her, that's

4   the first thing she said to you was:  Sign it.

5            THE WITNESS:  Yes.

6            THE COURT:  Was she already in a conversation with

7   somebody else when you arrived?

8            THE WITNESS:  I believe so.  She was with many of the

9   delivery boys.

10           THE COURT:  And could you hear what they were saying

11  before you got into that conversation?

12           THE WITNESS:  The truth is since we always have some

13  work to do and I was just there, and I felt bad, I just wanted

14  to leave.  So I had to pick up the plates, the ones that we had

15  for pick up, and leave it in the kitchen to get our delivery

16  ready for what had to be taken away.

17           THE COURT:  Next question.

18  BY MR. BROWN:

19  Q.  Did you -- do you know of anyone who did sign the

20  agreement?

21  A.  The truth, no.

22           MR. BROWN:  I have no further questions.

23           THE COURT:  Were you fired for not signing?

24           THE WITNESS:  Well, then the time passed, she didn't

25  come, and I don't know what happened.

1        THE COURT:  Do you know the name of this person?

2        THE WITNESS:  Which one, the one who wanted us to

3  sign?

4        THE COURT:  Yes.

5        THE WITNESS:  The name, no.

6        THE COURT:  Okay.  Go ahead.  Cross-examination.

7  CROSS-EXAMINATION

8  BY MR. DAVE:

9  Q.  Sir, when did you first learn about this lawsuit?

10  A.  It was approximately the month of August.

11  Q.  Sorry, did you say the month of August?

12  A.  August of the lawsuit when I became aware of the lawsuit.

13        THE COURT:  Was it before or after you had this

14  conversation with the lady who told you to sign the document we

15  just showed you?

16        THE WITNESS:  It was after.

17  Q.  I would like you to review what has been marked as

18  Defendant's Exhibit 9 in front of you.  After you have reviewed

19  that document, sir, my question is:  Do you recognize this

20  document?

21        THE COURT:  Do you recognize it?

22        THE WITNESS:  Yes.

23        THE COURT:  What is it?

24        THE WITNESS:  Delivery boys.

25        THE COURT:  That document is not delivery boys.  What

1   is that document?  What do you recognize it to be?

2                  THE WITNESS:  Like a class action suit.

3                  THE COURT:  So you recognize this from seeing it

4   before, correct?

5                  THE WITNESS:  This, no, afterwards, it was afterwards

6   that they sent me this notice.

7                  THE COURT:  But you have seen it before today,

8   correct?

9                  THE WITNESS:  No, right now is the first time that I

10   am looking at this document.

11                  THE COURT:  Go ahead.

12   BY MR. DAVE:

13   Q.  Sir, did you receive anything in the mail regarding this

14   lawsuit?

15   A.  Yes.

16   Q.  What did you receive in the mail?

17   A.  A document that seemed like -- looked like a class action

18   suit, like I mentioned, a class action suit.

19   Q.  Was it in English or Spanish?

20   A.  I believe that it was in English.

21   Q.  Did somebody read that to you in Spanish?

22   A.  Yes, I have children who read English and they read it to

23   me.

24   Q.  And did it ask you to do anything, the documents that you

25   received?

IAiTHERH                        Teutle - Cross

1   A.  Well, yes, if you are going to do this then you have to

2   become a part of this because of injustices.

3   Q.  I would like to show you, sir, what's been marked as

4   Defendant's Exhibit 11.  Do you recognize this document, sir?

5   A.  Yes.

6   Q.  Is that your signature on the line for signature?

7   A.  Yes.

8   Q.  And what is the date on this document?

9   A.  There, 22nd May.

10  Q.  Is that May 22nd, is that correct?

11  A.  Yes.

12  Q.  I would like you to review that a little bit closer, sir.

13  Does that look like a six or a five to you for the date?

14  A.  Two zero like 22.

15  Q.  Is that your handwriting, sir?

16  A.  Yes.

17  Q.  So you dated this May 22nd?

18  A.  Yes.

19  Q.  And is this one of the documents that you received in the

20  mail?

21  A.  Not this one.

22  Q.  How did you receive this document?

23  A.  This one, how did I receive it?

24  Q.  Yes.

25  A.  By the attorneys through the letter.

1    Q.  So you received it through a letter, was that not through

2    the mail?

3    A.  Previously, yes, but this document, no.

4    Q.  I want to understand, sir, how did this page, this

5    document, end up in your hands.

6    A.  Well, with this one, through the letter, we retained the

7    attorneys so they could tell me what this is about.

8    Q.  Sir, did you receive this -- did somebody hand this

9    document to you or did you open an envelope that you received

10   in the mail?

11   A.  No, I went directly to the attorney's office.

12   Q.  So you received this document when you went to the

13   attorney's office, is that correct?

14   A.  Yes.

15   Q.  And that would have been on or before May 22nd, 2018, is

16   that correct?

17   A.  Yes, May.  Yes, May.

18   Q.  So on May 22nd of this year you knew about this lawsuit?

19   A.  Yes.

20   Q.  And did you know what this document means by signing this?

21   A.  Well, what it says is this is a class action lawsuit.

22   Q.  Well, but do you know what it meant by you signing this

23   document?

24   A.  Not precisely too well, but I have seen the representation

25   and understood it was doing something in my favor.

IAiTHERH                         Teutle - Cross

1   Q.  So you were participating in the lawsuit, correct?

2   A.  Yes.

3   Q.  And so as of May 22nd, you were part of the lawsuit?

4   A.  Well, this document was signed then and I believe my

5   lawsuit continues based on this document.

6   Q.  I would like to show you what has been marked as

7   Defendant's Exhibit Number 5.

8           Do you recognize this document, sir?

9   A.  Yes.

10  Q.  Is that your signature on page 2?

11  A.  No.  Oh, yes.

12  Q.  Did you prepare this document?

13  A.  What do you mean?

14  Q.  Did you type this document up?

15  A.  No, I just signed it with the attorneys.

16  Q.  Did you read the document before you signed it?

17  A.  From what I understood, could be why I signed it, I was

18  because it was about what I was doing.

19  Q.  My question to you, sir, is:  Did you read it before you

20  signed it?

21  A.  Yes.

22  Q.  Can you read English, sir?

23  A.  I understand it a little.

24  Q.  So you read this yourself, is that correct?

25  A.  No, because I let myself go by the legal representation

IAiTHERH                           Teutle - Cross

1   that I have so that I'm aware what it is.

2   Q.  Did somebody read this for you?

3   A.  The attorney.

4           THE COURT:  Was it translated into Spanish for you?

5           THE WITNESS:  Yes.

6           THE COURT:  By whom?

7           Who translated it?

8           THE WITNESS:  An attorney that works at the same law

9   firm.  I don't remember the name right now.

10          THE COURT:  Go ahead.

11  BY MR. DAVE:

12  Q.  Sir, I would like you to review paragraph 2 of this

13  declaration.  And I'll read the first sentence.  It states:  On

14  July 13, 2018, and again on July 16, 2018, a manager --

15  A.  On July 16, 2018 --

16          THE COURT:  Stop, stop, stop.  Listen to the question.

17          What is the question?

18  Q.  Sir, you previously testified that an HR person distributed

19  a document to you on July 13, is that correct?

20  A.  Yes.

21  Q.  And did you understand what that document was when you

22  received it?

23  A.  Can you explain a little more, please?

24  Q.  Sure.  I would like you to review Plaintiff's Exhibit 1

25  that's in front of you, and I would like you to take a look at

IAiTHERH                          Teutle - Cross

1   page 1.

2   A.  This document.

3   Q.  When you received this document, sir, did you understand

4   what it was?

5   A.  The truth is it had a little -- didn't understand it,

6   frankly.

7   Q.  Did the person who distributed it explain to you what the

8   document was?

9   A.  A little bit.  Like I will repeat, they explain a little

10  bit about what it was about, how it would benefit us.

11  Q.  What did that person say?

12  A.  Well, the one from human resources.

13  Q.  What did she say?

14  A.  The little bit I understood from what she said, that that

15  document that we had to sign, that we needed it, that it could

16  help us.

17  Q.  So you did not know on your own what that document said, is

18  that correct?

19  A.  Yes, no, that I was not in agreement with the document,

20  that's correct.

21  Q.  I don't think I understood your answer.  My question is:

22  Did you understand what was contained in that document on

23  July 13?

24  A.  No, I did not understand it.

25  Q.  Did you understand it on July 16?

IAiTHERH                        Teutle - Cross

1    A.  July 16, which document?  The one that's over here?  13?

2    Q.  I'll withdraw that question.  You earlier said that the

3    next day, the very next day the HR person again asked you to

4    sign the document, is that correct?

5    A.  Yes.

6    Q.  Now your affidavit states that you represented that

7    document again on July 16, not July 14, do you think perhaps

8    you're mixing up your dates, sir?

9    A.  Yes.

10   Q.  So the second time the HR manager asked you to sign the

11   document, did you understand at that time the contents of the

12   document?

13   A.  No, no, because I wanted to understand perfectly what the

14   document contained, what the document said.

15            THE COURT:  By the time of the second meeting, the

16   second time you saw the woman, did you understand what that

17   document was?

18            THE WITNESS:  No, no, frankly not.

19            THE COURT:  When did you learn what the document was?

20            THE WITNESS:  Well, when I had to go with my legal

21   representation and that's when I became aware of the document.

22            THE COURT:  Go ahead.

23   BY MR. DAVE:

24   Q.  I would like you to look at page 2 of Plaintiff's Exhibit

25   1.  Do you recognize that document, sir?

1   A.  I don't understand this document.

2   Q.  Was this one of the other documents that was handed to you

3   by the HR person on July 13?

4   A.  There was many pages to sign; in other words, the document

5   I received is the one at the beginning.

6   Q.  How many documents did you receive from the HR person on

7   July 13?

8   A.  Just this document.  Of this, I read a little bit, but I

9   did not read any more.

10          THE COURT:  How many pages did you get from the woman

11   on July 13th?

12          THE WITNESS:  Look, she gave me just a document that I

13   mentioned, the first document, and the rest, just that one.

14          THE COURT:  Just one?

15          THE WITNESS:  Yes.

16   Q.  Did the HR person discuss the employee handbook on July 13?

17   A.  Well, the thing was there was some talking, but it happened

18   so fast and it was all done in English and I had to go.

19   Q.  So you don't know everything that was discussed by the HR

20   person on July 13, is that fair?

21   A.  Well, I believe the situation was for her to have us sign

22   and that was all.

23   Q.  That's not my question, sir.  I don't want to know what

24   your belief was.  I'm asking:  Do you for a fact know

25   everything that the HR person discussed on July 13 or do you

IAiTHERH                              Teutle - Cross

1  not?

2  A.  Not everything.

3  Q.  And you also testified earlier that you left before the

4  meeting ended, correct?

5  A.  Yes, because they called me to delivery and I had no more

6  time to listen, and besides, I was intimidated.

7  Q.  How did you come about speaking to the HR person on

8  July 13?

9  A.  It's that every time we are waiting to be called for

10  deliveries she has to pass by that same hallway, whether to

11  have a dialogue or to get to the office.

12  Q.  And you mentioned she went into the office when she

13  arrived, is that correct?

14  A.  She entered, went in, and then she came out.

15  Q.  When she came out, is that when she talked to you and the

16  other delivery boys?

17  A.  Yes, then she started talking with everyone that was there,

18  the five to six delivery boys.

19  Q.  So this was not a prescheduled meeting, is that correct?

20  A.  It was not a meeting because she did not end up telling us.

21  Q.  So you were working while she was talking, is that correct?

22  A.  Exactly.

23  Q.  And the other delivery boys were also working, preparing

24  things while the HR person was talking?

25  A.  Yes, or rather while we were working, like all the sudden

1  the manager would say all right, you, delivery, go on.  Like

2  that.

3  Q.  You mentioned Orlando and you didn't provide a last name,

4  but Orlando was in attendance on July 13, is that correct?

5  A.  Who was present?

6  Q.  I'm asking you, was there an individual by the name of

7  Orlando that was present on July 13?

8  A.  Yes, Orlando.

9          THE COURT:  That's the question, yes.  Next question.

10 Q.  Is there a person named Luis who goes by the name Orlando?

11 A.  I honestly don't know.

12 Q.  Did the HR person on July 13 ever say that if you don't

13 sign this document you will be fired?

14 A.  Sincerely, I did not hear it in that sense, but yes, but

15 she insinuated in her way that we have to sign it by force.

16 Q.  Is that a no, that she did not use those words?

17 A.  But she was like forcefully, not in other words, but

18 psychologically, you have to sign.  And in fact, the second

19 time she arrived angry because we did not sign it.

20 Q.  Sir, I want you to answer my question so I can move on.

21 Did she say that you will be fired if you do not sign?

22 A.  No, she did not say that.

23 Q.  Did she say that you would be fired if you did not sign on

24 July 16?

25 A.  She did not say that.

IAiTHERH                      Teutle – Cross

1            THE COURT:  The witness never said in court anything

2    happened on July 16.  So the second time to you met with the

3    woman, was it the next day or three days later?

4            THE WITNESS:  The next day.

5            THE COURT:  Did you ever tell anybody that it was

6    three days later?

7            THE WITNESS:  No, I did not say anything.

8            THE COURT:  Did you ever tell anybody it was July 16

9    when you had this next meeting?

10           THE WITNESS:  No, simply in that sense I didn't tell

11   anyone.

12           THE COURT:  How do you know it was July 13, the first

13   meeting?

14           THE WITNESS:  The first meeting?

15           THE COURT:  Yeah, how do you know it was July 13 or

16   not July 11 or July 12?

17           THE WITNESS:  Because that day, how do you call it, in

18   other words, that day we wrote things down and it was the 13th,

19   because of the controls of the deliveries, and that's why it

20   was noted as July 13.

