UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/21/2020
```

------------------------------------------------------------------X
                                                              :
RAMON HERNANDEZ, et al.,                                      :
                                                              :
                            Plaintiffs,                       :
                                                              :            17-cv-9541 (LJL)
              -v-                                             :
                                                              :                ORDER
BETWEEN THE BREAD 55TH INC., et al.,                          :
                                                              :
                            Defendants.                       :
                                                              :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiffs Ramon Hernandez, Eduardo Villegas Lopez, Jose Reyes, Luis Criollo, Gil

Moreno, Susana Jeronimo, Mauro Teutle, Ramiro Sanchez, Constantino Hernandez, Ruben

Irigoyen, Carlos Gonzalez, Mustapha Njie, Michael Marte, Jose Francisco Martinez, Mario

Rojas, and Jorge Menendez ("Plaintiffs") move for an order conditionally certifying a settlement

class and a collective action, granting preliminary approval to the proposed class action

settlement and plan of allocation, directing dissemination of notice and related materials to the

class, and setting a date for a fairness hearing and related dates.  Dkt. No. 167-1.  The Court held

a hearing on the motion on September 9, 2020 and ordered the parties to address certain issues

raised at that hearing by supplemental briefing.  Dkt. No. 170.  On September 18, 2020, the

parties submitted a letter addressing some of the Court's concerns and an addendum to the

settlement agreement.  Dkt. Nos. 171, 171-1.  For the reasons that follow, the Court denies the

motion for preliminary approval of the settlement without prejudice to the submission of a

revised agreement conforming to the views expressed in this opinion.

## BACKGROUND

A.  The Complaint's Allegations

Plaintiffs are employees of various locations of Between the Bread 55th Inc. ("Between the Bread," and with the individual defendants, "Defendants").  On December 5, 2017. they brought this putative class action under the Fair Labor Standards Act, 29 U.S.C. § 215 ("FLSA"), and the New York Labor Law, N.Y. Lab. Law § 215 ("NYLL"), seeking unpaid minimum wages, unpaid overtime, tips and liquidated damages.  Dkt. No. 1.  The Complaint was amended twice.  On March 21, 2018, an amended complaint was filed to remove one of the Defendants named in the Complaint.  Dkt. No. 24 ("First Amended Complaint").  On May 6, 2018, a Second Amended Complaint was filed to include the claims of 15 additional Opt-In Plaintiffs.  Dkt. No. 118 ("Second Amended Complaint").

Plaintiffs allege that Defendants, who operated a catering and food delivery business,  *id.* ¶¶ 48-50, failed to pay Plaintiffs, Opt-In Plaintiffs, and other current and former non-exempt employees, including delivery workers, caterers, food preparers, cashiers, and other individuals with similar job duties, minimum wages and overtime compensation, spread of hours premium, call-in pay, and all tips earned in violation of the FLSA and the NYLL.  Plaintiffs sought to recover, on behalf of themselves and others similarly situated, unpaid minimum wages, unpaid overtime compensation, unpaid spread of hours premium, unpaid call-in pay, unpaid tips which had been allegedly misappropriated by Defendants, liquidated damages and penalties, injunctive relief, and attorneys' fees and costs.

Among other claims, Plaintiffs allege that Between the Bread charged an 11% surcharge on orders, which it characterized as a "service charge" or "processing surcharge" until 2016.  *Id.* ¶¶ 52-54.  Plaintiffs claim that customers mistakenly understood this charge to be a gratuity,

even though management retained it.  *Id.* ¶ 58.  Under the NYLL, any administrative charge "shall be clearly identified as such and customers shall be notified that the charge is not a gratuity or tip."  N.Y. Comp. Codes R. Regs. tit. 12, § 146-2.19; *see also*, *Maldonado v. BTB Events & Celebrations, Inc.*, 990 F. Supp. 2d 382, 394 (S.D.N.Y. 2013) (holding, in a case involving the same employer and the same basic facts, that defendant was entitled to summary judgment on FLSA claims, but that plaintiffs were entitled to summary judgment on NYLL claims).  Additionally, Plaintiffs claim that Defendants paid them at rates below New York State minimum wage, *id.* ¶ 80, that Defendants refused to pay Plaintiffs at time and a half for overtime in violation of the FLSA and NYLL, *id.* ¶ 82, and that Defendants deducted 30 minutes of overtime payments per day for meal breaks, which in fact never exceeded 20 minutes, *id.* ¶ 83.

### B.  The Litigation and Settlement Process

Litigation continued for several years.  On December 19, 2018, the Court ordered the parties to participate in mediation.  Dkt. No. 100.  On January 4, 2019, the parties informed the Court of their intention to engage in formal, private, class-wide mediation with Carol Wittenberg, Esq., of JAMS.  Dkt. No. 103.  A full-day mediation was held on March 4, 2019 and the parties continued to negotiate in 2019 but failed to reach a final settlement.

In 2020, litigation resumed.  During that time, the parties briefed and argued several significant discovery issues in advance of the scheduled completion of discovery in August 2020. Dkt. Nos. 140, 141, 143-147.

On May 27 and 29, 2020, while the discovery motions were pending, the parties informed the Court that they were in the process of negotiating a term sheet for a class settlement.  Dkt. Nos. 150, 154.  On June 1, 2020, the parties wrote the Court that they had reached a settlement in principle for the class but were still finalizing the settlement documents.  Dkt. No. 155.  On July

7, 2020, Plaintiff wrote the Court seeking an order compelling Defendants to sign the Settlement Agreement, noting that the parties had reached the terms of a settlement but that Defendants had not signed the Settlement Agreement and Defendants' counsel had indicated he had not heard from his client.  Dkt. No. 159.  In the alternative, Plaintiff indicated it was prepared to reopen the litigation and resume discovery.  *Id*.  Defendants opposed on the grounds that the settlement agreement had not yet been finalized and requested an extension of time for the parties to finalize, sign and submit a settlement for judicial approval.  Dkt No. 160.  The Court granted that extension.  Dkt. No. 161.  By July 27, 2020, when Defendants still had not signed a settlement agreement, Plaintiff asked for a discovery conference which the Court granted and scheduled for September 9, 2020.  Dkt. No. 163.  On the eve of that scheduled conference, on September 4, 2020, Plaintiffs filed a motion for preliminary approval of the Settlement Agreement.  Dkt. No. 165.  With their motion, Plaintiffs submitted the Settlement Agreement and a proposed notice to class members.  Dkt. Nos. 167-1, 167-2.