21           THE COURT:  What was noted as July 13?

22           THE WITNESS:  Julio Cesar, what?

23           THE COURT:  How do you know the first meeting was

24   July 13?

25           THE WITNESS:  Because sometimes I maintain like a

1   control of my deliveries, and that's why I remember -- I don't

2   write it down, but I remember because of the control of my

3   deliveries.

4           THE COURT:  But you have a distinct recollection as

5   you sit here now that that meeting with the woman took place on

6   July 13.

7           THE WITNESS:  Yes.

8           THE COURT:  The second meeting was the next day.

9           THE WITNESS:  Yes, she returned again for us to sign.

10          THE COURT:  And did you ever learn her name?

11          THE WITNESS:  In all sincerity I was not interested in

12  her name.

13          THE COURT:  That's not my question.  Did you ever

14  learn her name?

15          THE WITNESS:  No, the next day she was just from human

16  resources, simply that.

17          THE COURT:  Go ahead.  Anything else?

18  BY MR. DAVE:

19  Q.  Sir, do you recall what day July 13 was?

20  A.  13, no, no, no, I don't remember too well, but I believe it

21  might have been a Monday, maybe, but I don't remember too well.

22  Q.  Do you work weekends, sir?

23  A.  On some occasions, yes.

24  Q.  Do you recall working --

25  A.  But not here in Between the Bread, at other places.

IAiTHERH                          Teutle – Cross

1   Q.  Have you ever worked on a weekend at Between the Bread?

2   A.  Yes, I have worked many times.

3   Q.  Sir, I would like you to review Exhibit 5.  This is your

4   declaration.

5          On paragraph 2 you stated on July 13, 2018, and again

6   on July 16, 2018, a manager named Gina distributed a document.

7          That's an incorrect statement, correct, sir?

8   A.  It's correct.

9          THE COURT:  I want to be clear, it was July 16 and you

10  did know her name.

11         THE WITNESS:  Honestly, no, no, never.

12         THE COURT:  Was it July 16 that you met her the second

13  time?

14         THE WITNESS:  Yes.  Well, yes, the 16th.

15         THE COURT:  So what you just told me under oath --

16         THE WITNESS:  Now I know her name is Gina.

17         THE COURT:  Now you know.  You're learning it here for

18  the first time?

19         THE WITNESS:  Well, because this is telling me she

20  distributed the document.

21         THE COURT:  But you signed this document, correct?

22         THE WITNESS:  Yes.

23         THE COURT:  But you're saying that you are just

24  learning now what her name was?

25         THE WITNESS:  Which document, this document or that

1    one?  Yes, I'm becoming aware right now about this paper.

2              THE COURT:  All right.  Do you have any more?

3              MR. DAVE:  Just a quick few questions, your Honor.

4    BY MR. DAVE:

5    Q.  Sir, do you know anyone that was fired as a result of not

6    signing Exhibit 1?

7    A.  Honestly, no.  No, because this is all individual.

8    Q.  I'm not sure that I understood you.  You don't know anyone

9    that has been fired because they didn't sign, correct?

10   A.  Which document, this document?

11   Q.  The one that's Exhibit 1, sir, the one that you received

12   from the HR.

13   A.  Yes.

14             THE COURT:  You know someone who got fired for not

15   signing?

16             THE WITNESS:  No, no, no, I don't know any of that.  I

17   don't know if they signed.

18             THE COURT:  Anything else?

19             MR. DAVE:  No, your Honor.

20             THE COURT:  Anything else?

21             MR. BROWN:  Not for this witness.

22             THE COURT:  You can step down.

23             Let's take a break.  Then I'm going to pick up with

24   another matter, so I'm going to need you to clear some space at

25   these tables.  Okay?

1                So we'll start up again in 15.  Clear half the table.

2                (Recess taken)

3                THE COURT:  Who is the next witness?

4                MR. BROWN:  The next witness is Carlos Gonzalez.

5                MR. DOBRY:  Your Honor, I would like to comment.

6     During the recess, a couple of witnesses who previously

7     testified were talking with the witnesses who have not yet

8     testified who were sequestered, as well as one of the members

9     of plaintiffs' counsel's table was speaking with the two

10    witnesses who have yet to testify.

11               MR. BROWN:  Your Honor, we just told them that we were

12    take a recess, and the other two witnesses were called back in.

13               THE COURT:  We can cross on this, but let's get

14    started with the next witness.

15               I think we'll need to pick up the pace here because

16    we're running out of time.

17     CARLOS GONZALEZ,

18         called as a witness by the Plaintiffs,

19         having been duly sworn, testified as follows:

20    DIRECT EXAMINATION

21    BY MR. BROWN:

22               THE COURT:  State your name and spell your name for

23    the record.

24               THE WITNESS:  Carlos Gonzalez, C-A-R-L-O-S

25    G-O-N-Z-A-L-E-Z.

IAITHER2                        Gonzalez - Direct

```
 1              THE COURT:  Good afternoon to you.  Just listen to the
 2    questions and only answer the questions, okay?
 3              Let's proceed, Mr. Brown.
 4    BY MR. BROWN:
 5    Q.  When did you first start working for Between the Bread?
 6    A.  August 2014.
 7    Q.  And what was your position there?
 8    A.  Delivery guy.
 9    Q.  And are you still employed for Between the Bread?
10    A.  Yes.
11    Q.  And in front of you is a document that was marked as
12    Plaintiff's Exhibit 1.  Can you please review that document?
13    A.  Okay.
14    Q.  Have you ever seen this document before today?
15    A.  Yes.
16    Q.  When was the first time that you saw this document?
17    A.  I remember that it was between July 12 or 13, I don't
18    remember the exact date.
19    Q.  And do you know who gave you that document?
20    A.  Yes, Ms. Gina.
21    Q.  Do you know who Gina is?
22    A.  I knew Gina, met Gina the time she gave me the document.  I
23    knew she worked there and she dealt with the office and some
24    papers, but didn't meet her until she gave me this document.
25    Q.  So when she gave you the document, that was the first time
```

IAITHER2                          Gonzalez - Direct

1    you had physically seen her?

2    A.   In person, yes.

3    Q.   Did you know of her before that?

4    A.   Yes, I have heard her name that she worked in the office,

5    but I never met her in person.

6    Q.   What did you understand her position to be?

7    A.   It seemed like she substitute Sarah or she worked in the

8    same place she was at.

9    Q.   And what position, what title did you believe that she had?

10   A.   The manager of the employee papers.

11   Q.   And when she gave you this document on either the 12th or

12   the 13th, did show -- give it to you -- were you by yourself or

13   were you with a group of people?

14   A.   I was with a group of people.

15   Q.   And how many people were you with?

16   A.   I don't remember, but there were around seven to eight

17   people.

18   Q.   And do you recall any of the names of the people who you

19   were with?

20            MR. DOBRY:  Objection, calls for speculation.

21            THE COURT:  Calls for speculation?  I don't think it

22   calls for speculation.  Overruled.

23   A.   Like three of them I remember.

24   Q.   And can you say them now?

25   A.   Christian, Ken, and Orlando.

IAITHER2                          Gonzalez - Direct

1    Q.  Any of the people that you -- in this courtroom today were

2    at that meeting besides any of people in the galley here?

3    A.  I don't remember, but I believe so, Constantino.

4    Q.  And before Gina gave you the document, did she say anything

5    to you or the group?

6    A.  Before, no.

7    Q.  And did she say anything to you during or after giving you

8    the agreement?

9    A.  When she gave the document, when she start distributing it,

10   she said she would talk about it.

11   Q.  And what specifically did she say?

12   A.  Well, from what I remember, it had something to do with the

13   sick days that we could have or personal days that we're

14   supposed to get by law, but then after that I don't remember

15   because I had go out and make a delivery.

16   Q.  So you left before she could finish talking?

17   A.  I did not finish, I did not get to hear the rest of the

18   conversation because I had to leave the room.

19            THE COURT:  But she gave you a paper?

20            THE WITNESS:  Yes.

21            THE COURT:  What did you do with the paper?

22            THE WITNESS:  I took it with me.

23            THE COURT:  Okay.  Did you ever read it?

24            THE WITNESS:  Part of it, of what I was able to

25   understand from the English because I don't understand English

IAITHER2                     Gonzalez - Direct

 1   too well.

 2              THE COURT:  But did you ask somebody else to translate

 3   it for you?

 4              THE WITNESS:  In fact, I know Orlando asked her to see

 5   if she could give us a translation of this and she did not give

 6   us one.

 7              THE COURT:  Was she speaking English or Spanish?

 8              THE WITNESS:  In both.  Both.

 9              THE COURT:  So after you left that meeting, did you

10   see her again?

11              THE WITNESS:  No, no longer.

12              THE COURT:  Okay.  I'm not sure what else he's got to

13   say that's relevant.

14   BY MR. BROWN:

15   Q.  So at what point did you understand the agreement?

16   A.  Just because they started saying that this agreement was

17   not good for us.

18              THE COURT:  Who said that?

19              THE WITNESS:  Kenneth.

20              THE COURT:  But I'm not interested in what Kenneth

21   thinks about any of this.  This hearing is about --

22              Did you ever sign this agreement?

23              THE WITNESS:  No.

24              THE COURT:  Did you fear that you would be fired if

25   you didn't sign the agreement?

IAITHER2                    Gonzalez – Cross

1          THE WITNESS:  Of course, I always thought that, the

2     fact of not sign it I felt I could be fired.

3          THE COURT:  Why?  Why did you think that?

4          THE WITNESS:  Because I don't want to get fired from

5     the job, I have a family to --

6          THE COURT:  I'm not saying why you don't want to get

7     fired, I want to know why you did think you would be fired if

8     you did not sign the document.

9          THE WITNESS:  I believe that it was like a type of

10    intimidation that they were having with this so that we would

11    fear to be fired.

12         THE COURT:  And how was this intimidation conveyed?

13         THE WITNESS:  Well, by the fact that, like the rest

14    said, about signing this for the arbitration.

15         THE COURT:  Well, did Gina ever say that you would be

16    fired if you didn't sign the arbitration provision?

17         THE WITNESS:  No.

18         THE COURT:  Anything else?

19         MR. BROWN:  In the interest of moving things along, I

20    have no other questions.

21         THE COURT:  Cross-examination?

22    CROSS-EXAMINATION

23    BY MR. DOBRY:

24    Q.  Good afternoon, Carlos.

25    A.  Good afternoon.

IAITHER2                    Gonzalez – Cross

1   Q.  Are you still working at BTB Events and Celebrations?

2   A.  Yes.

3   Q.  I'm referring to Plaintiff's Exhibit 1 that was shown to

4   you.  You testified earlier that you were only provided a

5   single document.  Is that the document you're referring to?

6   A.  Yes, this is what was given.

7   Q.  Did you receive any other documents?

8   A.  No.

9   Q.  But then you later testified that when you were having a

10  conversation with Gina she discussed sick days, is that

11  correct?

12  A.  Of course.

13  Q.  Does the document marked as Plaintiff's Exhibit 1 that

14  you're looking at, which you said was the only document that

15  you received, does that document mention sick days?

16  A.  I honestly did not read it completely, like -- I will say

17  it again, I don't understand the English very well.

18  Q.  But didn't you testify that you understood the agreement?

19  A.  No, I never said that.

20  Q.  I'm going to show --

21          MR. DOBRY:  Does he have the Defendant's Exhibit 9 in

22  front of him?

23          THE INTERPRETER:  Yes.

24  Q.  I would like you to review that document.  Once you're

25  finished reviewing, do you recognize this document?

IAITHER2                           Gonzalez - Cross

1    A.  Yes.

2    Q.  Did you receive these documents in the mail?

3    A.  Yes.

4    Q.  When did you first learn of this lawsuit?

5    A.  When all the other ones indicated that they had received

6    this notice in the mail.

7    Q.  So just so I'm correct, you learned of this lawsuit not

8    from receiving this document in the mail but from hearing about

9    it from other people?

10   A.  Exactly.  Because I moved out of my house and they did not

11   have my new address.

12   Q.  So you never received this document in the mail?

13   A.  Well, after I went searching for it after I changed my

14   address I went to my old mailbox to get my old mail.

15   Q.  When did you move or change addresses?

16   A.  It's been like four years now.

17   Q.  In four years you never changed your address?

18   A.  With Between the Bread, no, but with other places, yes.

19   Q.  Is your address 87-10 31st Avenue, East Elmhurst, New York?

20   A.  Yes, that's the address I have registered with Between the

21   Bread.

22   Q.  And you have not been living at that address for four

23   years, is that correct?

24   A.  No, because I moved.

25   Q.  So if you did not receive this notice in the mail, did you

IAITHER2                         Gonzalez – Cross

1   complete what says consent to join?  It's the sixth page of

2   that document.

3   A.  Yes.

4   Q.  How did you receive that document?

5   A.  In the envelope that it came in.

6   Q.  But you just testified that you did not receive the notice

7   or Exhibit 9 in the mail.

8   A.  That's what came in to my old mailbox.

9            THE COURT:  How did you get it?

10           THE WITNESS:  I got it from my mailbox.

11           THE COURT:  So you weren't living there but you went

12   back to the mailbox to get the mail?

13           THE WITNESS:  Yes, I always return to my mailbox after

14   I change over, I go back to my mailbox to get whatever mail I

15   was supposed to receive.

16   Q.  Who resides --

17           THE COURT:  Wait.  You were asked if you got this in

18   the mail and you said no.  Weren't you asked that?

19           THE WITNESS:  They did not ask me that.

20           THE COURT:  You were asked:  You learned of this

21   lawsuit not from receiving this document in the mail but about

22   hearing about it from other people, and you said exactly,

23   because I moved out of my house and they did not have my new

24   address.

25           So you never received this document in the mail?

IAITHER2                    Gonzalez - Cross

1   A.  So the moment I became aware of the lawsuit is when I

2   returned to my house to look at my mail.