C.  The Proposed Settlement

As originally proposed, the Settlement Agreement had several salient features.  Dkt. Nos. 166, 167:

- Defendants agreed, for purposes of settlement only, to the conditional certification of a class pursuant to Fed. R. Civ. P. 23 ("Rule 23") for the non-FLSA claims (i.e., the NYLL claims) and a FLSA collective for the FLSA claims (which, under federal law, are not subject to Rule 23).  Both the putative Rule 23 class and the FLSA collective, were defined as: "[T]he Named Plaintiff [sic] and up to 519 non-exempt employees who worked for Defendants at any time between December 5, 2011 and May 29, 2020."  Dkt.

No. 167-1 ¶ 1.5.  The Plaintiffs and non-exempt employees were defined as the Class Members.

- Defendants agreed to create a "Gross Settlement Fund" in the amount of $285,000, which would cover attorneys' fees for class counsel, fees to the Settlement Administrator (who was under common control with Plaintiff's counsel), incentive payments to six of the Plaintiffs, and payments to the Class Members.  *Id*. ¶ 3.1(A).

- The settlement fund would be distributed as follows: The Settlement Administrator would be paid $35,000 in fees.  *Id*. ¶ 3.4(A).  Class counsel would receive fees in an amount to be determined by the Court up to $95,000 plus additional costs and expenses.  *Id*. ¶ 3.2(A).  Six Plaintiffs would receive service awards in an amount to be determined by the Court of up to $5,000 each.  *Id*. ¶ 3.3(A).  After these deductions from the Gross Settlement Fund, "Individual Settlement Allocations are to be paid."  *Id*. ¶ 3.5(A).

- The Settlement Agreement permits Defendants to fund the Gross Settlement Fund over time.  $100,000 was to be paid no later than 30 days after the execution of the Settlement Agreement.  Thereafter, $30,833.33 is to be paid into the escrow account of the Settlement Administrator every month beginning as of January 1, 2021 until either (i) the entire Settlement Amount has been funded or (ii) if a lesser amount is determined to be sufficient to satisfy all required distribution, such less amount has been funded.  *Id*. ¶ 3.1 (B).

- If Defendants fail to pay the full amount required under the Settlement Agreement within the scheduled time, "Plaintiff may, on ten (10) days written notice, retain $100,000 of the funded amount, as legal and administration fees incurred in obtaining preliminary approval of the class settlement, and revert the lawsuit to its previous position as if no

settlement has been attempted, unless Defendants cure the shortfall before the ten (10) day notice period expires." *Id.* ¶ 3.1(B) (the "penalty provision").

- The Settlement Administrator fees, court-approved counsel costs, court-approved attorneys' fees, and court-approved service awards are to be paid first under the Settlement Agreement before the individual settlement allocations are paid to the authorized claimants and opt-ins and absent class members.  Thus, the Settlement Agreement directs the Settlement Administrator to make distributions in the following order: "(1) Paying the Settlement Administrator's total fees; (2) Paying Class Counsel's Court-approved costs; (3) Paying Class Counsel's Court-approved attorneys' fees; (4) Paying Court-approved service awards; (5) Paying Authorized Claimants their Individual Settlement Allocations. . . ." *Id.* ¶ 2.10.

- "Individual Settlement Allocations will be computed based on the number of workweeks worked by Class Members during the Class Period," based on a ratio of the number of weeks during which each Class Member was employed by Defendants during the Relevant Period to the aggregate number of weeks during which all Class Members were employed by Defendants during the Relevant Period (weighting those weeks by the hourly rate or estimated hourly rate each Class Member was paid in each such week). *Id.* ¶ 3.5(A).  The settlement does not draw a distinction between Class Members who have and are releasing both FLSA and NYLL claims and those who are releasing NYLL claims alone.  Any check for an individual settlement payment that is not redeemed within 120 days after its initial mailing will expire and become non-negotiable and any funds remaining from any uncashed checks are to be returned to Defendants.

- Under Rule 23, upon certification of the putative class and final approval of the settlement, all members of the class who did not opt out will release their NYLL claims, as a matter of law without any further action by the class member (and regardless whether the class member received and deposited a portion of the settlement). *Id*. ¶ 2.9. With respect to the FLSA claims, which are not subject to Rule 23, those Class Members who received, endorsed and deposited a settlement check would release the FLSA claims. Under the Settlement Agreement, endorsement and deposit of a settlement check would operate as joinder in the FLSA collective. *Id*. ¶ 4.1(A)-(B).

- The Settlement Agreement provides that within 30 days of entry of the Court's order of preliminary approval notice would be mailed by the Claims Administrator to the last known home address of each Class Member. *Id*. ¶ 2.4. Class Members would have 45 days from the date of the mailing or any remailing of the Notice to opt out or object to the settlement. *Id.* ¶¶ 1.3, 2.8.

D. Preliminary Settlement Approval Process

The motion for preliminary approval was filed on September 4, 2020. Dkt. No. 165. On September 8, 2020, the Court entered an order requiring Plaintiff to submit documents sufficient to establish the qualifications of its proposed Settlement Administrator and a budget and proposed retention agreement to support the requested $35,000 fee, and converting the previously scheduled September 9, 2020 status conference into a hearing on the motion for preliminary approval. Dkt No. 168. Plaintiff submitted the requested information that evening including an affidavit from an employee of its proposed Settlement Administrator, Advanced Litigation Strategies, LLC ("ALS"), setting forth the expected responsibilities and qualifications of ALS, a budget, and an assigned retention agreement. Dkt Nos. 169, 169-1. Although the

draft retention agreement recites in summary form that the fees were negotiated at arm's length, no information was submitted in support of that statement.  A cover letter accompanying the submission recited that ALS had been awarded administration fees exceeding $35,000 in similar mid-sized settlements and listed four cases in support of that assertion.[1]  It also noted that in two cases with smaller class pools of approximately 300 class members, ALS had been awarded administration fees of $25,000.[2]

The cover letter also contained evidence supporting the contention that it was not unethical for a law firm to use a settlement claims administrator under common control of counsel.  Dkt. No. 169.  Plaintiffs had previously provided this evidence to the Hon. Lorna G. Schofield in a prior class settlement approved in this District.  *Guaman v. 5 "M" Corp., et al.*, No. 13-cv-3820, Dkt. No. 91 (S.D.N.Y. Nov. 20, 2014).  Plaintiffs averred that they had contacted the Ethics Hotline of the Committee on Professional Ethics, which "confirmed that an attorney may own and operate both a law firm and a non-legal business (such as a settlement administration company) simultaneously."  Dkt. No. 169 at 1-2.

The Court held the hearing on September 9, 2020, during which it identified several issues with the proposed settlement.  Dkt. No. 172.  The Court identified several issues with respect to the settlement agreement and the parties agreed to modify the agreement accordingly.  *Id*.  In a subsequent order, the Court directed the parties to provide supplemental briefing on five additional issues.  Dkt. No. 170 at 2.  First, the Court asked what the estimated recovery would be for each putative class member and whether the recovery would differ depending on whether

---

[1] *Rodriguez v. Park It Mgmt. Corp., et al.,* No. 17 Civ. 4995 (S.D.N.Y.); *Salazar v. Spectrum of Creations, Inc., et al.*, No. 16 Civ. 0653 (S.D.N.Y.);  *Barbecho v. Matrat, LLC, et al.*, No. 15 Civ. 170 (S.D.N.Y.); *Guaman v. 5 "M" corp., et al.*, 13 Civ. 3820 (S.D.N.Y.).