3         THE COURT:  Let's move on.

4   BY MR. DOBRY:

5   Q.  You previously testified that you first learned about this

6   lawsuit from a group of people that you spoke with.  Is that

7   not correct?

8   A.  Exactly, and that's why I returned to look at my mailbox.

9   Q.  I want to hand the witness what's listed as Defendant's

10  Exhibit 13.  Do you recognize that document, sir?

11  A.  Yes.

12  Q.  Is that your signature at the bottom of the page?

13  A.  Yes.

14  Q.  And on what date did you sign that document?

15  A.  7/12/18.

16  Q.  And when did you speak with Gina?

17  A.  About this?

18        THE COURT:  When did you have the conversation you

19  testified about earlier with Gina?

20        THE WITNESS:  I never spoke with Gina.

21        THE COURT:  So you were not at a meeting where she

22  handed you a piece of paper?

23        THE WITNESS:  Just the one for the arbitration.

24        THE COURT:  Right.  That's the point.  When was that

25  meeting in relation to when you signed this document?

IAITHER2                          Gonzalez - Cross

 1              THE WITNESS:  Yes, like I was saying, I don't remember
 2      if it was July 12 or 13.
 3              THE COURT:  Next question.
 4      BY MR. DOBRY:
 5      Q.  Where did you sign this document?  Do you remember?
 6      A.  That was with the --
 7              THE COURT:  With the what?
 8              THE WITNESS:  With the attorneys.
 9      Q.  So am I correct in that you signed this document at the
10      attorney's office?
11      A.  Yes.
12      Q.  Is that the first time that you had spoken with those
13      attorneys?
14      A.  Yes.
15      Q.  And when did you return to your mailbox?
16      A.  It hasn't been long, like two months ago.
17      Q.  Did you return to your mailbox on July 12, 2018?
18      A.  No, I did not go that day.
19      Q.  Prior to July 12, 2018, when was the last time you went to
20      that mailbox?
21      A.  In May.
22      Q.  When you signed this document, was that also your first
23      time seeing this document?
24      A.  Yes.
25      Q.  Did the attorneys give you this document?

IAITHER2                           Gonzalez – Cross

1   A.   Yes.

2   Q.   How did you know where the attorney's office was?

3   A.   By the address that it had.

4   Q.   What had the address?

5   A.   I don't remember, it was 39th and something and the name of

6   the attorney, and I asked also my friends.

7   Q.   Which friends did you ask?

8             MR. BROWN:  Objection.  I'm having a hard time seeing

9   the relevancy of this line of questioning.

10            THE COURT:  I'm not sure either.  Why do we care how

11   he got to the lawyer's office?

12            MR. DOBRY:  It shows that, one, he did not receive the

13   notice, and two, may not have been informed of all the

14   materials inside the notice.

15            And plaintiff's motion is accusing our clients of

16   making misrepresentations about this lawsuit to a group of

17   potential-opt in plaintiffs, yet at the same time --

18            THE COURT:  Accusing you of contacting represented

19   parties and basically offering an arbitration agreement while

20   there was a notification that was pending, which is not the

21   same thing.

22            So we're not going to get to your witness today, I

23   guess.  Maybe nobody cares.

24            MR. DOBRY:  I'm almost done, your Honor.

25   BY MR. DOBRY:

IAITHER2                          Gonzalez - Cross

1   Q.   I'm showing the witness what is listed as Defendant's

2   Exhibit 6.  Do you recognize this document?

3   A.   Yes.

4   Q.   Did you type up this document?

5   A.   What do you mean "type?"  I don't understand.

6   Q.   Did you write this document?

7   A.   No.

8   Q.   On July 12 or 13, did you know who Gina was?

9   A.   It was until the moment that she gave me the arbitration

10  that I met her, and before that I just knew her as a name of a

11  person who worked at the office.

12  Q.   So if you knew her name when you spoke with her, why did

13  you submit a declaration that just said a manager, why not put

14  her name?

15  A.   What do you mean "manager?"  I don't understand.

16  Q.   What does it say in paragraph 2 of Exhibit 6?

17          Would you like me to read it so it could be

18  translated?

19          We need affirmative yes or no.

20          THE COURT:  A manager distributed a document.  Why did

21  you use that word and not the name of the person?

22          THE WITNESS:  Because the name of the person didn't

23  come to mind, just their charge.

24  Q.   If you turn to the second page of that document, is that

25  your signature?

IAITHER2

1   A.  Yes.

2   Q.  And did you read and understand this document when you

3   signed it?

4   A.  Yes, but I couldn't, how do you say, understand the

5   explanation that was there.

6   Q.  Is there a reason why you didn't sign your name on

7   Exhibit 6 like you did on Exhibit 13?

8   A.  No, no reason.

9   Q.  And am I correct in that you still work for Between the

10  Bread?

11  A.  Yes.

12  Q.  And to confirm, you did not sign the arbitration agreement,

13  correct?

14  A.  No, I did not sign it.

15          MR. DOBRY:  No further questions, your Honor.

16          THE COURT:  Okay.

17          MR. BROWN:  Your Honor, the final witness

18  Mr. Menendez, he actually never received the agreement from

19  Gina, he only received it -- only saw it from other co-workers.

20  So I think given the time limitations that we have, there's not

21  much utility calling him, so we're prepared to rest.

22          THE COURT:  You can step down.  Thank you,

23  Mr. Gonzalez.

24          MR. DOBRY:  And Mr. Menendez also is not one of 18

25  potential opt-in plaintiffs as well.

IAITHER2                          Puppo - Direct

```
 1                THE COURT:  Well, I'm not sure if that's good or bad,
 2       but in other words, none of the opt-ins were chilled from going
 3       forward with this suit.  Mr. Menendez may have been.  But I'm
 4       not trying to talk you into calling him.  I don't need to call
 5       him.  You don't want to call him?
 6                MR. BROWN:  No, your Honor.
 7                THE COURT:  Let's get your witness on the stand.
 8                Let me thank the interpreter.  Thanks.
 9        GINA PUPPO,
10            called as a witness by the Defendants,
11            having been duly sworn, testified as follows:
12       DIRECT EXAMINATION
13       BY MR. DOBRY:
14                THE WITNESS:  Gina Puppo, G-I-N-A  P-U-P-P-O.
15                THE COURT:  Let's proceed.
16       BY MR. DOBRY:
17       Q.  Where are you employed, Ms. Puppo?
18       A.  With Between the Bread Events and Celebrations.
19       Q.  And what is your position with BTB?
20       A.  Director of human resources.
21       Q.  When did you begin to working for BTB Events and
22       Celebrations?
23       A.  March 5, 2018.
24       Q.  Prior to working for BTB Events and Celebrations, did you
25       work in a similar human resources role?
```

IAITHER2                    Puppo - Direct

1    A.  Yes, I did.

2    Q.  How many years of experience do you have conducting human

3    resources?

4    A.  Approximately about 20 years.

5    Q.  Do you speak Spanish, Ms. Puppo?

6    A.  Yes, I do.

7    Q.  Where did you learn to speak Spanish?

8    A.  Well, it is my native language, so I learned that actually

9    from my mother.

10   Q.  And where were you born?

11   A.  In Colombia.

12   Q.  And are you fluent in Spanish?

13   A.  I consider myself semi-fluent in Spanish.

14          THE COURT:  Semi-fluent?

15          THE WITNESS:  Semi-fluent.

16   Q.  Since you began working for BTB Events and Celebrations,

17   have you always been the director of human resources?

18   A.  Yes, I have.

19   Q.  And as the director of human resources, what are your

20   primary duties and responsibilities?

21   A.  My duties are taking care of human resources, human capital

22   for the organization.

23   Q.  Sorry?

24   A.  For the organization.

25   Q.  Do you determine the schedules for any employees?

1    A.  No.

2    Q.  Are you involved at all with the processing of newly hired

3    employees?

4    A.  Yes, I am.

5    Q.  When you were onboarding a new hire or processing a new

6    hire, what is that process, like what do you do?

7    A.  I review new hire documentation and also ask the employees

8    to complete documentation, complete like the I-9, the W-4, the

9    IT-104 to satisfy the federal and state regulations.

10   Q.  What documents are included for new hires when you go in to

11   review --

12   A.  Besides the I-9 and W-4, the tax forms, it also includes

13   emergency contact information and also the employee handbook

14   acknowledgment, employee handbook, because that's something I

15   review with them, and also the arbitration agreement.

16   Q.  When you were hired back in March of 2018, did you receive

17   an arbitration agreement?

18   A.  Yes.

19          MR. DOBRY:  I would like to present what is marked as

20   Defendant's Exhibit 1, which is a copy, and offer to submit

21   that into evidence.

22   Q.  Ms. Puppo, do you recognize that document?

23   A.  Yes, I do.

24   Q.  And what is that document?

25   A.  That's the arbitration agreement.

IAITHER2                    Puppo - Direct

1   Q.  Is that a true and correct copy of the one you received

2   when you started working for Between the Bread?

3   A.  Yes.

4   Q.  Is that document something that is ordinarily maintained

5   and controlled by BTB Events and Celebrations during the course

6   of its business?

7   A.  Yes.

8   Q.  Have you used a copy of this arbitration agreement when

9   onboarding new hires for BTB Events and Celebrations?

10  A.  Yes.

11  Q.  Has this agreement changed at all since you have been

12  employed by BTB Events and Celebrations?

13  A.  No.

14  Q.  Do you know how long this document has been a part of BTB

15  Events and Celebrations's new hire process?

16  A.  From my review of the employee files, I have seen that it

17  was implemented approximately February of 2017.

18  Q.  I am going to hand a copy of what is marked Defendant's

19  Exhibit 14 to the witness.

20          MR. DOBRY:  And I have a copy for your Honor.

21          THE COURT:  Isn't it in the binder that you gave me?

22  Q.  Please review these documents, Ms. Puppo, and let me know

23  when you are ready.

24          MR. BROWN:  Your Honor, I object to the admissibility

25  of this document.

IAITHER2                        Puppo - Direct

1          THE COURT:  This is not being offered yet, so let's

2     see if it's going to be offered.  Frankly a lot of documents

3     have not been offered.  Maybe at the end of this we'll have a

4     discussion about what everyone stipulates to, and if there's a

5     dispute we can talk about that.

6          But anyway, do you have questions about this?

7          MR. DOBRY:  Yes.

8     Q.  Have you seen these documents before?

9     A.  Yes.

10    Q.  What are these documents?

11    A.  These are signed arbitration agreements.

12    Q.  Can you please identify some of the dates that these

13    arbitration agreements were signed?

14    A.  February 13, February 14 of 2017.

15    Q.  So let's go through the first maybe five pages, if you

16    will, and please identify what the signature date is on those

17    five pages.

18    A.  On the first five pages it's February 13, 2017.

19    Q.  Are all these arbitration agreements dated sometime in

20    February 2017?

21    A.  Yes, dated 13, the 14th, and the 15th.

22          THE COURT:  So 2017.  That's before you started at the

23    company, correct?

24          THE WITNESS:  Yes, correct.

25    Q.  Do you know if any upper level management or ownership of

IAITHER2                        Puppo - Direct

1   BTB Events and Celebrations have also signed arbitration
2   agreements?
3   A.   Yes.
4   Q.   Do you know if the defendant Ricky Eisen signed this
5   arbitration agreement?
6   A.   Yes.
7   Q.   I would like to move Defendant's Exhibit 14 into evidence.
8             THE COURT:  Do you object?
9             MR. BROWN:  Yes, your Honor, I think in redacted form
10  there's no actual information.
11            THE COURT:  Well, the point is the date, that's what's
12  being --
13            MR. BROWN:  There's no way to verify that these dates
14  are correct.  Plus, these predate the time the witness was
15  employed at the company.
16            THE COURT:  I don't think that matters.  I think the
17  witness could authenticate these as business records.  I don't
18  know if she has, but she probably could.
19            Are you questioning whether they had arbitration
20  agreements in place prior to 2018?
21            MR. BROWN:  We dispute there was arbitration
22  agreements given to class members.  We have no idea
23  regarding --
24            THE COURT:  After or before?
25            MR. BROWN:  Prior to July 13 of 2018.

IAITHER2                    Puppo - Direct

 1              THE COURT:  Okay.  So the names here are scratched out

 2     on this exhibit.  Do you see that?

 3              THE WITNESS:  Yes.

 4              THE COURT:  Which is fine, but do you know the names

 5     that actually are under these redactions?

 6              THE WITNESS:  I do know that Ricky Eisen would have

 7     signed the agreement.

 8              THE COURT:  So that's one you already talked about.

 9              Was this an agreement that was given to all employees?

10              THE WITNESS:  I was not employed with the company in

11     2017.

12              THE COURT:  But your understanding, when you became

13     the HR --

14              THE WITNESS:  Yes.

15              THE COURT:  -- director was that there were policies

16     in place, right?

17              THE WITNESS:  Yes.

18              THE COURT:  And so was it your understanding of the

19     company policy there was a standard arbitration agreement and

20     class waiver action that was provided to all new employees?

21              THE WITNESS:  Yes.

22              THE COURT:  That was your understanding?

23              THE WITNESS:  Yes, it was my understanding.

24              THE COURT:  All right.  And that goes from delivery

25     people all the way up to the president of the company, is that

IAITHER2                          Puppo - Direct

1    is what you're saying?

2              THE WITNESS:  Correct.

3              THE COURT:  Go ahead.

4    BY MR. DOBRY:

5    Q.  Do you know if arbitration agreements were always provided

6    to new hires?

7    A.  Well, for new hires they should have received the

8    documents, the new hire documents, all the new hire documents.

9    Q.  So is it possible that prior to you joining the company a

10   new hire may not have received these documents even though it

11   is part of the new hire documentation?

12   A.  Yes.

13   Q.  Since joining the company in March of 2018, have you used

14   the arbitration agreement when onboarding new hires?

15   A.  Yes.

16   Q.  And did you use the arbitration agreement when onboarding

17   all new hires after you joined the company?