[2] *Flores, et al. v. KC 53 LLC, et al.*, No. 12 Civ. 8095 (S.D.N.Y.); *Shariar v. Sukhmani, Inc., et al.*, No. 13 Civ. 3823 (S.D.N.Y.).

the class member opted into the FLSA collective or not. *Id.* Second, the Court asked Plaintiffs to justify the service awards of $5,000 to each of six Plaintiffs. *Id.* Third, the Court directed the Plaintiffs to explain the justification for the penalty provision and to explain why the proposal did not favor counsel at the expense of the clients. *Id.* Fourth, the Court asked for a new proposed schedule of distribution. *Id.* Finally, the Court directed Plaintiffs to address the possibility that their choice of claims administrator was tainted by conflict of interest. *Id.* Specifically, Plaintiffs' counsel was directed to submit to the Court proposals from three independent claims administrators for distribution of the settlement fund. *Id.*

On September 18, 2020, Plaintiffs filed a letter attempting to address the Court's concerns and included an addendum to the original proposed Settlement Agreement. Dkt. Nos. 171, 171-1. First, Plaintiffs indicated that the estimated average pro rata recovery for each class member would be $289, but that actual payments would fluctuate based on how long each class member worked at Between the Bread. Dkt. No. 171 at 2-3. Second, Plaintiffs stated that service awards were justified, because recipients of said awards had made important contributions to the case, including "assist[ing] Class Counsel's investigation and prosecution of the claims," and "were responsive and participated with counsel during mediation." *Id.* at 3. Four potential recipients also participated in an evidentiary hearing before Judge Sullivan on October 18, 2018. *Id.* Third, Plaintiffs argued that the penalty provision was necessary in order to "ensure that Defendants meet their payment obligations under the settlement." *Id.* at 5. Fourth, Plaintiffs put forward a proposed schedule for distribution of the settlement fund.

Finally, Plaintiffs attached three bids from other possible settlement administrators, Epiq, Arden Claims Service, and CPT Group. *Id.* These quotes were $44,749, $38,070, and $24,903, respectively. *Id.* Plaintiffs point out that ALS's estimate of $35,000 is approximately the

average of these three quotes.  Dkt. No. 171 at 6-7.  Further, Plaintiffs argue that it is "more beneficial to have an administration company under common control of Class Counsel administer the settlement."  *Id.* at 6.  Plaintiffs aver that other administration companies have "made errors in administering settlements" for them and suggest that this is because the staff of administration companies are working from home due to the pandemic.  *Id.*

The parties indicated in the letter that they are prepared to make the changes that the Court identified if the Court agrees that those changes would satisfy Rule 23 and the principles for approving a FLSA collective.  Dkt. No. 171 at 2.  Plaintiffs and Defendants have not submitted a revised proposed settlement.  Accordingly, the only signed settlement agreement that the parties have moved for approval remains the initial proposed Settlement Agreement submitted on September 4, 2020.  Dkt. No. 165-1.

## DISCUSSION

Plaintiffs seek preliminary approval of the certification and settlement of a Rule 23 class and of a FLSA collective.

A.    The Relevant Standards

Court approval of a proposed class-action settlement is governed by Fed. R. Civ. P. 23(e).  Under Rule 23(e), a court first grants preliminary approval of a class settlement.  If preliminary approval is granted, plaintiffs are permitted to disseminate notice of a hearing to the class members where class members and settling parties are provided an opportunity to be heard on the question of final court approval.  *Id.*  Under Rule 23(e)(1)(B), preliminary approval is warranted when the parties have shown that a court will likely be able to: "(i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal."  Rule 23(e)(2), in turn, authorizes final approval upon a showing that the settlement is

"fair, reasonable, and adequate."  "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).  However, even at the preliminary approval stage, "the Court's role in reviewing the proposed settlement 'is demanding because the adversariness of litigation is often lost after the agreement to settle.'"  *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (quoting *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 308 (W.D.N.Y. 2016)).

The Court's task at the preliminary approval stage is only to make a "threshold examination of the overall fairness and adequacy of the settlement in light of the likely outcome and cost of continued litigation," Newberg on Class Actions, § 13.13 (quoting *In re Inter-Op Hip Prosthesis Liability Litig.*, 204 F.R.D. 330, 350 (N.D. Ohio 2001)).  However, the Court still reviews the proposed settlement for the fairness, reasonableness, and adequacy by which it will judge final approval of the settlement.  The Second Circuit has historically used a nine-factor test articulated in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) to determine whether a settlement is fair, reasonable, and adequate.  These factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  *Id.* at 463.

In 2018, however, Rule 23 was amended.  The newly amended Rule 23 enumerates four factors for a court to consider in evaluating a settlement: (1) adequacy of representation; (2) existence of arm's-length negotiations; (3) adequacy of relief, and (4) equitableness of treatment of class members.  Fed. R. Civ. P. 23(e)(2).  The advisory committee describes the first two of these factors as "procedural" and the latter two as "substantive."  Although Rule 23 contains these new factors, "[t]he Advisory Committee Notes to the 2018 amendments indicate that the four new Rule 23 factors were intended to supplement, rather than displace the[] *Grinnell*" factors."  *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019).

The FLSA does not set forth a prescribed procedure for preliminary approval of a FLSA collective.  Both under statute and well-settled law in this Circuit, "stipulated dismissals settling FLSA claims with prejudice require the approval of the district court or the [Department of Labor] to take effect."  *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015).  "Consequently, 'the [P]arties must satisfy the Court that their agreement is fair and reasonable'".  *Zekanovic v. Augies Prime Cut of Westchester, Inc.*, 2020 WL 5894603, at *1 (S.D.N.Y. Oct. 5, 2020) (quoting *Penafiel v. Rincon Ecuatoriano, Inc.*, 2015 WL 7736551, at *1 (S.D.N.Y. Nov. 30, 2015)).  However, with respect to the collective element of the FLSA action, the "standard for approval of an FLSA settlement is lower than for a class action under Rule 23."  *Viafara v. MCIZ Corp.*, 2014 WL 1777438, at *8 (S.D.N.Y. May 1, 2014).  "Because, under the FLSA, 'parties may elect to opt in but a failure to do so does not prevent them from bringing their own suits at a later date, FLSA collective actions do not implicate the same due process concerns as Rule 23 actions."  *Id.* (quoting *McKenna v. Champion Intern. Corp.*, 747 F.2d 1211, 1213 (8th Cir. 1984)).