18   A.  Yes.

19   Q.  Where is your office located?

20   A.  Between the Bread Events and Celebrations' office is

21   located at 115 West 45th Street.

22   Q.  Is that where all BTB Events and Celebrations employees are

23   located?

24   A.  No, the location at 115 has the executive management and

25   executive -- sorry, executive management and managerial support

1   staff.

2   Q.   Where do catering assistants work?

3   A.   They work at the location of the 145 West 55th Street.

4   That's the commercial kitchen and catering office.

5   Q.   Just backtracking real quick to what is marked as

6   Defendant's Exhibit 14, where are those documents kept?

7   A.   In the employee files.

8   Q.   Is it within the course and scope of BTB's document

9   retention policies to keep these documents in the employee's

10  file?

11  A.   Yes.

12  Q.   Who is the custodian of these files?

13  A.   That would be me, myself.

14       MR. DOBRY:   And now your Honor, I would like to move

15  to admit Exhibit 14 as business records.

16       THE COURT:   Okay.  Any objection?

17       I think I already elicited the testimony that makes

18  these even relevant, but I will allow it.

19       (Defendant's Exhibit 14 received in evidence)

20       THE COURT:   Go ahead.  Move on.

21  BY MR. DOBRY:

22  Q.   Do you visit the 55th Street location?

23  A.   Yes, I do.

24  Q.   When is -- did you visit the 55th Street location in July

25  of 2018?

1    A.  Yes.

2    Q.  Did you go there on July 13, 2018?

3    A.  Yes, I did.

4    Q.  Why did you go there on July 13, 2018?

5    A.  I went there because the assistant catering manager named

6    Maria Casas --

7              THE COURT:  Could you spell that?

8              THE WITNESS:  C-A-S-A-S.

9              THE COURT:  What about her?

10             THE WITNESS:  She had contacted me regarding a new

11   hire, and I went to that location to meet with to meet the new

12   hire and also review new hire documents, and also asked him to

13   sign the new hire documentation.

14   Q.  Do you recall the name of the new hire that --

15   A.  Yes, Christian Garcia.

16   Q.  Do you recall the date he was hired?

17   A.  He was hired July 9.

18   Q.  Did you hire him directly?

19   A.  No, I did not.

20   Q.  I believe you mentioned that you went there to review new

21   hire documents.  Why did you want to review new hire documents

22   and who did you want to review them with other than Christian?

23   A.  Well, I spoke -- of course I spoke with Christian because

24   it was necessary for me to have him complete the new hire

25   paperwork.

IAITHER2                          Puppo - Direct

1          THE COURT:  Did you do this with every new hire, you

2     go to the restaurant where they're working?

3          THE WITNESS:  I would go to location because sometimes

4     they would hire them and, as you know, I need to have new hire

5     documentation.

6          THE COURT:  That's what you would do for every new

7     hire since you started in March of 2018?

8          THE WITNESS:  Sometimes I would go to the location and

9     sometimes they would come to the office where I was located.

10          THE COURT:  What percentage of the time did you go

11     there and what percentage did they go to you?

12          THE WITNESS:  I would say 75 percent of the time I

13     went to the location.

14          THE COURT:  You went to location.

15          Between March 2018 when you started and July 2013,

16     which is what we're really talking about today, how many new

17     employees were there in that period of time?

18          THE WITNESS:  Approximately about 40.

19          THE COURT:  All right.  Go ahead.

20          And you did this for each one of those 40?

21          THE WITNESS:  Yes.

22     BY MR. DOBRY:

23     Q.  Who did you -- other than Christian, who did you want to

24     discuss new hire documentation with at 55th Street on July 13?

25     A.  Well, on July 13 I also took the opportunity to meet with

1   other employees, and the reason for that was because since the

2   company was relocating, then I reviewed -- I was reviewing

3   documents.  And in the scope of reviewing the documents it came

4   to my attention that some of the employee files did not contain

5   the signed -- or refused to sign handbook acknowledgment or

6   arbitration agreements.  So therefore -- and because I didn't

7   know if they had been presented with them to have been asked to

8   sign off on them, then I took the opportunity when I went to

9   55th Street to present them with these documents and also to

10  review the handbook and giving them the option then to sign off

11  on the agreement documentation.

12  Q.  Did you know precisely who had these documents in their

13  files and who didn't have these documents in their files?

14  A.  No, I did not.

15  Q.  Did you go through every personnel file for 55th Street to

16  determine if they had or did not have certain documents in

17  them?

18  A.  No, I didn't go through every single file, but because I

19  was doing a review of what was going over to the new location,

20  I realized that in the file there were a lot of terminated

21  employees that I was not familiar with their names, and I

22  noticed that okay, there's both terminated and active in the

23  files in here, and most of them did not have these documents.

24  Q.  Do you know approximately how many personnel files were

25  missing new hire documentation?

IAITHER2                         Puppo - Direct

A.  I would say maybe 80 to 90 percent of the files.

Q.  When you went to 55th Street on July 13, did you schedule a
meeting to meet with people?

A.  No, I did not.

Q.  Do you know approximately what time you went to 55th
Street?

A.  Yes, I went at approximately 9:30.

Q.  Once you arrived, what did you do?

A.  I went into the kitchen, the office in the kitchen, which
is where their catering department is, and I asked Maria to
speak to the new hire, and they brought the new hire in to
speak with me to review the new hire documentation and to
complete the forms.

Q.  And then what did you do after you spoke with Christian?

A.  After I was complete -- finished up with Christian, then I
asked her if any other staff was available that I could speak
to to review some documentation.

Q.  Did you ask to speak to anyone else specifically?

A.  No, I asked if any staff was available.

Q.  Did you ask her if any specific type of employee was
available?

A.  No, I did not.

Q.  So you did not ask Maria whether any of the cooks were
available?

A.  No.

IAITHER2                        Puppo - Direct

1   Q.  You didn't ask Maria if any of the catering assistants were

2   available?

3   A.  No.

4   Q.  And then what happened after you asked that of Maria?

5   A.  Then Maria brought me down into the kitchen and I spoke

6   with -- I believe it was -- well, pretty sure it was to

7   production people.  So I went over the employee handbook with

8   them, the arbitration agreement with them, the employee

9   handbook acknowledgment.  Then after I had finished up with

10  them, then she also directed me to some other employees that

11  were available, and then I spoke with -- I believe it was two

12  food prep employees, and went over the documents with them as

13  well.  And then when I finished with these other two food prep,

14  I believe, employees then I was walking back to catering office

15  and I saw a group of employees in the hallway right outside of

16  catering, and then I said to Maria, oh, there's a group of

17  employees here, instead of one by one, I can just speak to them

18  in a group.

19  Q.  Apart from Christian, who I believe you testified said came

20  into the office, did you speak to any employee that day

21  individually about anything?

22  A.  No, I did not.

23  Q.  The events you just described, is that the totality of

24  people that you spoke with on July 13?

25  A.  Yes.

1    Q.  When did you speak with -- in that series of events, when

2    did you speak with catering assistants?

3    A.  Well, the group that was in the hallway, which I believe

4    were the catering assistants and possibly some other Between

5    the Bread employees, that would have been -- if I was there at

6    say 9:30, then possibly around 10:45 to 11.

7    Q.  So my question is when you were describing the people that

8    you spoke with on July 13, that was in chronological order?

9    A.  Yes.

10   Q.  When you were speaking with the last group, I believe you

11   testified -- you said catering assistants, do you remember how

12   many there were?

13   A.  No, I do not.

14   Q.  Do you know if all of the individuals were catering

15   assistants?

16   A.  No, I do not.

17   Q.  Did you know the names of the individuals that you were

18   speaking with?

19   A.  No, I did not.

20   Q.  So you can't tell us whether a person that you were

21   speaking with was a catering assistant or whether they worked

22   in production?

23   A.  No, I cannot.

24   Q.  Are you able to remember who was there, who was not there?

25   A.  No, I do not.  It was a group of employees that were there,

1  but I did not know the names of the employees to connect them

2  with the faces.

3  Q.  When you were speaking with these people, what did you

4  discuss with them?

5  A.  I went -- I actually let them know that I was there to

6  review the employee handbook with them, that they should be

7  aware of the employee handbook and the rights of the employees

8  that are working for the company.  And so I went through the

9  employee handbook page by page.  Actually I summarized each

10  page.

11  Q.  I'm going to hand the witness what is marked as Defendant's

12  Exhibit 2.  Do you recognize this document?

13  A.  Yes.

14  Q.  Please identify what it is.

15  A.  It's the employee handbook.

16  Q.  Is this a true and correct copy of the handbook that you

17  brought to 55th Street?

18  A.  Yes, it is.

19  Q.  What did you do or say to the group about this document?

20  A.  When it comes to the employee handbook, I review each page

21  of the employee handbook and say these are the company policies

22  and procedures, the employer's, so that they would know

23  basically what they can expect from the employer and what the

24  employer expects from the employee.

25  Q.  Do you read each line?

1    A.  Not each line, I summarize basically each page or each

2    chapter and each policy.

3    Q.  Did any of the people you were speaking with ask any

4    questions about the handbook?

5    A.  No, they did not ask any questions.

6    Q.  When you were discussing the handbook, did you speak in

7    English?

8    A.  Well, with the group, because they speak Spanish, some of

9    them speak English, some speak Spanish, then it was Spanish

10   English where I would do Spanish and English.

11   Q.  After you finished reviewing the handbook, what did you do

12   next?

13   A.  Then I went over the arbitration agreement.  Well, I'm

14   sorry, I went over the acknowledgment for the handbook.

15   Q.  So you went over the acknowledgment for the handbook

16   immediately after the handbook?

17   A.  It was a continuation, basically, because with the employee

18   handbook and the acknowledgment for the employee handbook.

19   Q.  I hand a copy of what is marked Plaintiff's Exhibit 1.

20   Please identify that document -- those documents.

21   A.  Sorry?

22   Q.  How many documents are part of Plaintiff's Exhibit 1?

23   A.  Exhibit 1 is the arbitration agreement and the

24   acknowledgment of the employee handbook.

25   Q.  Thank you.  Did you distribute those two documents?

1    A.  Yes.

2    Q.  Did you distribute those two documents to every employee

3    you spoke with at 55th Street?

4    A.  Yes.

5            THE COURT:  But you didn't keep track of who you spoke

6    to and who you gave the documents to?

7            THE WITNESS:  Because it was just a group that was

8    sitting there.  Then when I walked over I said okay, let me

9    read with you, but with me, the way that I would have handled

10   it was every employee, whether they sign an acknowledgment or

11   they refuse to sign, then I would have updated their employee

12   files.

13           THE COURT:  What if they already signed them?  You

14   didn't know if some of them already signed it and if their

15   files had them, correct?

16           THE WITNESS:  Correct.

17           THE COURT:  So you thought maybe I will give them

18   another one and maybe they will sign it again?  Doesn't seem

19   very scientific.

20           THE WITNESS:  Well, with the employee handbook,

21   because as HR I am supposed to be an advocate for employees,

22   and because I have had conversations with employees where they

23   weren't familiar vacation, with sick time, then when I had this

24   opportunity to review, then it was reviewing to everyone

25   because --

IAITHER2                         Puppo - Direct

```
 1              THE COURT:  I get you reviewing to everyone, but you
 2   gave documents to people that they were supposed to sign and
 3   those become part of their personnel file, right?
 4              THE WITNESS:  Yes.
 5              THE COURT:  But you didn't know whether some of them
 6   had already filled out those documents.
 7              THE WITNESS:  Correct.
 8              THE COURT:  Go ahead.
 9   BY MR. DOBRY:
10   Q.  Did anyone that you spoke with on July 13 tell you that
11   they have already signed either of those two documents?
12   A.  No, they did not.
13              THE COURT:  Did you ask?
14              THE WITNESS:  No, I did not ask.
15   Q.  Did you distribute those two documents to people that you
16   were speaking with?
17   A.  Yes.
18   Q.  Did you distribute them before or after reviewing the
19   handbook?
20   A.  It was after.
21   Q.  Did you say anything specific about the verification, about
22   the acknowledgment form?
23   A.  Well, the acknowledgment form, I basically summarize the
24   acknowledgment form as well so they were aware of what it said
25   and they would be then responsible for the -- to become
```

IAITHER2                        Puppo - Direct

1   familiar with the policy or policies.

2   Q.  Did you review the acknowledgment form in English or

3   Spanish?

4   A.  It was both Spanish and English.

5   Q.  And after reviewing the acknowledgment form, did you review

6   the arbitration agreement?

7   A.  Yes.

8   Q.  And is the copy of the arbitration agreement I showed you

9   earlier a copy of the agreement that you distributed to these

10  employees?

11  A.  Yes.

12  Q.  Did you review the arbitration agreement line by line?

13  A.  I basically summarized it.

14  Q.  Did you -- were there any particular portions of that

15  document that you emphasize when you are discussing with

16  employees?

17  A.  When it came to arbitration agreement, I said to them in

18  Spanish that the -- (speaking Spanish) -- means the company,

19  that the company is -- would like to basically, would like

20  to -- I'm trying to say the translation of -- (speaking

21  Spanish) -- into English, more the company is -- the company

22  would like to agree with the employees that should anything --

23  went through the arbitration agreement, and I ended that by

24  saying to them if they were -- if they're also -- if I say in

25  Spanish -- (speaking Spanish).

IAITHER2                        Puppo - Direct

1          THE COURT:  Look, the court reporter is not going to

2     get that down.  Say what you said in English.

3          THE WITNESS:  Which means that if they're also in

4     agreement, then they can sign and choose to sign the document.

5     Q.  Did you tell any of the last group that you spoke with, the

6     ones with the catering assistants, did you tell them that they

7     were required to sign the arbitration agreement?

8     A.  No, not at all.

9     Q.  Did you tell any employee that you spoke with at 55th

10    Street that they were required to sign, and if they didn't,

11    they would be fired?