B.  The Fairness of the Settlement Process and the Aggregate Settlement Consideration

The proposed settlement has the hallmarks of an arms'-length agreement reached between experienced and qualified counsel who adequately represented the class during the litigation and after sufficient discovery.  It also appears, on its face and without the benefit of any objections, that the settlement consideration is adequate after taking into account the costs, risks and delay of trial and appeal.

Plaintiff has addressed each of the *Grinnell* factors.  Some of the most salient are the following:  First, litigation of this case to conclusion would be complex, costly and long.  Dkt. No. 166 at 11.  The Court already had received briefing with respect to the discovery issues.  If the case were not settled, the Court would have to resolve that issue and the parties would have to take the discovery that arises once that dispute has been resolved.  In addition, the party depositions that would be necessary before this case is resolved as well as expert discovery, class certification, and ultimately trial would impose significant costs to both parties.  Second, though the Court does not have information about the reaction of the class to the settlement because notice has not yet been provided, the parties have taken enough discovery for counsel to "adequate[ly] appreciate[] the merits of the case before negotiating."  *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013) (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004)).  Plaintiff's counsel represents that he conducted in-depth interviews with the Plaintiff, other class representatives, and potential class members prior to agreeing upon the settlement.  He also represents that he obtained and reviewed data from Defendants with respect to the class members including a sampling of time and payroll records and same wage statements for other class members, a list of 460 potential class members who worked for Defendants at any time between December 2011 and May 2019 and a sampling of employment

13

records for other employees.  Dkt. No. 166 at 20.

Plaintiffs' case also was subject to considerable risk as to liability and damages, in addition to the risk (discussed below) that any judgment might be uncollectible.  Dkt. No. 166 at 21-22.  In particular, documents produced by Defendants indicate, among other things, that contrary to Plaintiffs' position, Defendants paid the proper overtime rate for hours worked in excess of 42.5 hours (and Defendants claim that their policy was a result of paying employees for a 30-minute meal break) and Defendants' recent invoices inform customers that the administrative fee that Defendants charge is not a tip thus potentially defeating Plaintiff's claim that customers believe the surcharge to be a tip that was not passed onto the employees.  *Id.* Although Plaintiffs claim to have answers to these arguments, it is clear that the evidence produced by Defendants demonstrates litigation risk.  Finally, particularly given the length of the proposed class period and the variety of the putative class members, there is a risk that the Court might not certify a class and—even if it certified a class and permitted a FLSA collective, those organizational vehicles would not survive further discovery and a motion to decertify.  *Id*. at 22-23.

Of particular relevance to the fifth and seventh *Grinnell* factors, and to the settlement more generally, is the impact of the COVID-19 pandemic on the restaurant industry and on Defendants in particular.  As Plaintiffs put it:

> One of the main risks in this lawsuit is the COVID-19 pandemic that has wreaked havoc on the hospitality industry.  Defendants' business has not been open since March 2020, when the New York City-wide lockdown was implemented, and Defendants' counsel has confirmed that it has since permanently closed.  In addition, the main owner and operator of the business, Ricky Eisen, has passed away after long illness.  Dkt. No. 166 at 23.

*See also*, *id.* at 22 ("Defendants' operations have been significantly affected by the COVID-19 pandemic, and the death of Defendants' main owner and operator, Ricky Eisen.  Defendants'

14

business has not been open since March 2020 when the New York City-wide lockdown was implemented, and it has since permanently closed.  Defendants' counsel confirms that Defendants have been unable to identify any potential suitors to purchase their business.  Thus, although Defendants have made provisions to ensure the funding of this agreed-upon settlement, their current financial status weighs heavily in favor of the proposed settlement.").

Thus, taken as a whole, the *Grinnell* factors favor preliminary approval of the settlement.

C.  The Other Rule 23(e)(2) Factors

Although the *Grinnell* factors favor preliminary approval, upon considering of the Rule 23(e)(2) factors, the Court cannot approve the settlement as currently drafted and presented.

Three features of the proposed Settlement Agreement as it has been presented to the Court raise concerns that the rights of the absent class members have been compromised and that the settlement is thus not fair and reasonable as drafted.  The Court discusses those features in turn:

- First, Plaintiffs propose to use as claims administrator Advanced Litigation Strategies ("ALS"), an administrator that operates under the "common control" of Plaintiff's counsel and that is "firm-controlled."  Dkt No. 166, at 13; Dkt No. 169 at 1.

- Second, the timing of the payment of counsel costs and fees and of the Service Awards for Plaintiffs as well as the operation of the penalty provision gives rise to the concern that counsel and several Plaintiffs have an incentive to compromise the rights of the absent class members and will have insufficient incentives to ensure they are paid.  The planned timing of the distributions also raises concerns that all class members will not be treated equitably with respect to one another.

- Third, the proposed notice would be sent to the last addresses of the potential opt-in plaintiffs, a method which may not be sufficient given that potential opt-ins are likely to be transient.

Moreover, none of these concerning provisions are properly viewed in isolation. They operate alongside one another. Both collectively and individually, they convince the Court that the settlement cannot be approved.

1. Choice of ALS as Claims Administrator

The Court is charged with reviewing "any agreement made in connection with the [settlement] proposal." Fed. R. Civ. P. 23(e)(3); *see* Fed. R. Civ. P. 23(e)(2)(C)(iv) (requiring a court to consider "any agreement required to be identified under Rule 23(e)(3) before approving a class action settlement").

Plaintiffs have proposed to use ALS as claims administrator, an administrator that operates under the "common control" of Plaintiffs' counsel. Dkt. No. 171 at 6, 13; Dkt. No. 169 at 1. The claims administrator's role is to receive proofs of claims, respond to class member questions, rule on the validity of claims, conduct hearings on challenges to claims, and order final distribution of the settlement fund. For its services, ALS would be paid a fee of $35,000 from the Settlement Fund immediately. Dkt. No. 167-1 ¶ 1.24.