12    A.  No, I did not.

13         THE COURT:  Were they required to sign an

14    acknowledgment of the employee handbook?

15         THE WITNESS:  Well, employees can sign the

16    acknowledgment, but employees, sometimes in other companies

17    that I worked for, have refused to sign, and I just need to

18    acknowledge that on the form.

19    Q.  Did any of the individuals that you were speaking with on

20    the 13th refuse to sign both the arbitration agreement and the

21    verification form?

22    A.  They didn't refuse to sign, say that I refuse to sign it,

23    they had just asked, because when I was finishing up on the

24    conversation with the staff there, and they said if anyone

25    wants to return any signed documents to me they can do so now,

IAITHER2                      Puppo - Direct

1     and one of the catering assistants named Orlando, he said oh, I

2     really want to take it home to review it.  And I said that's

3     okay, that's your right to do that.  Then everybody in the

4     group said that they also wanted to take it home to review it.

5     And I said okay, that's fine, that's fine.

6              THE COURT:  How did you plan on keeping track as to

7     whether or not they completed the forms?

8              THE WITNESS:  Because I have a listing of the

9     employees, so then I would be able to also check off on my list

10    that all the employees --

11             THE COURT:  But you didn't even know the people you

12    were talking to, right?

13             THE WITNESS:  No, but if I received the form back it

14    would have their name and I would be able to track it.

15             THE COURT:  So I don't understand.  You gave out forms

16    to certain people that you met, right?

17             THE WITNESS:  Yes.

18             THE COURT:  Not the entire office, not the entire --

19             THE WITNESS:  No.

20             THE COURT:  -- location.

21             And you told them to get them back to you, is that

22    right?

23             THE WITNESS:  I said if they wanted to sign it, they

24    could sign it, as I was there.

25             THE COURT:  And if they took them home, what were they

IAITHER2                           Puppo - Direct

1    to do?

2              THE WITNESS:  They were going to review them.

3              THE COURT:  And then do what?  Mail them to you?

4              THE WITNESS:  No, I said I would be back the following

5    week, I will be back next week, and you can give me any

6    documents that you choose to sign.

7              THE COURT:  Okay.  But you didn't keep track to who

8    you had given them to.

9              THE WITNESS:  No.

10             THE COURT:  So if you missed them the next week, how

11   would you know whether they had signed or hadn't signed?

12             THE WITNESS:  Well, the way that I was planning to --

13   because it was such a just a prompt kind of meeting, was the

14   way that I keep track of all the employees documents or

15   anything that needs to be signed or trainings or anything is I

16   keep track of it on Excel.

17             THE COURT:  Well, but you had it in Excel before you

18   went to this location, right?

19             THE WITNESS:  Yes.

20             THE COURT:  So you already knew who signed and hadn't

21   signed already, right?

22             THE WITNESS:  No, no, no, I did not have that, no, I

23   had a listing of the employees that worked for the company,

24   yes, on a spreadsheet, but I did not have a listing of who had

25   signed and who had not signed.

1          THE COURT:  So I don't understand.  So a week later

2     when you came back you were going to and collect whatever you

3     could collect and then do what?

4          THE WITNESS:  Then I would mark them just as I had

5     started to for the employees that signed.

6          THE COURT:  If they didn't sign, what, you would

7     follow up with them?

8          THE WITNESS:  Yeah, if an employee doesn't return

9     documents, yes, of course I would follow up with an employee if

10     they decided not to sign.  It's their right not to sign, but I

11     would indicate that they had refused it sign the document and

12     then I would file that in their file.

13          THE COURT:  Go ahead.

14     BY MR. DOBRY:

15     Q.  Did any employees sign arbitration agreements on July 13?

16     A.  Yes.

17     Q.  Did anyone in the final group you were speaking with sign

18     the arbitration agreement on July 13 in the final group you

19     were speaking with?

20     A.  No.

21     Q.  I'm going to provide a copy of what is marked as

22     Defendant's Exhibit 15.  Please take a moment to review.  And I

23     will come back for a moment to what is marked as Defendant's

24     Exhibit 2, I believe, that employee handbook.  Is that a true

25     and correct copy of the one that you brought with you to 55th

IAITHER2                         Puppo - Direct

1    Street on July 13?

2    A.  Yes.

3    Q.  Where is that document kept?

4    A.  In the corporate office.

5    Q.  Is that handbook or is that document kept in the course and

6    scope of the business of BTB Events and Celebrations?

7    A.  Yes.

8    Q.  Who is the custodian of that document?

9    A.  I am.

10        MR. DOBRY:  Your Honor, I would like to admit

11   Defendant's Exhibit 2 into evidence.

12        THE COURT:  Any objection?

13        MR. BROWN:  I mean I don't see the relevancy, but I

14   have no objection to admissibility.

15        THE COURT:  This is what you brought with you to the

16   location on July 13, right?

17        THE WITNESS:  Yes.

18        THE COURT:  Did you hand out copies of it.

19        THE WITNESS:  No, I did not hand out copies.

20        THE COURT:  Exhibit 2 is received.

21        (Defendant's Exhibit 2 received in evidence)

22   Q.  When you were speaking with the employees on the 13th, did

23   you tell them there would be consequences if they did not sign?

24   A.  No.

25   Q.  Did you say anything that would suggest to them they would

1  be looked upon unfavorably if they did not sign?

2  A.  No.

3  Q.  What if they did sign, did you tell them they would receive

4  preferential treatment?

5  A.  No.

6  Q.  Please review the document marked Exhibit 14.  No, I

7  apologize, Exhibit 15.  What are these documents?

8  A.  15 is the arbitration agreement.

9  Q.  When are these arbitration -- when did you get these

10  arbitration agreements signed?

11  A.  The ones in my hand right now were signed on the 13th and

12  on the 17th.

13  Q.  Are these the arbitration -- all the arbitration agreements

14  that were signed between September 13 and September -- sorry,

15  July 13 and July 17, 2017?

16  A.  Yes.

17  Q.  Did you personally distribute each of these arbitration

18  agreements to the signing employees?

19  A.  Yes.

20  Q.  Can you please identify any catering assistants who signed

21  this agreement on July 13, 2018 based off of this document?

22  A.  On July 13, Christian Garcia was the only catering

23  assistant that signed.

24  Q.  To confirm, Mr. Garcia was a new hire?

25  A.  Correct.

IAITHER2                         Puppo - Direct

1   Q.   Did any other catering assistants sign the arbitration

2   agreement after July 13, 2002?

3   A.   Yes.

4   Q.   Do you know how many catering assistants signed after the

5   13th?

6   A.   One.

7   Q.   Do you recall the name?

8   A.   Yes, Paul Lobel.

9   Q.   Where are each of these documents in Exhibit 15 kept?

10  A.   With the new hire documentation in the employee files.

11  Q.   Are they in a general file for employee files or in

12  specific files?

13  A.   They're in their individual file.

14  Q.   What do you mean by "individual file?"

15  A.   Their individual HR file.  Every employee has an HR file.

16  Q.   Are these true and correct copies of the signed arbitration

17  agreements that are in these employees' files?

18  A.   Yes.

19  Q.   Are these documents kept in the normal scope of business of

20  BTB Events and Celebrations?

21  A.   Yes.

22  Q.   Who is the custodian of these documents and personnel

23  files?

24  A.   I am.

25            MR. DOBRY:  Your Honor, I would like to submit

1    Defendant's Exhibit 15 into evidence.

2              THE COURT:  Any objection?

3              MR. BROWN:  Same objection as the other agreements.

4              THE COURT:  I think your other objections were

5    hearsay -- including hearsay.  I think this is a business

6    record, but the relevance is I think somewhat limited.  It

7    shows some people did consent during this time period, right?

8    Doesn't show whether they were intimidated to doing it or

9    whether they did it voluntarily and happily, it doesn't show

10   anything about that, just shows that they submitted them.

11             For that limited purpose, I will allow it, but let's

12   wrap it up.  I have an affidavit from this witness.

13             (Defendant's Exhibit 15 received in evidence)

14   Q.  Ms. Puppo, after the 13th, when was the next time that you

15   went to 55th Street?

16   A.  On the 17th.

17   Q.  Did you speak with any employees at 55th Street the

18   following day on July 14?

19   A.  No.

20   Q.  Is BTB Events and Celebrations open on Saturdays?

21   A.  No.

22   Q.  Did you go to 55th Street on July 16, 2018?

23   A.  No.

24   Q.  Why did you go to 55th Street on July 17, 2018?

25   A.  Again, I went for a new hire, employee new hire.  And the

IAITHER2                        Puppo - Direct

1    reason why it was imperative that I go on that Tuesday was

2    because payroll is processed on Wednesday, so new hire

3    information needs to be inserted, updated into the payroll

4    file.  Since I took on the responsibility just two weeks

5    before, I needed to be sure that I had that information for the

6    new hire in the system.

7    Q.  Did you have any other reason to go to 55th Street on the

8    17th?

9    A.  No, that day was imperative for the new hire.

10   Q.  Did you speak to anyone about the arbitration agreement at

11   55th Street on the 17th?

12   A.  Yes, as I was walking in and passing actually the catering

13   assistants, then I said:  Oh, since I'm here, if anybody has

14   any documents, any signed documents, actually, to return, you

15   can return them to me now.

16   Q.  And did you discuss the arbitration agreements with anyone?

17   A.  Well, when I did say that to the group, then one of the

18   employees said to me that oh, he had left his home, and then I

19   said, I can get another copy if you want me to, and he said no,

20   I really want my daughter still to review them with me, and I

21   said okay, fine.  And the other people that were in the group

22   were basically saying they need more time to review them.  I

23   said okay, fine.  Then I went into the office where Maria is

24   situated.

25   Q.  When did you meet with Mr. Lobel?

IAITHER2                          Puppo - Direct

1   A.  During that same time when I was there.

2   Q.  So let's backtrack.  Around what time did you go to 55th

3   Street on July 17?

4   A.  I believe I went about 9:45.

5   Q.  And then what did you do when you walked into the facility?

6   A.  I walked into the facility, and then because as you walk

7   into the facility you pass the hallway before you get into the

8   catering manager's office, and that's where they were standing.

9   So as I was passing, that's when I said oh, since I'm here,

10  then if anyone has any documents they would like to return to

11  me.

12  Q.  Did you speak to Mr. Lobel at that time?

13  A.  I spoke to Mr. Lobel, yes, actually, because when I went

14  through -- when I was walking through and some of the -- there

15  was an employee that I really don't recall his name, and he

16  said:  Oh, what documents are those?  And then I said these

17  were actually -- and I explained to him this was the

18  arbitration agreement and the employee handbook acknowledgment

19  form, and then Paul also was -- he came over and then I gave

20  him the documents as well.  And then Paul said oh, I have been

21  with the company for so many years, he said I have no problem

22  with this, and he signed them.

23  Q.  Did you tell Paul that he had to sign them?

24  A.  No, actually Paul is the one who said to me:  Oh, I have

25  been with the company many years, I have no problem with this.

IAITHER2                    Puppo - Direct

1   Q.  As of July 13, 2018, did you know that Mr. Ramon Hernandez

2   had filed a lawsuit?

3   A.  No, I did not.

4   Q.  Did you know that any current or former catering assistant

5   had filed a lawsuit at that time?

6   A.  No, I did not.

7            THE COURT:  So you were the director of human

8   resources and you were not aware that employees of the company

9   were suing the company for wage and hour violations that

10  directly related to human resources issues?  You were unaware

11  of that?

12           THE WITNESS:  I was unaware of that.  I would have

13  never asked employees to -- that they could sign arbitration

14  agreements if I would have been aware of that.

15  BY MR. DOBRY:

16  Q.  If you did not know there was a lawsuit, were you aware of

17  any employees contemplating filing claims or did any employees

18  came to you about complaints about wage and hour violations?

19  A.  No.

20  Q.  When you were speaking with employees on either the 13th or

21  the 17th, did any individual mention or ask about wage and hour

22  policies or practices?

23  A.  No.

24  Q.  Did anyone complain to you or make reference to wage and

25  hour violations on either the 13th or the 17th?

1    A.  No.

2    Q.  What about prior, did you receive any complaints or

3    concerns about wage and hour from any employee?

4    A.  No.

5    Q.  When did you learn of this lawsuit?

6    A.  After I returned from visiting the 55th Street location.

7            THE COURT:  On what date?

8            THE WITNESS:  On the 17th, the afternoon of the 17th,

9    approximately 4:00 p.m. I learned through an email from

10   counsel.

11   Q.  And since learning of this lawsuit, have you distributed

12   arbitration agreements?

13   A.  No, I have not.

14   Q.  But what if there was a new hire at BTB Events and

15   Celebrations, have you distributed an arbitration to a new

16   hire?

17   A.  No.

18   Q.  When you were meeting with people on the 13th and the 17th,

19   did anyone ask about anything to do with their legal rights?

20   A.  No.

21   Q.  Did anyone mention a lawsuit to you?

22   A.  No.

23   Q.  I present what is listed as Defendant's 17.

24           MR. DOBRY:  This is a late addition.

25           THE COURT:  Okay, go ahead.

IAITHER2                           Puppo - Direct

1  Q.  Please identify what this document is.

2  A.  It's catering assistants employed between December 5th,

3  2014 and the present.

4         THE COURT:  It's a list, right?  It's a list of

5  employees?

6         THE WITNESS:  Yes.

7  Q.  Have you seen this document before Ms. Puppo?

8  A.  Yes.

9  Q.  Have you seen this document on or before July 17?

10  A.  No.

11  Q.  What is your understanding about this document?

12  A.  That it lists employees that were employed with the company

13  between that period, December 5 through the present.

14  Q.  Do the individuals on this list have any relation to this

15  lawsuit?

16  A.  Yes.

17  Q.  And what is that relation?

18  A.  Some of them have opted into the lawsuit.

19  Q.  Are you able to -- do you know if the individuals on this

20  list are current or former employees?