Plaintiffs' selection of ALS raises two separate concerns, one regarding ethics and the other with respect to the fairness of the fee. In a previous case before Judge Schofield, the same counsel addressed the ethics of a law firm acquiring a non-legal business and employing that non-legal business in connection with its activities on behalf of a client. *Guaman v. 5 "M" Corp., et al.*, No. 13-cv-3820 (S.D.N.Y. Nov. 20, 2014), Dkt. No. 91. There, Plaintiffs' counsel submitted a letter—also submitted here—indicating that it had spoken with the Ethics Hotline,

which had "confirmed that an attorney may own and operate both a law firm and a non-legal business (such as a settlement administration company) simultaneously," and that "engagement in such non-legal business is not prohibited by the Rules of Professional Conduct 5.7, 5.8, or otherwise." Dkt. No. 90 at 1-2. After receiving that letter, Judge Schofield approved the settlement and authorized the use of ALS. Plaintiffs also cite a case from the Eastern District of New York, again with the same plaintiffs' counsel using ALS. *Cabrera v. Glenoak Enterp. LLC, et al.*, No. 14-cv-5599 (E.D.N.Y. June 9, 2016), Dkt. No. 47. There, however, the court did not analyze ALS's relationship to counsel, noting only that "because of their experience in this capacity, Advanced Litigation Strategies, LLC shall serve as the Claims Administrator of the settlement." *Id.* at 2. The Court assumes, for purposes of this decision, that Judge Schofield implicitly determined that there were no ethical issues that presented an insuperable bar to the engagement of a controlled non-legal business there and declines to address that question here, since it is not necessary to the Court's decision.

There is a second set of concerns with respect to the use of a firm-controlled non-legal services business to provide claims administration, however, that is yet to receive judicial attention. The claims administrator was chosen by Plaintiffs' counsel, the law firm that controls it; the fees were negotiated and set by that firm; and, as laid out below, those fees will be paid to the controlled claims administrator from the first dollars of the settlement, without the opportunity for any class member to object and regardless of whether the settlement is approved. Moreover, on the facts here, and as laid out by Plaintiffs, this case has many of the characteristics of a limited fund settlement. Given the apparently dire financial condition of Defendants and the real risk that they may not be able to fund the full settlement, every dollar paid to the claims administrator may effectively come out of the pockets of the putative class members, reducing

their ability to collect any judgment if the settlement is not approved and they choose instead to litigate.  These concerns are distinctive to the selection of an "in-house" claims administrator.

The courts have long been concerned with the potential for conflict between the interests of the class in minimizing the amount of fees that they are charged for a representation and those of class counsel who are interested in earning fees for the representation.  The risk that counsel will favor its own interest in fees over the interests of its client is present in every professional representation; it is policed by the rules of professional conduct and the activities of state disciplinary committees.  *See, e.g.*, N.Y. R. Prof. Conduct 1.5(a) ("A lawyer shall not make an agreement for, charge, or collect an excessive or illegal fee or expense.").

In the class and collective action context, there are additional checks on the risks of excessive billing.  Plaintiffs' counsel is generally paid on contingency, which mitigates the risk of overbilling, and the named plaintiffs are charged with monitoring counsel to ensure that fees are reasonable.  Thus, courts have been vigilant to reject as class representative a person or entity who is not able to police counsel and who might have an interest in counsel's fees.  *See, e.g.*, *Wexler v. AT&T Corp.*, 323 F.R.D. 128, 130 (E.D.N.Y. 2018) ("[C]ourts have long found that a familial (or any other) relationship creates a conflict if it gives the class representative an interest in the fees class counsel might recover."); *In re IMAX Secs. Litig*, 272 F.R.D. 138, 155 (S.D.N.Y. 2010) ("[C]ourts are concerned that 'when a class representative is closely associated with class counsel, he or she may permit a settlement less favorable to the interests of absent class members.'") (quoting *In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 109 (N.D. Ill. 1996)); *Stull v. Baker*, 410 F. Supp. 1326, 1337 (S.D.N.Y. 1976) ("[T]rial courts have found that, when the class plaintiff is so closely allied with the class attorney that he or she might have an interest in the legal fees that the attorney may ultimately seek, there is at least a potential conflict of

interest."); *Fischer v. Int'l Tel. & Tel. Corp.*, 72 F.R.D. 170, 173 (E.D.N.Y. 1976) (class representative's interest in class counsel's fee is "the touchstone for denial of class action status"). "A vigilant class representative will—at least in theory—act as a foil to self-dealing by class counsel." *Wexler*, 323 F.R.D. at 130. Moreover, no award of attorneys' fees—which will come out of a settlement fund and deplete the recovery of the class members—may be made without notice to the absent class members who in the end will be bound by the settlement and without affording those absent class members an opportunity for them to object.

The retention of a claims administrator here affiliated with Plaintiffs' counsel raises similar concerns about conflict of interest, but without the same controls. By virtue of their affiliation with ALS, class counsel here will receive financially some of the benefit of the settlement, regardless of whether it is finally approved. That interest gives rise to the risk that class counsel in agreeing on a fee with ALS was less than aggressive in ensuring that the class would pay no more than strictly necessary to secure the services of a claims administrator. It also gives rise to the concern that class counsel—who would receive a benefit through ALS only if there was a settlement and then would receive that benefit regardless of whether the settlement was approved—was less than aggressive in ensuring that the settlement was the most favorable to the class and the absent class members that could be achieved.

Moreover, the controls that operate to protect against the risk of self-interested conduct by counsel are not present to the same extent in this case, where class counsel's interest is in the claims administrator in addition to its own fees. In the first instance, the Court is mindful that this is a FLSA collective and a NYLL class action. It is always challenging for a named plaintiff to police attorneys' fees, even when that named plaintiff is a sophisticated financial institution or business. It is that much more challenging when the named plaintiffs are bringing FLSA and

NYLL claims against a retail establishment.  *See Lopez v. Nights of Cabiria,* LLC, 96 F. Supp.

3d 170, 179 (S.D.N.Y. 2015) ("Among the people who require the protection of the FLSA are

workers who are poorly educated and non-English speaking.  Some of these workers may have

an understandable aversion to courthouses and lawyers.  At the same time such persons are

especially vulnerable to workplace exploitation and have much to gain from the diffusion of

information about their employment rights.").  There is little reason to believe that the Plaintiffs

here, who are drawn from the same class as the absent class members and members of the FLSA

collective, are that much more sophisticated or able to guard against an excessive claims

administrator fee.  In addition, the Plaintiffs will labor under the difficulty of making the

decision without the disinterested advice of their counsel, who—as noted—has an interest in the

claims administrator.  In any event, there is no evidence that the Plaintiffs had any substantive

involvement here in the selection of ALS.[3]

Additionally, the controls that exist with respect to attorneys' fees are simply not present

when the financial interest comes through the claims administrator.  The claims administrator

will incur its costs only once there is a settlement and will be paid regardless of whether the

settlement is approved.  It thus does not have the inherent interest in controlling costs that class

counsel—who operate on a contingent basis and take the risk that they may never receive

payment for their efforts—have in litigating a case.  Although a court must approve the claims

administrator's fee in approving the settlement, there is a less well-developed body of law and

basis of comparison for claims administrator fees than for legal fees, where a court is able to

draw on its own experience and observations as to how the case has been litigated.  Additionally,

---

[3] For reasons discussed below, the incentive payments to the six plaintiffs raise further concerns
about the interest and ability of those persons to guard against a settlement that results in an
excessive payment to the claims administrator.