21  A.  Some are current and some are former.

22  Q.  What about Mr. Luis Criollo, current or former employee?

23  A.  Current employee.

24  Q.  What about -- I believe it's Diallo, current or former

25  employee?

1   A.  No, he's a former employee.

2   Q.  Do you know when he stopped working for Between the Bread?

3   A.  He stopped working for Between the Bread, I believe that

4   was 12/12 of 2017.

5   Q.  Is Jose Diaz a current or former employee?

6   A.  Jose Diaz is on leave currently.

7   Q.  And when was he put on leave?

8   A.  March 28 of this year.

9   Q.  So he wasn't actively working in July of 2018?

10  A.  No, he was on leave.

11  Q.  And the same for Mamadou Diallo?

12  A.  Yes.

13  Q.  What about Constantino Fernandez?

14  A.  He's still with the company.

15  Q.  Is Fernandez the correct last name for Constantino?

16  A.  Yes.

17  Q.  Do you know a Constantino Hernandez?

18  A.  Yes.  Sometimes it's Hernandez or Fernandez.

19  Q.  Is Carlos Gonzalez still a former or current employee?

20  A.  He's a current employee.

21  Q.  Is Robin Herrera a current or former employee?

22  A.  Current employee.

23  Q.  Is Ruben Irigoyen a current or former employee?

24  A.  He's a current employee.

25  Q.  Is Susana Jeronimo a current or only former employee?

IAITHER2                          Puppo - Direct

1    A.  Current employee.

2    Q.  Is Paul Lobel a current or former employee?

3    A.  Current employee.

4    Q.  Is Hassan Mahboob a current or former employee?

5    A.  Current employee.

6    Q.  Is Gil Moreno a current or former employee?

7    A.  Current employee.

8    Q.  Is Mustapha Njie a current or former employee?

9    A.  Former employee.

10   Q.  And do you know when he stopped becoming -- he stopped

11   working for BTB?

12   A.  I believe it was early July 2018.

13   Q.  What about Mr. Jose Reyes, is he a current or former

14   employee?

15   A.  Former employee.

16   Q.  When did Mr. Reyes stop working for BTB?

17   A.  It was August of 2018.

18   Q.  And Ivan Rodriguez, is he a current or former employee?

19   A.  Ivan is a current employee, I believe.

20   Q.  Is Ramiro Sanchez-Garcia a current or former employee?

21   A.  Yes.

22   Q.  Current or former?

23   A.  Current, sorry.

24   Q.  Is John Sire Torrez a current or former employee?

25   A.  Sir Torrez is a former employee.

IAITHER2                      Puppo - Direct

1   Q.  Is Eduardo Villegas Lopez a current or former employee?

2   A.  He's a former employee.

3           Ivan Rodriguez actually is a terminated employee.

4           THE COURT:  Terminated?

5           THE WITNESS:  Yes.

6   Q.  And do you know when he stopped working for BTB?

7   A.  Ivan actually stopped working in -- that was also -- that

8   was 12/22, I believe, 2017.

9   Q.  So out of the -- this listing, how many employees are on

10  this list?

11  A.  18 employees.

12  Q.  Do you know -- having learned about this lawsuit, do you

13  know how many of these individuals opted into this lawsuit?

14  A.  Yes.

15  Q.  And how many is that?

16  A.  I believe it's -- if I'm correct, it will be 15.  Well, I

17  know there's 15.

18  Q.  How many of these individuals on this list do you know

19  signed arbitration agreements?

20  A.  I don't know the exact number, I believe maybe seven on

21  this list, or twelve, I'm not --

22          THE COURT:  Twelve signed arbitration agreements?

23          THE WITNESS:  Oh, arbitration agreements?

24  Q.  The question is:  Do you know how many people on this list

25  signed arbitration agreements?

IAITHER2                         Puppo - Direct

```
1   A.  One.
2            THE COURT:  Who?
3            THE WITNESS:  That's Paul Lobel.
4            THE COURT:  Who?
5            THE WITNESS:  Paul Lobel, L-O-B-E-L.
6   Q.  Do you recall, when you were at the 55th Street location on
7   July 13, do you recall speaking to Jose Reyes?
8   A.  No, I do not.
9   Q.  Do you recall speaking to Mauro Teutle?
10  A.  No, I do not.
11  Q.  Do you recall speaking to Constantino Hernandez or
12  Fernandez?
13  A.  No, I do not.
14  Q.  Do you recall speaking to Carlos Gonzalez?
15  A.  No, I do not.
16  Q.  Do you recall speaking to a Jorge Menendez?
17  A.  No, I do not.
18  Q.  By not recalling if you spoke with these people, does that
19  mean that you didn't speak with them?
20  A.  They may have been in the group, and if they were in the
21  group then I was speaking to the group.
22  Q.  After speaking -- after July 17, did you tell any catering
23  department manager to not give time off to any catering
24  assistant?
25  A.  No, I did not.
```

IAITHER2                          Puppo - Cross

1   Q.  Did you tell any catering department manager not to give

2   time off or allow sick days or tardiness to anyone who did not

3   sign an arbitration agreement?

4   A.  No, I did not.

5   Q.  Did you tell any manager at the catering department to

6   alter or modify someone's schedule if they didn't sign an

7   arbitration agreement?

8   A.  No, I did not.

9   Q.  Did you terminate any employee who did not sign an

10  arbitration agreement?

11  A.  No, I did not.

12  Q.  Did you instruct anyone else to terminate an employee who

13  did not sign an arbitration agreement?

14  A.  No, I did not.

15  Q.  To your knowledge, has any employee been terminated for not

16  signing an arbitration agreement?

17  A.  No, they have not.

18          MR. DOBRY:  No further questions.

19          THE COURT:  All right.  Cross-examination.

20          Could I say, if your clients wish to leave they're

21  free to leave.  They don't have to leave, they're welcome to

22  stay, but if they want to leave, they can.  I don't want them

23  to feel trapped.  Go ahead.

24  CROSS-EXAMINATION

25  BY MR. BROWN:

1   Q.   What was your job title at Between the Bread?

2   A.   Director of human resources.

3   Q.   And can you describe what your job responsibilities were?

4   A.   Well, they are -- my duties pertain to human resources and

5   the human capital of the organization.

6   Q.   Were you in charge of employee documentation at Between the

7   Bread?

8   A.   Yes.

9   Q.   Were you involved in the hiring process of employees of

10   Between the Bread?

11   A.   Yes.

12   Q.   The firing process?

13   A.   Yes.

14   Q.   Scheduling?

15   A.   No.

16   Q.   Were you involved in disciplinary issues other than

17   termination?

18   A.   With the management team, yes.

19   Q.   And what was your role in terms of, say, hiring employees?

20   A.   My role would be to review the new hire documentation, have

21   them complete the necessary forms, review the employee handbook

22   with new hires.

23   Q.   And was there anyone else who was in charge of

24   documentation, the employee documentation, besides yourself?

25   A.   No.

IAITHER2                    Puppo - Cross

1    Q.  So you were solely responsible for the documentation for

2    Between the Bread?

3    A.  Yes.

4              THE COURT:  Are there any other people who work in HR?

5              THE WITNESS:  No.

6              THE COURT:  Do you have a secretary or assistant or

7    something like that?

8              THE WITNESS:  No.

9              THE COURT:  How many employees are there Between the

10   Bread?

11             THE WITNESS:  Approximately about 75.

12             THE COURT:  All right.  Go ahead.

13   Q.  And who was your direct superior at Between the Bread?

14   A.  Well, I really -- well, it's Ricky Eisen, and then I also

15   have my lines to the VP and to the partner.

16   Q.  And do you have to consult them with respect to decisions

17   regarding, say, discipline or termination?

18   A.  Yes.

19   Q.  What other types of decisions would require you to get

20   authorization from your superiors?

21   A.  Well, termination.

22             MR. DOBRY:  Objection, relevancy.

23             THE COURT:  I'll allow a couple of questions, but it's

24   not obvious to me sort of why I need to know all the approvals

25   she needs to get.  But firings, you said?

IAITHER2                          Puppo - Cross

1        THE WITNESS:  Yes, terminations, changes to policies,

2   trainings.

3   Q.  So when you saw that there was -- 80 to 90 percent of the

4   employees were missing arbitration agreements, did you feel

5   that that was something that you should talk to your superiors

6   about?

7   A.  Well, no, because I was responsible -- it was my

8   responsibility to bring the employees' files up to date,

9   because the company had never had a human resources presence

10  there, so it was my responsibility to get things in order, the

11  employee files, and also to review, as I said, the employee

12  handbook with the employees so they were aware.

13       THE COURT:  Did you ever mention to your bosses:  By

14  the way, 80 to 90 percent of our work force have not signed

15  arbitration agreements?  Did you ever have that conversation

16  with Eisen or anybody else?

17       THE WITNESS:  No, no, no.

18       THE COURT:  Next question.

19  BY MR. BROWN:

20  Q.  Did anyone tell that you everyone was supposed to have an

21  arbitration agreement signed in their file?

22  A.  Sorry?

23  Q.  Did anyone tell you that everyone was supposed to have an

24  arbitration agreement in their file?

25  A.  No.

IAITHER2                          Puppo - Cross

1              THE COURT:  So as the HR director, you understood that

2      an arbitration agreement meant that people couldn't go to

3      court, they had to arbitrate instead.  You understood that?

4              THE WITNESS:  Yes.

5              THE COURT:  Were you familiar with the litigation of

6      the company with respect to its employees?

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.  So how did you learn there

9      litigation involving employees of the company?

10             THE WITNESS:  I know that there was a -- there was

11     another case that we -- that the company was working on.

12             THE COURT:  When did you learn about that?

13             THE WITNESS:  That was for another location, that

14     was -- I learned of that one in March.

15             THE COURT:  In March when you started.

16             THE WITNESS:  Yes.

17             THE COURT:  So when you started you knew about a

18     litigation --

19             THE WITNESS:  Yes.

20             THE COURT:  -- involving a different location.

21             THE WITNESS:  Yes.

22             THE COURT:  What did you know about that litigation?

23             THE WITNESS:  That one was an employee that was

24     claiming sexual harassment.

25             THE COURT:  So you knew there was a sexual harassment

IAITHER2                          Puppo - Cross

1    case.  Was it a filed lawsuit or was it an arbitration?  What

2    was it?

3                THE WITNESS:  That was a filed lawsuit.

4                THE COURT:  Where was it pending?  Did you know what

5    court?

6                THE WITNESS:  No.

7                THE COURT:  Any other litigation that you were aware

8    of?

9                THE WITNESS:  No.

10               THE COURT:  Okay, go ahead.

11   BY MR. BROWN:

12   Q.  When did you first learn of this litigation then?

13   A.  On July 17, approximately 4 o'clock, from an email from

14   counsel.

15   Q.  Defense counsel introduced Exhibit 17, which is a list of

16   employees and their addresses.  Who prepared that document?

17   A.  I did not.

18   Q.  So someone else besides yourself prepared it?

19   A.  Yes.

20   Q.  And who compiled the documents that were given to

21   defendants' counsel in response to discovery in this case?

22   A.  I'm sorry?

23               MR. DOBRY:  Objection, relevancy.

24               THE COURT:  I'm not sure -- I think certainly it is

25   relevant, I'm not sure if it's an intelligible question.

IAITHER2                     Puppo - Cross

1           Do understand what is being asked?

2           THE WITNESS:  No.

3           THE COURT:  You said you didn't learn about this

4    litigation until July 17 or 18, right?

5           THE WITNESS:  Yes.

6           THE COURT:  Once you learned about this litigation,

7    did you learn about what had been produced in the discovery

8    portion of this litigation?

9           THE WITNESS:  I didn't know all the details, I just

10   knew that there was a case because I called counsel and I said

11   okay, I see this email, and I wasn't aware of any case with the

12   company.

13          THE COURT:  But one of the things that was produced

14   were time records of various employees.  Were you involved in

15   preparing these time records to be produced in discovery?

16          THE WITNESS:  No, I was not the one who was handling

17   payroll before I was -- I took over the responsibility of

18   payroll at the beginning of July.

19          THE COURT:  Well, another thing that happened in this

20   case was the addresses -- names and addresses of employees were

21   produced.  Were you involved in producing those materials?

22          THE WITNESS:  No, I was not.  Because that's also in

23   payroll.

24          THE COURT:  All right.  And then did you have regular

25   meetings with the leadership team of the company?

1              THE WITNESS:  Regular meetings, yes, I would have

2      meetings.

3              THE COURT:  Is there a discussion at those meetings,

4      typically, about litigation?

5              THE WITNESS:  No.

6              THE COURT:  Okay, go ahead.

7      BY MR. BROWN:

8      Q.  Do you use email at work?

9      A.  Yes.

10     Q.  Do you use it to communicate with your superiors?

11     A.  Yes.

12     Q.  So if we were to require disclosure of those emails, we

13     would see no mention of this lawsuit at all in those emails?

14             MR. DOBRY:  Objection, calls for speculation.

15     Objection.

16             THE COURT:  Sustained as to form.

17             Do you recall any emails involving this litigation

18     prior to July 17?

19             THE WITNESS:  No, I do not recall.

20             THE COURT:  No, you don't recall any?

21             THE WITNESS:  No.

22             THE COURT:  Have you gone back and taken a look since

23     and seen:  Oh, my goodness I did get a email that predated

24     that.  Have you done that?

25             THE WITNESS:  I have not gone back to my files.

IAITHER2                     Puppo - Cross

1            THE COURT:  You have not gone back.

2            THE WITNESS:  No.

3            THE COURT:  Next question.

4    BY MR. BROWN:

5    Q.  So you unilaterally made the decision to have everyone sign

6    these arbitration agreements without consulting anyone else?

7    A.  Yes.

8    Q.  So did you give employees anything in return for signing

9    these agreements?

10            The arbitration agreement, was anything given to them

11    in return for signing?