Case 1:17-cv-09541-LJL   Document 174   Filed 10/21/20   Page 21 of 33

and importantly, the Court is confronted with the requirement of approving the claims administrator's fees and diminishing the settlement pot (and the pot potentially available to the victorious plaintiff if the settlement is rejected) before notice has even been sent to the putative class and without the benefit of any objections that the absent class members or members of the FLSA collective might make.  Those persons will only *get* notice if the court approves the claims administrator's fee.

Those concerns are only heightened here where: (1) at least a partial justification of the settlement amount, and its size, is that Defendants will not be able to pay more than $285,000 and the parties have expressed concern that they might not even be able to pay that (or more than $100,000); (2) the $35,000 fee is a large portion of the first $100,000 that will be paid and the Settlement Agreement has a feature—discussed below—that provides no incentive for counsel to continue to insist that Defendants satisfy the settlement after that $100,000 has been paid; (3) the payments to the Class Members are small both as an absolute matter and in relation to the claims administrator's fee, and the class is large, giving each putative class member less of an incentive to challenge the claims administrator's fee (because any reduction of that fee would result only in a very small benefit to any individual putative class member); and (4) the fact that the class members are transient and that notice, while constitutionally adequate, might not reach every putative class member who will be bound.

In comparable circumstances, where a fiduciary engages in a self-interested transaction, the courts engage in an entire fairness review.  There is no per se rule against self-interested transactions.  They can be efficient and in the interests of the principal but the fiduciary must show it acted with "utmost good faith and the most scrupulous inherent fairness of the bargain." *Valeant Pharmaceuticals Intern. v. Jerney*, 921 A.2d 732, 746 (Del. Ch. 2007).  The standard

requires a court to assess fairness "based on all aspects of the entire transaction." *In re John Q. Hammons Hotels Inc. Shareholder Litig.*, 2009 WL 3165613, at *13 (Del Ch. Oct. 2, 2009).  In general, a court will look to ensure both that the process that led to the deal was fair and that the ultimate price paid was also fair.  *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011); *see also* Restatement (Third) of Agency § 8.06(2) ("An agent who acts for more than one principal in a transaction between or among them has a duty to deal in good faith with each principal . . . [and] otherwise to deal fairly with each principal."); 4 Newberg on Class Actions § 13:2 (15th ed. 2020) ("The process by which the settlement is negotiated is a factor in a court's consideration of whether to grant final approval to the settlement.  That is so because one of the primary fears in class settlements is that class counsel have undersold the class's claims in return for a more generous fee for themselves.  Judges scrutinize the settlement process because its nature might provide information bearing on the sell-out concern.").

Plaintiffs have submitted insufficient evidence that would satisfy that standard.  Counsel avers that it finds the use of ALS "more efficient, more streamlined, and more productive and less risk of having errors from third-parties that I can't control in order to conduct the administration through our own affiliates," Dkt. No. 172 at 3:19-23, and that "lately, as most administration company staff are working from home due to the pandemic, even the most well known administration companies have made errors in administering settlements for Lee Litigation Group's class settlements this year, including failure to timely serve CAFA notices and failure to notify counsel of defendants' payment defaults, causing a significant delay in default and enforcement proceedings."  Dkt. No. 171 at 6.  There is no evidence that—even if it were true that ALS was less error-prone and more efficient than its competitors—those benefits would be worth what the putative class is, in effect, paying.  There is no evidence that the fee

ALS quoted was the product of a negotiation.  At the status conference, further, Plaintiffs

conceded that they did not seek offers from other claims administrators or engage in any

competitive bidding process before proposing the $35,000 fee to the Court.  Dkt. No. 171 at 6-7.

Moreover, although Plaintiffs' counsel identified that the fee here is comparable to that which

ALS charged in other cases in which Plaintiff's counsel represented the putative class, there is no

evidence that those fees were negotiated at arms' length or otherwise represented fair value for

the putative class.

      These concerns have been only partially allayed by the quotes that Plaintiffs' counsel has

presented from unaffiliated vendors at the behest of the Court.  Plaintiffs have solicited and

submitted to the Court bids from three claims administrators: Epiq, Arden Claims Services, and

CPT Group.  Epiq estimates that it would charge $44,749, Arden estimates $38,000, and CPT

Group estimates $24,903.05.  Dkt. No. 171-3.  Advanced Litigation Strategies offers an estimate

of $35,631.  Plaintiffs observe that, while one of the provided quotes "is lower than the

Advanced Litigation Strategies estimate, parties are not required to select an administrator based

only on the lowest possible administration fee quote. Sometimes you get what you pay for."

Dkt. No. 171 at 7.

      The line items in Advanced Litigation Strategies' estimate are roughly comparable to

those provided by Epiq and Arden Claims Service.  The large discrepancy between CPT Group's

quote and the other three quotes is primarily due to the estimated cost of paying the project

manager.  CPT Group estimates that it will pay the Project Manager for five hours of work at

$95 per hour for a total of $475.  Dkt. No. 171-3 at 10.  Advanced Litigation Strategies estimates

that it will pay $175 per hour for sixty hours of work, for a total of $10,500.  Dkt. No. 169-2.

CPT Group's quote is substantially lower, apparently because it assumes a far lower estimate for

the amount of labor that distributing the fund will entail.

Plaintiffs have put forth no reason sufficient to justify a $10,000 difference in the cost of claims administration, especially for the distribution of a settlement fund as small as this one. For this reason, the Court will not grant preliminary approval for the use of ALS as claims administrator at this time.  In order for Plaintiffs to show the use of ALS is appropriate, Plaintiffs must negotiate an arrangement with ALS at a lower fee and demonstrate why the arrangement is entirely fair to the class.

2.  The Timing of Payments and the Penalty Provision

Fed. R. Civ. P. 23(e)(2)(C)(iii) requires a court to consider "the terms of any proposed award of attorney's fees, including timing of payment" and Fed. R. Civ. P. 23(e)(2)(D) requires a court to consider whether the proposal treats class members equitably relative to each other.  *See GSE Bonds*, 414 F. Supp. 3d at 698 ("Consideration of this factor 'could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear upon the apportionment of relief.'") (quoting 2018 Advisory Committee Note).

The Court may defer some of these issues to a later date.  The Settlement Agreement reserves to the Court the determination of an award of attorneys' fees and costs and expenses to be paid out of the Gross Settlement Amount.  Although Defendants agree not to oppose an application for a fee award of 1/3 of the Gross Settlement Amount ($95,000) plus additional costs and expenses, the agreement makes clear that the approval of that fee award or of any other fee award is not a condition of the settlement.  It provides: "The substance of Class Counsel's application for attorneys' fees, expenses and costs is to be considered separately from the Court's consideration of the fairness, reasonableness, adequacy, and good faith of the settlement of the

Litigation" and that "[t]he outcome of any proceeding related to Class Counsel's application for attorney's fees, expenses and costs shall not terminate this Agreement or otherwise affect the Court's ruling on the Motion for Final Approval." Dkt. No. 167-1 § 3.2. "Any reduction in attorneys' fees and expenses shall automatically be applied to the Net Settlement Amount to be distributed to Class Members." *Id.* § 3.2(C).