12    A.  No.

13            THE COURT:  A document or a benefit?  I'm not sure I

14    understand.

15    Q.  Any kind of benefit.

16    A.  No.

17    Q.  Either extra money, extra vacation, anything like that?

18    A.  No, no, no.

19    Q.  Would you agree that the arbitration agreement requires the

20    employees to give up some sort of legal right?

21    A.  Yes.

22    Q.  So what do they get in return for giving up that right?

23            MR. DOBRY:  Objection, calls for speculation.

24            THE COURT:  Do you know?  Were you involved in

25    preparing this agreement?

IAITHER2                    Puppo - Cross

1              THE WITNESS:  No.

2              THE COURT:  The agreement, you said, predated your

3    tenure.

4              THE WITNESS:  Yes.

5              THE COURT:  Sustained.  Next question.

6    Q.  You said also it was not a condition of continued

7    employment that they sign this agreement.

8              MR. DOBRY:  There was no testimony like that.

9    Mischaracterization of former testimony.

10             MR. BROWN:  I'll rephrase.

11             THE COURT:  I thought she had said -- so the question

12   was:  It was not a condition of continued employment.  I think

13   she testified to that, but I will ask again.

14             If an employee refused sign the arbitration agreement,

15   would that have any impact on their continued employment?

16             THE WITNESS:  No.

17             THE COURT:  No.  Go ahead.

18   Q.  You said part of your job was to make -- to make sure that

19   the personnel files were complete, correct?

20   A.  Yes.

21   Q.  So why did you wait three months to review the personnel

22   files to see that the arbitration agreements were missing?

23   A.  When I started working for the company I also reviewed

24   documents for other stores.  So I took care of one store, took

25   care of another store, and I was now at 55th Street, but it was

1    more because I was reviewing the documents because we were

2    moving.  And then I said okay, since I need to clean out these

3    files and get everything in order, then I noticed that these

4    are missing a lot of these forms, and then I took the

5    opportunity, since I was going over on the 13th.

6              THE COURT:  It was just that location or other

7    locations also?

8              THE WITNESS:  The other locations I already updated

9    the files.

10             THE COURT:  You already updated those files.

11             THE WITNESS:  Yes.

12             THE COURT:  What caused you to update the files at

13   some locations before other locations?

14             THE WITNESS:  Well, only because of the location I was

15   concentrating on:  Okay, let me concentrate on this location,

16   let me make sure that everything is in order.  And then I moved

17   to the next location.

18             THE COURT:  But what order did you choose?  Why did

19   you pick some first and others later?

20             THE WITNESS:  It was more because I was hiring and I

21   needed to hire new people for that location, and I said okay, I

22   need to make sure that their employees' files are in order,

23   because as HR, when I start working for a company, I usually do

24   an audit of their policies and their employee files.

25             THE COURT:  How many locations were there?

1          THE WITNESS:  Three.

2          THE COURT:  Three locations.  What are they again?

3          THE WITNESS:  The 27th Street location, the 40th

4   Street location, and then 55th.

5          THE COURT:  Which one did you do first?

6          THE WITNESS:  I believe it was the 27th Street

7   location.

8          THE COURT:  Okay.  But it has nothing to do with

9   starting south and moving north?

10         THE WITNESS:  No, I think it was more that I needed to

11  hire for that location.

12         THE COURT:  Was there hiring at the other locations?

13         THE WITNESS:  Yes, but there was a turnover in that

14  location that was hiring, so there was new hire documents and

15  going through the employee files.

16         THE COURT:  Okay.

17  BY MR. BROWN:

18  Q.  And you said you only went to the workplace two times to

19  talk about the agreement, correct?

20  A.  Sorry?

21  Q.  You only went to this work location two times, July 13 and

22  July 17, correct?

23  A.  Well, I had been to that location many times before.

24  Q.  For the purpose of distributing agreements?

25  A.  Yes.

IAITHER2                    Puppo - Cross

1    Q.  And how many agreements did you distribute on the 13th?

2    A.  I did not count exactly how many I distributed.  It was to

3    the group that was there in addition to the other employees at

4    that location.

5           THE COURT:  How many did you bring?  How many forms

6    did you bring?

7           THE WITNESS:  Well, I think I brought with me about --

8    that location does have approximately like 50 to 70 employees.

9    I didn't bring that many with me, I brought approximately 15,

10   and if I needed more I would make them.  They have a copy

11   machine.

12          THE COURT:  So 50 or 70 employees in that location?

13          THE WITNESS:  Yes.

14          THE COURT:  I thought I asked how many were in the

15   company and you said 75.

16          THE WITNESS:  No, for that particular -- for Between

17   the Bread Events and Celebrations.

18          THE COURT:  For all of the -- you're HR for a number

19   of different entities that are associated with Between the

20   Bread, right?

21          THE WITNESS:  Yes.

22          THE COURT:  So how many employees are there with those

23   various entities?

24          THE WITNESS:  So there's approximately 110 employees.

25          THE COURT:  110.  All right.

IAITHER2                          Puppo - Cross

1                Go ahead.

2     BY MR. BROWN:

3     Q.  So did you give out all 15 of those agreements?

4     A.  I may have, yes.

5     Q.  Did you get more and distribute more than the 15?

6     A.  Get more and distribute more?

7                THE COURT:  Well, did you run out and say:  I need to

8     make more copies, there's such a land rush here on these forms.

9                THE WITNESS:  I don't recall if I made the copies when

10    I first arrived because I needed more.  Because when I go to

11    that location usually I have to make more copies because

12    sometimes there are more employees than I expected to meet with

13    for new hire paperwork.  So I didn't bring 50, I brought

14    approximately 15 to 20, maybe, and I did distribute all the

15    ones I had on me.

16    Q.  So you didn't make any more copies after you distributed

17    the 15?

18    A.  No, I don't recall making more copies.

19    Q.  Did you distribute -- how many agreements did you

20    distribute on the 17th?

21    A.  On the 17th, I think maybe --

22                MR. DOBRY:  Objection, foundation.

23                THE COURT:  Overruled.

24    A.  I think maybe two.

25                THE COURT:  You were back the 17th and brought more

1    forms with you?

2            THE WITNESS:  No, I didn't have more forms with me on

3    that day.

4            THE COURT:  Did you distribute -- I thought you --

5            THE WITNESS:  I did.  I gave to Paul, because I was

6    there for the new hire, then I had paperwork with me.

7            THE COURT:  So you had more forms with you.

8            THE WITNESS:  Yes, but they weren't -- it was like I

9    had single forms for that, I had the new hire paperwork for two

10   new hires, and then I just pulled them out from the new hires

11   and I gave it to the two employees.

12   Q.  So how many copies did you have with you on the 17th?

13   A.  On the 17th I had two, because I had two new hire packets.

14   Q.  It says, if you look at Defendant's Exhibit 3, which is

15   your declaration, paragraph 41 --

16           THE COURT:  Paragraph 41?

17           MR. BROWN:  Yes.

18   Q.  It says that you located copies of the employment policies

19   as well as the arbitration agreements, to paraphrase.

20           This is the top of the last page.

21           THE COURT:  Top of page 9.  Do you see that?

22           THE WITNESS:  Yes.

23           THE COURT:  What's the question?

24   Q.  Did you -- you said you had two copies with you.  Did you

25   go and locate more copies, find additional ones?

IAITHER2                    Puppo - Cross

1    A.  No, as I stated a minute ago, I had new hire packets on me,

2    and because I had new hire packets on me, those documents would

3    be included in those.  So I located them and I pulled them out.

4    Q.  You located them within your new hire packet?

5    A.  Yes.

6    Q.  Did the new hires get those -- any of those documents?

7    A.  Well, then I needed to -- well, I brought two new hire

8    packets on me only because I wouldn't just carry one, and so

9    when I went inside, then I actually -- well, with Maria I

10   would -- I gave her a copy to keep in her office of new hire

11   documents.

12            THE COURT:  You said you went there with two copies

13   for new employees.

14            THE WITNESS:  Yes.

15            THE COURT:  And when you were there you gave Maria a

16   set for her office.

17            THE WITNESS:  No, no, no, what I'm saying is that I

18   had previously given Maria a copy of new hire -- I gave her a

19   new hire packet, basically, so I knew that in her office she

20   would have one.  So when I had those two on me and they asked

21   me, I just automatically got them out of the new hire packets

22   that I had on me.

23            THE COURT:  How much more do you have?

24            MR. BROWN:  Probably another two or three minutes.

25            THE COURT:  Two or three minutes?

1              MR. BROWN:  Yes.

2              THE COURT:  All right.

3    BY MR. BROWN:

4    Q.  Did you set a deadline for when they had to sign the

5    documents and return them?

6    A.  No, I didn't set a deadline.

7    Q.  It says that in your declaration last paragraph, middle of

8    the paragraph, page 9:  Rather I indicated that they may return

9    any signed documents to me on Thursday.

10             What do you mean by that?

11   A.  Because I was going to return to the office on Thursday.

12             THE COURT:  You knew you were going to return on

13   Thursday?

14             THE WITNESS:  Yes.

15             THE COURT:  Why did you know that?

16             THE WITNESS:  Because I knew that I needed to review

17   things with Maria.

18             THE COURT:  What things did you need to review?

19             THE WITNESS:  Because when I was reviewing all the

20   employee files, and because I had taken over the payroll, then

21   I noticed that there were a lot of employee files --

22             THE COURT:  I thought you said you went there because

23   there were with two new employees, that's why you went on the

24   17th.  Am I wrong about that?  Isn't that what you said?

25             THE WITNESS:  I went on the 17th for new hire

1    paperwork for a new employee, yes.

2              THE COURT:  I thought you said it was two new

3    employees.

4              THE WITNESS:  No, I brought two new hire packets with

5    me.

6              THE COURT:  So you went back on the 17th because of a

7    new hire?

8              THE WITNESS:  Mm-hmm.

9              THE COURT:  And did you know that on the 13th that

10   there was going to be a new hire that would be coming back on

11   the 17th?

12             THE WITNESS:  No.

13             THE COURT:  But you told people on the 13th that you

14   would be coming back on the 17th.

15             THE WITNESS:  No, I said to them that I would be back

16   next week.

17             THE COURT:  Next week.

18             THE WITNESS:  Yes, next week.  I didn't say a

19   particular day, I didn't say on the 17th on Tuesday, I said I

20   would be back next week, stop back next week.

21             THE COURT:  Go ahead.

22   Q.  What percentage of employees would you say come back with

23   signed agreements, based on your experience?

24   A.  My experience -- in my 20 years experience usually all

25   employees return acknowledgment forms; and of employee

IAITHER2                           Puppo - Redirect

1   handbooks, if they choose not to sign, then of course I mark it

2   that they refuse to sign.

3   Q.   What about not just the employee handbooks, I'm talking

4   about the arbitration agreements.  Same thing?

5   A.   Well, no, no other company that I worked with had an

6   arbitration agreement.

7   Q.   You said that you were going down store by store and giving

8   out agreements, correct?

9   A.   Oh, yes.  You mean at the Between the Bread?

10  Q.   Well, yes, I'm saying Between the Bread.  What percentage

11  of arbitration agreements would you say come back signed that

12  you distributed?

13  A.   A hundred percent.

14             MR. BROWN:  No further questions.

15             THE COURT:  Any anything else?

16             MR. DOBRY:  Real quick.

17             THE COURT:  Real quick.

18  REDIRECT EXAMINATION

19  BY MR. DOBRY:

20  Q.   The other locations you mentioned, the 27th Street and the

21  40th Street, are those owned by the BTB Events and

22  Celebrations, Inc.?

23  A.   No.

24  Q.   Do either of those two entities or stores, do they employ

25  any catering assistants?

IAITHER2                        Puppo - Redirect

1    A.   No.

2    Q.   Does only BTB Events and Celebrations conduct catering out

3    of 55th Street?  Is that correct?

4    A.   Yes.

5    Q.   Is the 27th Street location the location that had the issue

6    with a sexual harassment allegation?

7    A.   Yes.

8    Q.   The Thursday that is referenced in the final paragraph of

9    your corrected declaration in Defendant's Exhibit 3, is that

10   the Thursday following the 17th of July, or are you -- when did

11   you tell people that you would be back on Thursday, on the 13th

12   or the 17th?

13   A.   On the 17th.

14   Q.   Did you return on the 17th to collect anyone who signed?

15   A.   No, I did not.

16   Q.   Other than --

17          THE COURT:  That's because you learned about the

18   litigation at that point and you were told to back off.

19          THE WITNESS:  Yes.

20          THE COURT:  Who told you to back off?

21          THE WITNESS:  Counsel, advice of counsel.

22          THE COURT:  Counsel in this case, or is there a

23   general counsel in the company?

24          THE WITNESS:  No, counsel.  Because once I learned of

25   it through the via the email, then I spoke with counsel and he

IAITHER2

1    advised us on not moving forward and just discontinuing.

2              THE COURT:  Okay.

3              MR. DOBRY:  No further questions.

4              THE COURT:  All right.  Nothing else?

5              MR. BROWN:  No, your Honor.

6              THE COURT:  You can step down, thank you.

7         No other witnesses, right?  Do you want submissions,

8    argument, what do you -- what did you anticipate doing next?

9              MR. BROWN:  However the Court sees fit.  We could

10   provide a written statement.

11             THE COURT:  I don't want to belabor this.  I don't

12   want run up costs unnecessarily.  If you want to do that, I'm

13   okay with that.  If you don't want to, there's no point.

14        What do you want to do?

15             MR. BROWN:  I'm fine doing a written submission.

16             THE COURT:  A written submission.

17             MR. DOBRY:  Your Honor, I could -- I'm more than happy

18   to briefly summarize what was discussed today and apply it to

19   the scope of a motion for preliminary injunction.

20             THE COURT:  Well, I mean so that's the issue, do you

21   want to do that orally or in writing?  One of you wants to do

22   it in writing, one orally.  Correct?