Likewise, although the Settlement Agreement contemplates the size of the service awards that may be rendered to each of six Plaintiffs, the size of those awards too—and whether they would result in class members being treated inequitably relative to one another—can be deferred to a later date. The Settlement Agreement provides that Defendants will not oppose an application to be made to the Court by each of the six Plaintiffs for a service award of $5,000 each (or a total of $30,000) and that, in exchange, each of those six Plaintiffs agree to provide a general release. *Id.* § 3.3. However, the Settlement Agreement also makes clear that "[t]he application for Service Awards is to be considered separately from the Court's consideration of the fairness, reasonableness, adequacy, and good faith of the settlement of the Litigation" and that "[t]he outcome of the Court's ruling on the application for Service Awards will not terminate this Agreement or otherwise affect the Court's ruling on the Motion for Final Approval." *Id.* § 3.3. "Any reduction in attorneys' fees and expenses shall automatically be applied to the Net Settlement Amount to be distributed to Class Members." *Id.* § 3.3(C).

The timing of those payments to each counsel and the identified plaintiffs, as well as to the claims administrator, however, is a structural feature of the Settlement Agreement that is not severable from the remainder of the Settlement Agreement and that therefore must be addressed in considering the fairness, reasonableness, adequacy, and good faith of the settlement as a whole. *See, e.g.*, *Hart v. BHH, LLC*, 334 F.R.D. 74, 77 (S.D.N.Y. 2020) (rejecting a settlement

agreement because it included a "quick-pay" provision, under which counsel would be paid before the absent class members).

The Settlement Agreement has several striking features. Apparently in light of Defendants' strained financial condition, it provides for the settlement fund to be paid in installments. The sum of $100,000 is to be paid no later than 30 days after the execution of the Settlement Agreement. Thereafter, $30,833.33 is to be paid into the escrow account of the Settlement Administrator every month beginning as of January 1, 2021 until either (i) the entire Settlement Amount has been funded or (ii) if a lesser amount is determined to be sufficient to satisfy all required distribution, such less amount has been funded. Dkt. No. 167-1 ¶ 3.1 (B).

Moreover, the Settlement Administrator fees, court-approved counsel costs, court-approved attorneys' fees, and court-approved service awards are all to be paid before the individual settlement allocations are paid to the authorized claimants and opt-ins and absent class members. Thus, the Settlement Agreement directs the Settlement Administrator to make distributions in the following order: "(1) Paying the Settlement Administrator's total fees; (2) Paying Class Counsel's Court-approved costs; (3) Paying Class Counsel's Court-approved attorneys' fees; (4) Paying Court-approved service awards; (5) Paying Authorized Claimants their Individual Settlement Allocations. …" *Id.* ¶ 2.10.

Finally, if Defendants fail to pay the full amount required under the Settlement Agreement within the scheduled time, "Plaintiff [sic] may, on ten (10) days written notice, retain $100,000 of the funded amount, as legal and administration fees incurred in obtaining preliminary approval of the class settlement, and revert the lawsuit to its previous position as if no settlement has been attempted, unless Defendants cure the shortfall before the ten (10) day notice period expires." *Id.* ¶ 3.1(B) (the "penalty provision").

These provisions create the very real possibility that the $100,000 fund will be depleted through the payment attorneys' fees, administration fees, and service awards, leaving nothing in the settlement fund to go to the absent class members and no incentive for anyone—either counsel or named plaintiffs—to fight for them either to compel Defendants to fund the remainder of the settlement fund or to litigate on their behalf if Defendants choose not to pay.  The point can be demonstrated through simple math.  Counsel has indicated it will request attorneys' fees of 1/3 of the Gross Settlement Fund or $95,000 *plus* costs and expenses.  Added to that is the $35,000 to the claims administrator.  Even assuming that the Court were to grant a fee award of one-quarter of the gross settlement amount, the fees would be over $70,000.  Given the incentive payments to Plaintiffs discussed below, there is virtually no award that the Court could make for attorneys' fees that would not exhaust the $100,000 escrow.  In that circumstance, Counsel—with no skin in the game—would have no financial incentive to chase the remaining $185,000.  Nor would Defendants presumably have much of an interest in paying it.  Plaintiffs are providing a release in exchange for defense counsel's agreement not to oppose their application for a service award.  The only repercussions for Defendants of not doing so would be that the case would revert to its position before the settlement but this time without Plaintiffs to pursue it.

Quick-pay provisions, under which counsel gets paid at least a portion of their fees before any payments are made to class members have been the topic of judicial interest in the past.  On the one hand, the payment of at least a portion of the fee before class members are paid is a deterrent to "the filing of baseless objections (and appeals), which can delay payment of class relief."  *Hart*, 334 F.R.D. at 77; *see also* 2 McLaughlin on Class Actions § 6:24 (16th ed.  2020) ("In order to discourage the filing of baseless objections in the hope of obtaining a fee, some

class action settlement agreement include a negotiated 'quick pay' provision, which provides for payment of court-awarded attorneys' fees to class counsel upon trial court approval of the settlement (*i.e.* altering the usual practice of no fee payment until all available appeals of the approval of a class action settlement are exhausted.")). On the other hand, courts have expressed the concern that once counsel were paid, they would have "no further incentive to pour further resources into [the] litigation" and that allowing counsel to be paid before the class would harm the class by leaving class counsel with no incentive to protect the fund on behalf of the class. *Hart*, 334 F.R.D. at 77-78.

The priority of payments and penalty provisions here raise the same concerns as a quick-pay provision but in a more aggravated form and without its benefits. Under those provisions, counsel will be paid the entirety of its fees and costs, the claims administrator will be paid the entirety of its fees, and six of the plaintiffs will be paid their service awards before any absent class member is paid a penny from the settlement. Moreover, as the parties have made clear, those sums will come not from a defendant flush with cash but from a retail institution that—by virtue of the payment of the first $100,000—may be left close to judgment-proof.

It thus is no answer for counsel to assert that it would remain committed to the absent class members under the current settlement structure. The fact is that if counsel is paid in whole from the first $100,000 they will no longer have an interest in pursuing the remaining $185,000 on behalf of the class. They will not benefit from the receipt of any of that $185,000. Having been paid for all of their efforts in this case, they also will not have much of an interest in continuing to pursue the Defendants for FLSA and NYLL claims. At least, they will not have an interest distinguishable from any other counsel who has not invested in the case. The corporate defendant, who is out of business and who claims soon to be judgment proof, will be deprived of

assets by which it could pay the absent class members who would remain in a failed settlement if those absent class members were to prevail.  The absent class members would be left with worthless claims.