23             MR. BROWN:  I'm a better writer than speaker.

24             THE COURT:  When do you want to make the submissions?

25             MR. BROWN:  I could do it within the next ten days or

1   so, if that would be fine.  By next Friday?

2                THE COURT:  All right.  Next Friday.  And then you

3   respond a week after that, I guess?

4                MR. DOBRY:  I guess, your Honor.  But personally I

5   don't think that it's necessary for another round of written

6   submissions when your Honor has heard all the evidence and the

7   evidence has shown that there's simply has been no harm.  Out

8   of the 18 potential opt-in members of the stipulated class,

9   eleven opted in.

10               The final day -- pursuant to the joint letters that

11   were submitted suggesting the date of mailing, the final day of

12   the opt-in period at the very latest was July 13.  Mr. Lobel

13   didn't speak with Gina to receive a copy of the arbitration

14   agreement until the 17th, after the period had expired.

15   There's simply no evidence to suggest that any potential opt-in

16   member was chilled, prevented, retaliated against or

17   discouraged in any way with respect to the collective opt-in

18   period or the arbitration agreements.

19               In fact, all of the declarants who were part of the

20   stipulated potential pool who received the arbitration

21   agreements did not sign, were not fired, and all still opted

22   into this lawsuit signing those documents, whether or not they

23   actually received the notice themselves, signed those

24   documents, apparently, before -- well before, back in June of

25   2018.

1              THE COURT:  I get all that, so that's why I'm not

2    sure -- so what do you want to do in a written submission?

3              MR. BROWN:  Since we're already here and arguing the

4    facts, I could argue it now.

5              THE COURT:  Okay.

6              MR. BROWN:  So we did hear from the witnesses and it's

7    pretty much undisputed at this time that there was an

8    arbitration agreement that was distributed during the opt-in

9    period.

10             THE COURT:  Well, the very end of it, right?

11             MR. BROWN:  It was on the last day, but that could be

12   one of the most critical times during the opt-in process.

13             THE COURT:  But it didn't chill any of these

14   witnesses, right?

15             MR. BROWN:  Not these particular witnesses.

16             THE COURT:  Did it chill any -- what's the evidence it

17   chilled anybody?

18             MR. BROWN:  I think the agreement speaks for itself.

19   I mean we heard from Ms. Puppo that there was a hundred percent

20   return rate on these agreements, that there was a message being

21   sent to the individuals during the opt-in period.

22             THE COURT:  But that message, if it was sent, it

23   certainly wasn't internalized because none of these witnesses

24   actually signed the agreement.  So it's not a hundred percent

25   that -- I mean a hundred percent of the witnesses who testified

1   didn't sign, so the only person who did sign, apparently, was

2   Christian, who made a hearsay statement to one or more of the

3   witnesses today that he felt chilled, but that's all there is,

4   I think.

5           MR. BROWN:  There was also -- we did have testimony

6   from Ms. Puppo that there was another individual who was a

7   member, Paul --

8           THE COURT:  He wasn't approached until after the

9   opt-in period, right?

10          MR. BROWN:  Yes.

11          THE COURT:  So how is he chilled?

12          MR. BROWN:  He was approached, according -- well, we

13  don't know --

14          THE COURT:  None of your witnesses put Paul at this

15  meeting, and Ms. Puppo didn't say she had this conversation

16  with Paul on the 13th.  So I don't understand how Paul was

17  chilled from entering into or opting into this litigation by

18  virtue of an arbitration agreement that was presented to him

19  after the opt-in period closed.  That seems illogical.

20          MR. BROWN:  There is a very high likelihood that there

21  were discussions amongst the employees.  We know there were

22  immediate discussions amongst the employees about this

23  agreement, and there's a high likelihood they heard about the

24  agreement.

25          And that's why, even if it's just a notice to these

IAITHER2

1    individuals saying that this agreement was given during the

2    opt-in period, and therefore was improper, we'll give you one

3    last chance to opt in.  I think that would eliminate all doubt

4    as to whether these individuals were chilled or not.  We don't

5    have proof that they were chilled, we don't have any of them

6    here, unfortunately, but I think, given the circumstances and

7    given the fact that these people were given the agreements

8    during the opt-in period warrants at least notice and a short

9    reopening of the opt-in period.

10              THE COURT:  Okay.  Look, I'm not sure I found

11    Ms. Puppo wholly credible.  It seems to me that the timing is

12    quite coincidental, if that's what it was, and it seems that

13    the HR operation at this company is quite haphazard, if that's

14    the case.

15              Nonetheless, it doesn't seems to me that there's any

16    need to send out additional notices to reopen the opt-in period

17    or to avoid arbitration agreements.  There's been no testimony

18    that reflects that anybody was chilled.  The witnesses who

19    testified weren't chilled.  Each insisted that they felt

20    intimidated.  I will say I don't find Ms. Puppo to be

21    intimidating at all.  I could barely hear her and I'm right

22    next to her.  So I think the suggestion of each witness that

23    they were intimidated, wasn't so much what she said but how she

24    said it, I found that preposterous.

25              I also was really struck about how the declarations of

1   all the witnesses who ended up testifying were virtually

2   identical, how they were inconsistent with much of the trial

3   testimony, how it seems that the declarations seem to have been

4   prepared without a lot of input from the witnesses themselves.

5         I can go through them and talk about them, but it

6   seems to me that Mr. Teutle never said anything about July 16.

7   In fact, he disclaimed it on the stand today.  He insisted he

8   never new the name of the person.  It wasn't until today when

9   he was confronted with his own declaration that he said oh, it

10  must be Gina, I'm learning it now.  Gina informed us that we

11  were required to sign the document.  He didn't say that on the

12  strand.  That struck me as troubling, to say the least.

13        We also had Carlos Gonzalez who didn't sign the

14  document with his signature.

15        And we also had Mr. Hernandez, Constantino Hernandez,

16  who didn't sign the document and says it's not his signature.

17  His declaration, he also disclaimed portions of it, and

18  portions of it were definitely contradicted by his testimony.

19  Mr. Hernandez didn't say that they were required to sign the

20  document by Thursday, as he does in his declaration.  He didn't

21  say that many of the newer employees signed the agreement.  He

22  didn't say that on the stand today.

23        And so again, I think there's a disconnect between the

24  declarations and the testimony here in court.

25        With respect to Mr. Gonzalez, again, I find his

testimony with respect to the intimidation factor that

plaintiffs insist was present here to be not supported by the

evidence that I have seen.

Now I don't think it's good form to be reaching out to

litigants, to individual plaintiffs or potential opt-in

plaintiffs during the opt-in period, even if it's the last day,

with arbitration agreements.  And so I'm a little skeptical of

the timing.  But that being said, I don't see the remedies

being sought by the plaintiffs here to be necessary because I

just don't think there's any basis to conclude that people were

kept out of this by the activities of the 13th and 17th of

July.

So I'm going to deny the request for an injunction,

deny the request for the relief of reopening the period, of

sending out additional notices or voiding the arbitration

agreement.  Certainly the arbitration agreement, I'm not ruling

that it can't be voided at some point.  I'm not being asked to

do that.  There's nobody who has come forward and said I signed

the arbitration agreement but I shouldn't be bound by it

because I didn't understand it or I didn't think I had a choice

because they were so intimidating.  Nobody has said that.  So

if somebody wants to challenge the arbitration agreement in

some other suit, then I guess they can do that, and that will

be for some other judge to decide, perhaps based on some of the

same testimony here.  I don't have to rule on that today.  But

IAITHER2

1  I'm not going to going to grant the relief requested.

2          It's clear, I think, from the testimony, no one

3  contradicted it, that the defendants are not offering the

4  arbitration agreement to anybody at the moment.  So to the

5  extent something improper happened on the 13th, it has not been

6  replicated since then, or at least certainly not since the 17th

7  of July.  So I am not worried about future violations or

8  improper communications of any kind.  If that changes, you will

9  let me know.  But for all those reasons I'm going to deny the

10  request, and I do think there should be much more care given to

11  declarations of this sort.  It seems to me that the witnesses

12  were not familiar with them, and some cases outright

13  contradicted them.

14          I did think, while I'm at, that Ms. Puppo's

15  declaration had points that she had no business making.  I

16  don't really need her to be opining on the quality of the

17  declarations of other witnesses, whether they were duplicative

18  and prepared by the same lawyer.  That's not her place to do

19  that.  So there's a limit to what a witness should be asked to

20  do, and I think lawyers sometimes really put their own

21  witnesses in jeopardy when they try to have them carry too much

22  weight.  With that, then I'm going to deny these requests.

23          Where are we now with discovery and where are we now

24  with the case management plan that was previously set?

25          MR. DOBRY:  I believe discovery, the fact discovery

IAITHER2

1    deadline isn't until December, but I had discussed earlier that

2    after this meeting we would speak and see where we're at with

3    discovery.

4           THE COURT:  In other words, you may need more time

5    because this slowed things down?

6           MR. DOBRY:  Yes, your Honor.

7           THE COURT:  I assume it must have slowed things down.

8    Huddle up, get back to me.  If you think we need more time,

9    tell me what you propose.  Be reasonable.  If you agree and

10   you're reasonable then I'm not going to have a problem with it.

11   I can't imagine you giving yourselves an extra eight months or

12   something, but if you think a couple extra months, I think

13   that's reasonable given how long this has taken.

14          Is there anything else?

15          MR. BROWN:  Your Honor, just one quick question.

16   Previously you had ordered that you would defer decision

17   regarding putative class members if we were to get to that

18   point.  Does that decision still stand?

19          THE COURT:  Putative class members?

20          MR. BROWN:  That the agreements were also given in

21   addition to it putative collective action members, and you said

22   that issue was still not ripe because we haven't reached that

23   point.  Does this decision affect your other decision regarding

24   putative class members?

25          THE COURT:  I think it would affect it because it

IAITHER2

1   doesn't seem to me anyone was chilled.  The notice went out, so

2   you're talking about on a motion for additional notice or just

3   a class action on the New York labor law based on the size of

4   the class and the scope of the class that has already been

5   developed through discovery?

6           MR. BROWN:  The class size is much larger than the

7   FLSA collective action size.

8           THE COURT:  Because of the numbers of years.

9           MR. BROWN:  Because of the number of years and also it

10  includes more than catering assistants.

11          THE COURT:  That motion hasn't been made, and I don't

12  know when you are planning to make it, but I haven't ruled on

13  that.  So it does seem to me the findings here today could

14  affect that, but I'm not sure that they will be dispositive

15  towards that.  You could make the motion, and if and when you

16  want to make that motion you should do it in the normal course

17  with a promotion letter.

18          Do you have a sense of the timing on that?

19          MR. BROWN:  Most likely immediately after the close of

20  discovery.

21          THE COURT:  So it doesn't preclude you from making the

22  motion.  Tee it up in a premotion letter and then they will

23  respond and then we'll talk about it.

24          MR. BROWN:  Thank you, your Honor.

25          MR. DOBRY:  And your Honor, we would like to reserve

IAITHER2

1    all issues and relief stemming from the declarations,

2    particularly Mr. Hernandez, which I believe he claimed was

3    forged, or that was not his signature and he did not sign that

4    document.

5         THE COURT:  Look, we didn't get into whether it's

6    forged or not.  He said it wasn't his signature.  It looked

7    very similar to his printed name, so it may be -- look, there

8    could be a number of reasons.  It could be that he was confused

9    he thought he had to write his name, not his signature, it

10   could be he forgot, I don't know.  We didn't explore that

11   really.

12        I do have the Court Exhibit 1, which I will docket,

13   which is his signature, and as you or Mr. Dobry pointed out,

14   the signature is also in another exhibit that was part of the

15   binder today to show that clearly it's not his signature;

16   whether it's not his handwriting is a different issue.  It's

17   not a signature, I think that's clear.

18        MR. DOBRY:  I wasn't asking for a determination on

19   those issues today, I would just like it to be reflected on the

20   record that it's preserved.

21        THE COURT:  Yeah, nothing is prevented.  You can

22   certainly cross these witnesses again based on this testimony

23   and these documents if and when we ever get to a trial, for

24   sure.

25        MR. DOBRY:  Thank you, your Honor.

IAITHER2

1          THE COURT:  Let me thank the court reporter, as

2   always, and I got to run, so I will issue a short order to that

3   effect.

4          MR. BROWN:  Thank you.

5          MR. DOBRY:  Thank you.

6          (Adjourned)

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                                Page

 3    JOSE REYES

 4    Direct By Mr. Brown  . . . . . . . . . . . . . 7

 5    Cross By Mr. Dobry . . . . . . . . . . . . . .17

 6    Redirect By Mr. Brown  . . . . . . . . . . . .37

 7    CONSTANTINO HERNANDEZ

 8    Direct By Mr. Brown  . . . . . . . . . . . . .39

 9    Cross By Mr. Dave  . . . . . . . . . . . . . .52

10    MAURO TEUTLE

11    Direct By Mr. Brown  . . . . . . . . . . . . .62

12    Cross By Mr. Dave  . . . . . . . . . . . . . .71

13    CARLOS GONZALEZ

14    Direct By Mr. Brown  . . . . . . . . . . . . .86

15    Cross By Mr. Dobry . . . . . . . . . . . . . .91

16    GINA PUPPO

17    Direct By Mr. Dobry  . . . . . . . . . . . . 100

18    Cross By Mr. Brown . . . . . . . . . . . . . 137

19    Redirect By Mr. Dobry  . . . . . . . . . . . 155
```

20

21

22

23

24

25

PLAINTIFF EXHIBITS

Exhibit No.                                      Received

   1    . . . . . . . . . . . . . . . . . . . 8

DEFENDANT EXHIBITS

Exhibit No.                                      Received

   14   . . . . . . . . . . . . . . . . . . 108

   2    . . . . . . . . . . . . . . . . . . 124

   15   . . . . . . . . . . . . . . . . . . 127