In supplemental briefing, Plaintiffs' counsel suggested that, "[i]f the Court is not comfortable with the penalty going to Plaintiffs' counsel, as an alternative, Plaintiff proposes that, after deduction of the administrator's fees of $35,000, the $65,000 penalty balance be paid as a *cy pres* donation to a charity selected by the Court."  Dkt. No. 171 at 5-6.  That proposal does not go far enough in addressing the Court's concerns.  To be sure, the Second Circuit has authorized the use of *cy pres* awards in the class action context.  *See, e.g.*, *In re Citigroup Inc. Secs. Litig.*, 199 F. Supp. 3d 845, 848 (2d Cir. 2016); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007).  Those awards are commonly made when a settlement amount is paid in full and there are funds left over after all class members have been paid.  *Id.*  Plaintiffs' proposal also would address the Court's concern that counsel continue to have skin in the game to chase the full amount of the settlement on behalf of the absent class members.  But, if Defendants do not pay the full settlement amount, the Court sees no reason why the funds that are unpaid should go to a charitable organization rather than (according to the formula addressed in the Settlement Agreement) to the members of the class and collective who were underpaid and, perhaps, consistent with quick pay awards that have been approved in this district, to satisfy counsel expenses and perhaps a small percentage of a fee award.  If it turns out that such allocation would result in settlement awards to each absent class member too small to make it efficient for them to be distributed, the parties can then address the Court on whether to revise the plan of allocation.

Finally, as to the Service Awards, the Court agrees with Plaintiffs that there is no need

now for the Court to approve or disapprove the requested Service Awards, "but rather to simply preliminarily and conditionally certify the settlement in order for notice of the settlement and its terms (including the service awards) to issue to the Class." Dkt. No. 171 at 3.  Then, absent class members can object to the amount of service awards at the fairness hearing.  *Id*.  It also recognizes that the disparate treatment to be accorded to those plaintiffs who will receive service awards, different from that accorded to absent class members, can be justified by the interest in "compensat[ing] the Named Plaintiffs for their willingness to serve the Class, the service they rendered, risks they bore, and opportunities sacrificed to ensure a favorable class settlement" and that "[i]n a wages and hours case, where a low level employee assumes responsibility for prosecuting an action against an employer and takes considerable personal risk in so doing, such awards are singularly appropriate."  *Henry v. Little Mint, Inc.*, 2014 WL 2199427, at *10 (S.D.N.Y. May 23, 2014); *see also Parker v. Jekyll & Hyde Entm't Holdings, L.L.C.*, 2010 WL 532960, at *1 (S.D.N.Y. Feb. 9, 2010) ("Enhancement awards for class representatives serve the dual functions of recognizing the risks incurred by named plaintiffs and compensating them for their additional efforts."); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 201 (S.D.N.Y. 1997) ("The guiding standard in determining an incentive award is broadly stated as being the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claims, and, of course, the ultimate recovery.").

However, "[p]ayments to class representatives . . . should be closely scrutinized." *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007).  "If class

representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989). The same concerns with respect to the full payment of an attorney fee award ahead of any payment to the absent class members also exists with respect to the payment of a service award. If the notion is to be indulged that it is a named plaintiff that drives litigation rather than counsel, then that named plaintiff must continue to have some incentive to drive counsel on behalf of the absent class members. That incentive is created when the named plaintiff shares with the absent class members the interest in the collection of the full settlement amount. If the settlement is reproposed, Plaintiffs may propose that the plaintiffs receiving service awards be paid a small percentage of any such award. Moreover, in order to ensure that absent class members have the opportunity to object and that court has an informed view based on any objections, the notice should include language indicating that class members may object to the service awards at the fairness hearing.

      3.  Adequacy of Method of Notice

      The Court also raised concerns about notice. The proposed settlement would require Defendants to provide last known addresses of persons employed by them from December 5, 2011 to May 29, 2020. Dkt. No. 167-1 ¶¶ 1.5, 2.4. The proposed settlement would also require the claims administrator to mail notice to all class members within 30 days of the entry of preliminary approval of the settlement. *Id*. ¶ 2.4. "The Settlement Administrator [would] take all reasonable steps to obtain the correct address of any Class Members for whom a Notice is returned by the post office as undeliverable, and [would] attempt a re-mailing to any member of the Settlement Class for whom it obtains a more recent address." *Id*.

Under the due process clause of the Constitution, absent class members are entitled to notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Mail to the last known address typically meets this standard. *See, e.g.*, *McBean v. City of New York*, 2012 WL 3240600, at *2 (S.D.N.Y. Aug. 6, 2012) ("[N]otice by mail sent to the last known address of the absent class member meets the due process requirement of notice through reasonable effort" (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 369 (S.D.N.Y. 1996)). However, the Court's role in giving preliminary approval to a settlement is to ensure that the procedures are fair, reasonable, and adequate. In this case, class members are likely to be transient and mail to the last known address may not be the best way to reach them. This issue is especially concerning here, where there are substantial reasons to suspect that the claims administrator may not be fully incentivized to get notice to all class members and Defendants may have incentives not to provide a full list.

Plaintiffs ask that the order require Defendants to provide all contact information including telephone numbers and email addresses. The Court agrees that Defendants must provide this information as well as any social media information. If the settlement is reproposed, the claims administrator will directly attempt to reach class members by all means available, including mail, telephone, text, social media and email. *See Zhongle Chen v. Kicho Corp.*, 2020 WL 1900582, at *9 (S.D.N.Y. Apr. 17, 2020) (ordering production of social media handles as a means of providing notice to potential opt-in plaintiffs in a FLSA action); *Lijun Geng v. Shu Han Ju Restaurant II Corp.*, 2019 WL 4493429, at *21 (S.D.N.Y. Sept. 9, 2019) (ordering defendants to produce social media usernames for dissemination of notice); *Knox v. John Varvatos Enterps.*

*Inc.*, 282 F. Supp. 3d 644, 667 (S.D.N.Y. 2017) (authorizing notice to potential opt-in plaintiffs through email).

## CONCLUSION

The Court recognizes that counsel worked hard to achieve this settlement and also recognizes the challenges when the Defendant may soon be on the verge of being judgment-proof.  Nonetheless, the Court has an obligation to ensure the settlement is fair and reasonable and complies with due process.  For the foregoing reasons, the Court concludes that it does not.

The motion to approve the proposed settlement as submitted is DENIED without prejudice to the submission of a revised settlement consistent with this opinion.

SO ORDERED.

Dated: October 21, 2020
      New York, New York                LEWIS J. LIMAN
                                       United States District Judge